# EXHIBIT 1

1  MELINDA HAAG (CABN 132612)
   United States Attorney
2
   MIRANDA KANE (CABN 150630)
3  Chief, Criminal Division

4  JOHN N. GLANG (GUAMBN 94012)
   Assistant United States Attorney
5
       150 Almaden Boulevard, Suite 900
6      San Jose, CA 95113
       Telephone: 408-535-5084
7      Fax: 408-535-5066
       E-Mail: john.glang@usdoj.gov
8
   Attorneys for Plaintiff
9

10                 UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12                      SAN JOSE DIVISION

13

14  IN THE MATTER OF THE                )   AFFIDAVIT OF FEDERAL BUREAU OF
    APPLICATION OF THE UNITED           )   INVESTIGATION SPECIAL AGENT
15  STATES FOR AN ORDER                 )   TERRY J. ALBURY IN SUPPORT OF
    AUTHORIZING THE INTERCEPTION OF )       APPLICATION
16  WIRE AND ELECTRONIC                 )
    COMMUNICATIONS                      )
17  _____    )   (UNDER SEAL)

18

19

20

21

22

23

24

25

26

27

28

                              1

**TABLE OF CONTENTS**

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.   APPLICATION, IDENTIFICATION OF TARGET TELEPHONE, AND LIST OF TARGET OFFENSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    B.   GOALS OF THE INVESTIGATION . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    C.   BASIS FOR FACTS CONTAINED IN AFFIDAVIT . . . . . . . . . . . . . . . . . . . . 16

    D.   PERSONS WHO MAY BE INTERCEPTED (THE INTERCEPTEES) . . . . . . 17

    E.   PRIOR APPLICATIONS IN THIS INVESTIGATION . . . . . . . . . . . . . . . . . 18

    F.   SUMMARY OF INITIAL INVESTIGATION . . . . . . . . . . . . . . . . . . . . . . . 19

    G.   ANALYSIS OF GAMBLING MACHINES BY FBI FORENSIC EXAMINER JAMES DUNLAP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

II.   STATEMENT OF FACTS REGARDING THE INVESTIGATION AND PROBABLE CAUSE TO BELIEVE THAT THE TARGET TELEPHONE IS BEING USED TO FACILITATE AND TO COMMIT THE TARGET OFFENSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    A.   CONFIDENTIAL SOURCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

    B.   UNDERCOVER AGENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

    C.   PHYSICAL SURVEILLANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

    D.   TRASH SEARCHES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

    E.   MAIL COVERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

    F.   SEARCH WARRANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

    G.   FINANCIAL INVESTIGATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

    H.   POLE CAMERAS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

    I.   GPS VEHICLE TRACKERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

    J.   MEETINGS BETWEEN CONFIDENTIAL SOURCES, AND CO-CONSPIRATORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

    K.   THE TARGET CELLULAR TELEPHONE . . . . . . . . . . . . . . . . . . . . . . . 73

    L.   PEN REGISTER, TRAP AND TRACE ANALYSIS . . . . . . . . . . . . . . . . . . 77

    M.   INVESTIGATIVE CONCLUSIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

III.  NEED FOR INTERCEPTION AND UNAVAILABILITY OF OTHER INVESTIGATIVE TECHNIQUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

TITLE.III.WIRETAPS.TT1.TT2-000414

A. CONFIDENTIAL SOURCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

B. UNDERCOVER AGENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

C. PHYSICAL SURVEILLANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

D. PEN REGISTERS, TRAP AND TRACE DATA, AND TOLL RECORD ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

E. TRASH SEARCHES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

F. MAIL COVERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

G. INTERVIEWS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

H. GRAND JURY SUBPOENAS AND GRANTS OF IMMUNITY . . . . . . . . . . 96

I. ARRESTS AND/OR BUY-BUSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

J. SEARCHES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

K. FINANCIAL INVESTIGATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

L. POLE CAMERAS/CLOSED-CIRCUIT TELEVISION MONITORING . . . . . 101

M. GPS VEHICLE TRACKERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

N. INVESTIGATIVE CONCLUSIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

IV. FINAL MATTERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

A. LENGTH OF INTERCEPTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

B. MINIMIZATION EFFORTS AND PROCEDURES . . . . . . . . . . . . . . . . . . . 105

C. EXPENSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

D. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TITLE.III.WIRETAPS.TT1.TT2-000415

# I. <u>INTRODUCTION</u>

1.      I, Terry J. Albury, Special Agent of the Federal Bureau of Investigation

(hereinafter referred to as "FBI"), being duly sworn, hereby declare as follows:

2.      I am an "investigative or law enforcement officer of the United States" within the

meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States

who is empowered by law to conduct investigations of, and to make arrests for, offenses

enumerated in Title 18, United States Code, Section 2516.

3.      I am a Special Agent of the FBI and have been so employed since 2005. I am currently

assigned to a Violent Crime and Major Offenders squad. I received formal training at the

eighteen (18) week FBI Basic Agent Training in Quantico, VA. The 18-week Basic Academy

included comprehensive, formalized instruction in, among other things: basic narcotic

investigations, drug identification and detection, interdiction, familiarization with United States

narcotics laws, financial investigations and money laundering, identification and seizure of drug-

related assets, organized crime investigations, physical and electronic surveillance, undercover

operations, and counterintelligence and counterterrorism threats.

4.      During the course of my law enforcement career, I have been involved in investigations

of numerous criminal and counterterrorism offenses, including those offenses related to this

current investigation. I have participated in approximately 15 investigations of illicit drug

trafficking organizations, ranging from street-level dealers to major dealers and approximately 30

counterterrorism investigations related to the material support of terrorism and other threats

emanating from state sponsors of terrorism and other loosely affiliated groups. These

investigations have included the use of Confidential Human Sources (hereinafter referred to as

"CS"); undercover agents; the analysis of pen register, trap and trace, and toll records; physical

surveillance; and the execution of search warrants. These investigations have also included the

unlawful importation, possession with intent to distribute, and distribution of controlled

substances, the related laundering of monetary instruments, the conducting of monetary

transactions involving the proceeds of specified unlawful activities, and conspiracies associated

with criminal narcotics offenses. These investigations have resulted in approximately 15 state

TITLE.III.WIRETAPS.TT1.TT2-
000416

and federal prosecutions of individuals who have possessed, imported, or distributed controlled

substances, including cocaine, heroin, methamphetamine, marijuana, and 3,4-

Methylenedioxymethamphetamine (also known as MDMA, or Ecstasy), as well as the seizure of

those illegal drugs and the proceeds from the sale of those illegal drugs. In addition, I was a lead

investigator on a case that led to the successful indictment of a specially-designated global

terrorist and his brother for conspiracy to provide, and providing, material support to terrorists, in

violation of 18 U.S.C. § 2339A and 50 U.S.C. § 1705(b). The primary subject was incarcerated

and sentenced to ten years in prison.

5.      I have worked with approximately 15 criminal program CSs, approximately 10 criminal

program undercover agents, and approximately 15 counterterrorism CSs. I have monitored

approximately 20 meetings and consensual telephone conversations with drug dealers involving

CSs and undercover agents. I have participated in hundreds of hours of surveillance of narcotics

traffickers. During these surveillances, I have personally observed narcotics transactions,

counter-surveillance techniques, and the methods that narcotics traffickers use to conduct

clandestine meetings.

6.      I have participated in approximately 10 state and federal investigations in which court-

authorized wire interceptions were used in narcotics and/or money laundering investigations. I

have utilized the Foreign Intelligence Surveillance Act ("FISA") in support of approximately 10

counterterrorism investigations. During these investigations, I have listened to and deciphered

conversations between narcotics traffickers and terrorists in which they discussed their criminal

activities in coded language, the meanings of which were later corroborated by surveillance

observations or defendants' statements, and I have participated in the seizure of narcotics and

narcotics proceeds that resulted from the monitoring of these types of conversations. In addition,

through the use of the FISA, I gained a great deal of intelligence into the structure and network

used by terrorists to support their activities domestically and overseas.

7.      In connection with these and other cases, I have conducted approximately 10 follow-up

investigations concerning the concealment of assets, money, bank records, etc., and the

identification of co-conspirators through the use of ledgers, telephone records, photographs, and

TITLE.III.WIRETAPS.TT1.TT2-
000417

financial records.  In addition, I have conducted approximately 10 counterterrorism investigations involving terrorism financing, proliferation, and procurement targeting Sunni and Shia extremist groups.

8.      I have participated in approximately three Organized Crime Drug Enforcement Task Force ("OCDETF") investigations.  OCDETF is a task force consisting of multiple law enforcement agencies which jointly investigate large drug trafficking organizations, with an emphasis on prosecution of both drug and drug-related financial crimes, and identification and forfeiture of assets.

9.      I have been involved in the execution of approximately 30 state and federal narcotics-related search and arrest warrants and approximately 10 counterterrorism-related search and arrest warrants.  As a result, I have encountered and become familiar with the various tools, methods, trends, paraphernalia, and related articles used by drug traffickers and trafficking organizations in their efforts to import, conceal, manufacture, and distribute controlled substances.

10.      I have interviewed approximately five drug dealers, users, and CSs and have discussed with them the lifestyle, appearances, and habits of drug dealers and users, the use and meaning of coded language, and the concealment of assets.  I have become familiar with the manner in which narcotics traffickers smuggle, transport, store, and distribute narcotics, as well as how they collect and launder drug proceeds.  I am also familiar with the manner in which narcotics traffickers use telephones, cellular telephone technology, pagers, coded or slang-filled telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations.  I have interviewed approximately 25 counterterrorism subjects and received extensive training on Islamic culture and a plethora of terrorism-related threats facing the United States and its interests.

11.      I have also had discussions with other law enforcement officers and cooperating individuals about the packaging and preparation of narcotics, methods of operation, and security measures which are often employed by narcotics traffickers.  I have examined documentation of various methods in which illicit drugs are smuggled, transported, and distributed.  Through these

6

investigations, I have gained expertise in the use of a variety of law enforcement techniques, including the application and utilization of wire and electronic interceptions, the utilization of CSs and undercover agents, the use of physical surveillance techniques, and various others types of electronic surveillance techniques, such as body wires and transmitters.  Additionally, I have gained knowledge and expertise in the utilization of pen register and trap and trace devices; telephone toll analysis; the analysis of traditional types of records, including financial records, telephone records, and utility records; and nontraditional records, including records routinely maintained by narcotics traffickers listing amounts of drugs delivered and amounts of money owed (pay-and-owe sheets).  I have also gained knowledge and expertise in the collection and identification of drug evidence and the analysis and interpretation of taped conversations obtained by the methods detailed above.

12.     I have also received additional training regarding drug trafficking, money laundering, wire intercept investigations, gang culture, and the manner in which narcotics are used to support terrorism in foreign countries.

13.     In addition to the above, I have spoken to, and worked with, more experienced federal, state, and local narcotics agents and officers.  These agents and officers include FBI Special Agent ("SA") Khanh B. Tang, FBI SA Michael P. McCready, Drug Enforcement Administration ("DEA") SA Anthony J. Herrera, and DEA SA Stephen M. Shidell.  Their combined training and experience in conducting narcotics investigations is approximately 20 years.  FBI SA Khanh B. Tang has experience in conducting physical surveillance, analyzing telephone records, interviewing witnesses, drafting affidavits for wire interceptions, search and arrest warrants, executing search and arrest warrants, and other investigative techniques.  He has received specialized training in drug trafficking, money laundering, and wire interception investigations. He has participated in drug investigations in which court-authorized wire interceptions were used.  As a result, he became familiar with how such criminal organizations use telephones and other communication devices to conduct drug trafficking and their frequent usage of coded language to discuss drug trafficking activities.  He has debriefed numerous defendants, CSs, and witnesses who had personal knowledge regarding major drug trafficking organizations.

TITLE.III.WIRETAPS.TT1.TT2-
000419

1   Additionally, he participated in many aspects of drug investigations, including undercover

2   operations, physical surveillance, and arrests.  He is familiar with drug traffickers' methods of

3   operation including the distribution, storage, and transportation of controlled substances, the

4   collection of drug proceeds, and methods of money laundering used to conceal the nature of the

5   proceeds.  He conducted investigations regarding the unlawful importation, possession, and

6   distribution of controlled substances, as well as related money laundering violations involving

7   the proceeds of specified unlawful activities and conspiracies associated with the distribution of

8   drugs.

9   14.      I have also spoken personally with FBI agents who are well-versed in investigations that

10  target organized crime syndicates in New York City, specifically, criminal activity involving

11  members and associates of La Cosa Nostra.  These agents have participated in investigations of,

12  among other things, racketeering, extortion, illegal gambling, and loan sharking, in violation of

13  18 U.S.C. §§ 1962, 1951, 1955, and 892-894, respectively, and of illegal narcotics distribution,

14  in violation of 21 U.S.C. § 841.  During the course of these investigations and others, they have

15  conducted or participated in wire and electronic surveillance, physical surveillance, the

16  introduction of undercover agents, the execution of search warrants, debriefings of informants,

17  and review of recorded conversations.  This knowledge has been shared with the me and has

18  greatly enhanced my understanding and familiarity with the tactics of organized crime members.

19  15.      In addition, I have spoken with James Douglas Dunlap, an FBI  Forensic Examiner in the

20  Racketeering Records Analysis Unit in Washington, D.C.  Mr. Dunlap received a Bachelor of

21  Arts degree in Psychology from the University of Baltimore in Baltimore, Maryland in 1973.  He

22  was appointed to the Baltimore County Police Department in 1972.  In 1977, he was assigned to

23  the Vice Unit of the Vice/Narcotics Control Section, Criminal Investigative Services.  While

24  assigned as a Detective in the Vice Unit, Mr. Dunlap was responsible for the investigation of

25  vice-related crimes, including illegal gambling (involving sports bookmaking, illegal lottery, and

26  video gambling devices), usurious loan transactions, prostitution, and liquor laws.  Mr. Dunlap

27  retired from the Baltimore County Police Department in October 1994.

28  //

8

16.     Mr. Dunlap commenced employment with the FBI in Washington, D.C. in October 1994 as a Forensic Examiner in the Racketeering Records Analysis Unit.  In 2003, the name of the RRAU was changed to the Cryptanalysis and Racketeering Records Unit ("CRRU").  The CRRU conducts examinations of suspected gambling (including sports bookmaking, illegal lotteries, and gambling devices), usurious loan and extortionate credit transaction, prostitution, and drug records for the purpose of determining whether they are part of an illegal business.  The CRRU attempts to determine the scope, methods of operation, and structural organization of a business as revealed in its records.  The CRRU provides training to federal, state, and local law enforcement agencies throughout the United States and Canada.

17.     Mr. Dunlap has been a member of the Eastern States Vice Investigators Association, which consists of over 450 members from law enforcement agencies from the Eastern part of the United States, specializing in gambling, pornography, prostitution, and narcotics.  Mr. Dunlap has been the Director of Training and Regional Coordinator of the Association.

18.     During Mr. Dunlap's employment with the Baltimore County Police Department, he received training in the area of illegal gambling (including sports bookmaking, illegal lotteries, and video gambling devices), usurious loan transactions, and prostitution investigations from senior vice investigators, Special Agents of the FBI, and investigators from federal, state and local law enforcement agencies.

19.     During his tenure with the Baltimore County Police Department, Mr. Dunlap participated in over 12 court-authorized wiretap investigations of illegal gambling (including sports bookmaking and illegal lotteries).  Mr. Dunlap has been the affiant in more than 40 search and seizure warrants for illegal gambling (including sports bookmaking and illegal lotteries.)

20.     Mr. Dunlap has participated in the execution of over 100 search and seizure warrants for illegal gambling (including sports bookmaking and illegal lottery.)  During the execution of said warrants, Mr. Dunlap answered the telephone at the raided locations and accepted wagers from individuals who were calling the "bookmaker" to place their wagers. Pursuant to the execution of the warrants, Mr. Dunlap has searched, seized, examined, and interpreted illegal gambling (including sports bookmaking and illegal lotteries) records in

9

1   preparation for the issuance of charging documents, pre-trial conferences with prosecutors, and

2   for testimony in subsequent trials.  Mr. Dunlap has been designated as an expert witness in the

3   area of illegal gambling (including sports bookmaking and illegal lotteries) more than 30 times

4   by courts in Maryland.

5   21.    Mr. Dunlap has interviewed individuals involved in illegal gambling (including sports

6   bookmaking and illegal lottery), including bettors, writers, clerks, and bookmakers.  This has

7   provided Mr. Dunlap the opportunity to become very familiar with the methodology used by

8   individuals involved in this illegal activity.  Mr. Dunlap has personally interviewed legal

9   bookmakers and oddsmakers in Las Vegas, Nevada.

10  22.    Mr. Dunlap has shared his extensive knowledge with the me, which has greatly enhanced

11  my understanding and familiarity with the tactics of organized crime members as they pertain to

12  illegal gambling.

13  23.    I have also studied and researched many facets of illegal gambling with a particular

14  emphasis on the history and development of slot machines, ploys and diversions, slot machine

15  characteristics, retention ratio, and video device variations.  One particular report that I have

16  studied extensively is a monograph drafted by retired FBI Special Agent William L. Holmes of

17  the FBI Laboratory in Washington, D.C. entitled "Video Games: Concepts and Latent

18  Influences."  In addition, I have thoroughly read and digested the following reports:

19  •      Illegal Gambling:  An FBI Laboratory Technical Supplement.

20  •      Owner's manual for the Megatouch CRT-260 gambling machine.

21  •      Characteristics of Slot Machines, Video Gambling Games, and Video Amusement
       Games.

22

23  •      Owner's manual for the Lucky 8 Lines gambling machine.

24  •      Gambling machine pay-out.

25  •      Slot Machines, Video Poker, and Video Lotteries versus the Law.

26  •      Megatouch user manual dated 1999.

27  •      Mystery of the Machine by John Wilson of www.casinocenter.com.

28  •      Owner's manual for the Draw Poker II/Dwarf's Den gambling machine.

TITLE.III.WIRETAPS.TT1.TT2-
000422

- Payback percentages and gambling machines.
- United States District Court for the Western District of Pennsylvania civil forfeiture action against 294 gambling devices in case number 85-297.

23.    The knowledge obtained from these reports has greatly enhanced my understanding and familiarity with various facets of illegal gambling and games of chance, and their overall connection and utility to organized crime.

24.    The conclusions and opinions set forth below are based on my experience and training as a Special Agent, my direct participation in this investigation as described below, and conversations with other law enforcement officers, including James Douglas Dunlap, who are familiar with the facts and circumstances of this investigation. Throughout this Affidavit, all sentences that begin with the words "I believe" are based upon this combination.

## A. APPLICATION, IDENTIFICATION OF TARGET TELEPHONE, AND LIST OF TARGET OFFENSES

25.    This affidavit is being submitted in support of an Application which seeks an Order authorizing the interception of wire and electronic communications of the following individuals:

      a.    Lennie Luan Le

      b.    Dung Minh Dinh

      c.    Que Hong Nguyen, also known as "Sarah"

and others as yet unknown, (hereinafter the "Interceptees") to and from telephone number 408-613-0015 (hereinafter referred to as the "**Target Telephone**"), accessed by Device ID or Electronic Serial Number (or "ESN") a000002f9c17c8, a pre-paid Verizon Wireless cellular phone subscribed to TracFone[1], 9700 Northwest 112th Avenue, Miami, Florida 33178, but used by Lennie Luan Le, for a thirty (30) day period pursuant to 18 U.S.C. § 2518.

//

_____

[1] TracFone is a prepaid device provider that utilizes the networks of major cell phone providers to carry their signal. TracFone does not have its own wireless network in the United States. Instead, TracFone purchases wholesale access to the networks of U.S. carriers to support its approximately 11.8 million subscribers. Its devices are sold at retailers such as WalMart with prepaid minutes of service. TracFone is listed as the subscriber of record for the telephone number and no record of the identity of the actual purchaser or user is obtained or maintained.

TITLE.III.WIRETAPS.TT1.TT2-
000423

26.     As a result of my personal participation in this investigation, as well my knowledge and experience as a Special Agent of the FBI and conversations with other agents and state and local officers with whom I have discussed this investigation, I believe that the facts contained in this Affidavit establish that there is probable cause to believe that the Interceptees and others whose identities are presently unknown, are committing, have committed, and are about to commit the federal offenses listed below.  Based upon the investigation as set forth below, I further believe that there is probable cause to believe that the **Target Telephone** has been, is now, and will continue to be used by the Interceptees in connection with and in furtherance of the federal felony offenses listed below, and that the wire and electronic communications to be intercepted will concern the following federal felony offenses (hereinafter, the "**Target Offenses**")[2]:

        a.      Interfering with commerce by threats or violence, or conspiring to do so, in violation of Title 18, United States Code, Section 1951(a);

        b.      Conducting, financing, managing, supervising, directing, or owning an illegal gambling businesses, in violation of Title 18, United States Code, Section 1955[3]; and

        c.      Aiding and abetting the above-mentioned offenses, in violation of Title 18,

---

[2]  While my investigation has revealed that certain members of the Viet Nam (hereinafter referred to as "VN") gang, including Lennie Luan Le, are extensively involved in the distribution of narcotics and money laundering, as of yet, it has not established probable cause to believe that the **Target Telephone** is being used in furtherance of those activities.  As a result, I have not included drug trafficking or money laundering offenses as "Target Offenses" in this Affidavit.  In the event that pertinent conversations concerning these offenses are intercepted over the **Target Telephone**, the court will be advised.

[3]  Title 18, United States Code, Section 1955(a)(1)(i) provides that the term "illegal gambling business" includes as one of its required elements a gambling business which is a violation of the law of the State in which it is conducted.  In this case, the investigation has determined that there is probable cause to believe that the following criminal offenses of the State of California (hereinafter referred to as "CA") have been, and are now being, committed: CA Penal Code Section 330a(a) (possession of a gambling machine within a building); CA Penal Code Section 331 (owner or tenant permitting gambling in house); and CA Penal Code Section 334(a) (fraudulently obtaining money by means of a hidden mechanical device.)

TITLE.III.WIRETAPS.TT1.TT2-
000424

1   United States Code, Section 2.[4/]

2   27.     There is probable cause to believe that the particular wire and electronic communications

3   of the Interceptees and others as yet unknown concerning the **Target Offenses** will be obtained

4   through the interception of wire and electronic communications to and from the **Target**

5   **Telephone**.  In particular, it is expected that the communications to be intercepted will concern

6   the goals of the investigation that are set forth below in subsection B.

7   28.     The requested order is sought for a period of time until the interception fully reveals the

8   manner in which the **Target Offenses** are being committed, or for a period of thirty (30) days,

9   whichever occurs first, pursuant to Title 18, United States Code, Section 2518.

10  29.     Normal investigative procedures have been tried in this investigation and have failed or

11  reasonably appear to be unlikely to succeed if tried or to be too dangerous.  Additional efforts to

12  employ normal investigative techniques reasonably appear unlikely to reveal the full scope of the

13  unlawful activities of the organization, the roles of the individuals involved, or the identities of

14  other participants.  A full and complete statement of the investigative procedures which have

15  been tried and have failed, or which reasonably appear to be unlikely to succeed if tried, or to be

16  too dangerous, is set forth below in the section entitled "Need for Interception and Unavailability

17  of Other Investigative Techniques."

18  30.     I request that the authorization to intercept the wire and electronic communications of the

19  Interceptees occurring over the **Target Telephone** apply to the background conversations

20  intercepted over the **Target Telephone** when it is off the hook or otherwise in use.  The

21  authorization is to apply not only to the **Target Telephone**, but also to any telephone number

22  subsequently assigned to or used by the instrument bearing the same ESN as the **Target**

23  **Telephone**, within the thirty (30) day period of the authorized interception, and to any changed

24  or new ESN assigned to the **Target Telephone** within the thirty (30) day period.  Additionally,

25  because of the mobility of cellular telephones, pursuant to Title 18, United States Code, Section

26  ────────────

27       [4/] Although aiding and abetting is not expressly enumerated as a predicate offense for
    which interception of wire or electronic communications is authorized under 18 U.S.C. § 2516,
28  the FBI is investigating members of the target organization for aiding and abetting those offenses,
    in violation of 18 U.S.C. § 2.

TITLE.III.WIRETAPS.TT1.TT2-
000425

1   2518(3), it is requested that in the event that the **Target Telephone** is transferred outside the

2   Northern District of California, interception may take place even when the **Target Telephone** is

3   located in any other jurisdiction within the United States.  All interceptions over the **Target**

4   **Telephone** will take place in the Northern District of California regardless of the location where

5   the telephone calls are placed.  Accordingly, all interceptions will be heard first in the Northern

6   District of California.

7         **B.  GOALS OF THE INVESTIGATION**

8   31.     The goals of this investigation are:

9           i)     To identify and develop evidence of the manner, scope, and extent that the

10  **Target Telephone** is being used to facilitate and to commit the **Target Offenses** listed above,

11  evidence of which tends to prove the existence of a criminal conspiracy and tends to establish

12  evidence of the identities and roles of the co-conspirators and the precise nature and scope of the

13  illegal activities;

14          ii)     To identify:

15              (a)    The leaders, subordinates, and all members of the VN gang

16                  in Santa Clara County, CA and elsewhere;

17              (b)    The leaders, subordinates, and all members of the target

18                  organization who provide gambling machines and participate in the

19                  collection of extortion payments at Vietnamese-owned and

20                  managed coffee shops in Santa Clara County, CA and elsewhere;

21              (c)    The purpose of collecting extortion payments from Vietnamese-

22                  owned and managed coffee shops in Santa Clara County, CA and

23                  elsewhere;

24              (d)    The relationship and connection between the gambling operation

25                  and the extortion operation of the VN gang;

26               (e)    The methods used by the VN gang to collect and launder the illegal

27                  proceeds derived from their collection of gambling proceeds and

28                  extortion payments;

TITLE.III.WIRETAPS.TT1.TT2-
000426

(f)    The suppliers of gambling machines for the organization;

(g)    The manner in which the members of the VN gang conduct, finance, manage, direct, and own the illegal gambling business;

(h)    The individuals who distribute, service, and collect proceeds from the gambling machines controlled by the organization; and

(i)    The methods used by the organization to collect and launder the illegal proceeds derived from gambling and extortion.

iii)    To identify and develop evidence of the distribution networks used by the Interceptees, and others who are presently unknown, and their co-conspirators, to acquire and distribute illegal extortion payments and illegal gambling machines throughout Santa Clara County, CA and elsewhere;

iv)    To identify and develop evidence of the dates, times, and places of the Interceptees' collection of extortion payments;

v)    To identify and develop evidence of the locations where the Interceptees and their co-conspirators are storing the gambling machines and proceeds of extortion activity;

vi)    To identify and develop evidence of the identities and roles of all of the Interceptees' accomplices, aiders and abettors, co-conspirators, and participants in the identified illegal activities;

vii)    To identify and develop evidence of the distribution and transfer of the vehicles and money involved in those activities;

viii)    To identify and develop evidence of the existence and location of the books and records, computer disks, ledgers, telephone address books, telephone answering devices, photographs, videocassettes, personal data/digital assistants, digital recorders, and all other methods used and documents kept to record the criminal activity, evidence of which supports the existence of a conspiracy, and which provides evidence of the identities and roles of the co-conspirators;

ix)    To identify and develop evidence of the location and source of resources used to finance the Interceptees' and co-conspirators' illegal activities;

15

1    x)  To identify and develop evidence of the location and disposition of the

2 proceeds from those activities;

3    xi)  To identify and develop evidence of the communication facilities, including

4 other cellular telephones, business telephones, residential telephones, pay telephones, digital

5 pagers, fax machines, voice mail systems, and/or computer communication systems

6 commonly used by the co-conspirators to facilitate the activities described herein;

7    xii)  To identify and develop evidence of the methods used to communicate with

8 the co-conspirators and aiders and abettors of the Interceptees, and others as yet unknown, thereby

9 identifying the co-conspirators, financiers, managers, and supervisors, and the precise nature and

10 scope of the illegal activities; and

11    xiii)  To identify and develop admissible evidence of the commission of the

12 **Target Offenses** listed above sufficient to establish proof beyond a reasonable doubt of the intent

13 of each of the participants to join and participate in the conspiracy knowingly and willingly.

14 **C. BASIS FOR FACTS CONTAINED IN AFFIDAVIT**

15 32.  Except where otherwise noted, the information set forth in this Affidavit has been obtained

16 by me or provided, directly or indirectly, by federal law enforcement agents or other law

17 enforcement officers who may have had either direct or hearsay knowledge concerning the

18 information. Unless otherwise noted, wherever in this Affidavit I recount a statement, including

19 written statements, made by another person, that statement is recounted in substance and in

20 relevant part. Statements in quotation marks are based on either preliminary review of recordings,

21 preliminary interpretations made by foreign language interpreters, or preliminary debriefing of

22 witnesses, all of which may be subject to revision. Likewise, information set forth herein

23 resulting from physical surveillance is based on either my personal observations or information

24 provided to me directly or indirectly through other law enforcement officers who also conducted

25 such surveillance. Furthermore, wherever information is attributed to other law enforcement

26 officers or to a law enforcement agency as a whole, and wherever the pronoun "we" is used, I

27 learned the information from speaking with other law enforcement officers and employees and/or

28 by reviewing reports, notes, and other records prepared by them.

TITLE.III.WIRETAPS.TT1.TT2-
000428

33.     This Affidavit is submitted for the limited purpose of seeking authorization for the interception of wire and electronic communications.  As such, I have not set forth each and every fact learned and known to me concerning this investigation.  Facts not set forth or incorporated herein are not being relied upon in reaching my conclusion that an Order should be issued.  I have set forth only those facts that I believe are essential to establish the necessary foundation for an Order authorizing the interception of wire and electronic communications.

### D.  PERSONS WHO MAY BE INTERCEPTED (THE INTERCEPTEES)

34.     This section provides a description of the Interceptees, their known criminal history as it relates to extortion and illegal gambling offenses, and their suspected role in the organization.  The information in this section was obtained from law enforcement databases, surveillances, pen register and trap and trace devices, and/or other investigation described further below in Section II.  Based on the information contained in this Affidavit, I believe that communications by the following persons, and others as yet unknown, concerning the **Target Offenses** will be intercepted if authorization to intercept such communications is granted[5] [6]

    a.      Lennie Luan Le

            Date of birth:  July 24, 1981

            Criminal history:  Convicted in 1998 of murder in the second degree (as a felony) as a juvenile and sentenced to 8 years incarceration in the California Youth Authority.  Convicted in 2004 of bringing drugs into a jail facility as a felony and sentenced to two years in state prison.

---

[5] While Bao Luu has been identified as the leader of the VN gang and the criminal activities that are the subject of this investigation, I have not included him as a named Interceptee in this section because airplane travel records reflect that he traveled to Vietnam during July 2011, and there is no evidence that he has returned to the United States since that time.

[6] This investigation has established extensive evidence that is discussed in this Affidavit that various individuals in addition to the named Interceptees (known as "Target Subjects") are co-conspirators of Lennie Le in the illegal gambling and extortion scheme that is the subject of this investigation.  However, there is no evidence I am aware of that Lennie Le is currently using the **Target Telephone** to contact these Target Subjects, and therefore I have not included them as named Interceptees in this section.  Said Target Subjects include the following individuals: Bao Tuu Luu, Tu Xuan Nguyen, Ho Yong Jung Lee, Tam Thanh Nguyen, Young Ngoc Nguyen, John Vo, and Anthony James Aguas.

TITLE.III.WIRETAPS.TT1.TT2-
000429

1   Convicted in 2008 of possession with intent to distribute marijuana as a felony in United States

2   District Court, Northern District of California, and sentenced to nine months at Cornell

3   Corrections and 12 months of home confinement.  Le is currently on supervised release until

4   October 2013 in that case.

5         b.     Dung Minh Dinh

6              Date of birth:  October 24, 1971

7              Criminal history:  Convicted of vehicle theft as a misdemeanor in 1997 and

8   sentenced to 15 days in jail.  Convicted of reckless driving as a misdemeanor in 2008 and placed

9   on three years probation through January 2011.  Arrested for assault with a deadly weapon in

10  September 2011; no known disposition.

11        c.     Que Hong Nguyen a/k/a "Sarah"

12             Date of birth:  December 12, 1978

13             Criminal history:  Convicted of receiving stolen property as a felony in 1999 and

14  sentenced to 90 days jail; the charge was later reduced to a misdemeanor and dismissed pursuant

15  to California Penal Code Section 1203.4.

16      **E.  PRIOR APPLICATIONS**

17  35.     Based on a search of the FBI and DEA Electronic Surveillance Records (hereinafter

18  referred to as ELSUR) indices conducted on April 27-30, 2012, I have been advised that no other

19  application has been made for the authorization to intercept, or order issued approving the

20  interception of, wire, oral, or electronic communications involving the same persons, facilities, or

21  places specified in this Affidavit, nor that any Interceptee has otherwise been intercepted, except

22  as outlined below.

23  36.     On June 25, 2006, an application was made for an order authorizing the interception of the

24  wire communications of Khanh Trieu Le and others known and unknown, over telephone number

25  707-720-5594.  On June 26, 2006, in Case Number CR-6-90258, the Honorable James Ware,

26  United States District Judge, Northern District of California, signed an order authorizing the

27  interception of the wire communications of 707-720-5594 for a period of 30 days.  On July 31,

28  2006, a renewal order for telephone number 707-720-5594 was signed by the Honorable Jeffrey S.

TITLE.III.WIRETAPS.TT1.TT2-
000430

1   White, United States District Court Judge, Northern District of California, which

2   authorized the interception of wire communications for an additional 30 days.  During execution

3   of that order, wire communications of Lennie Luan Le, who was utilizing phone number 408-821-

4   0088 at that time, were intercepted.  These intercepted conversations pertained to marijuana

5   trafficking activities that Lennie Le engaged in with other Asian males in San Jose, California.

6   **F.  SUMMARY OF INITIAL INVESTIGATION**

7   37.   OCDETF investigative efforts to date involving physical surveillance and

8   reliable confidential source reporting into the extortion and illegal gambling activities of the Bao

9   Luu criminal enterprise ("CE") have identified the following individuals and their associated

10   roles:

11       a.   Bao Tu Luu - He is the leader of the VN and 454 gangs, and controls and receives

12           profits of illegal gambling from Vietnamese coffee shops in San Jose.

13       b.   Lennie Luan Le (a named interceptee)- He is a lieutenant in the VN and 454 gangs.

14           Le directs the installation of illegal gambling machines in Vietnamese cafés

15           throughout San Jose and negotiates and collects cash extortion payments from the

16           café owners on behalf of the Luu CE.  These payments are based on profits derived

17           from the two gambling machines owned by CS 3 and CS 4 inside their café.

18       c.   Dung Minh Dinh (a named interceptee) - He installs and collects extortion

19           payments from Vietnamese cafés throughout San Jose.  Dinh collects cash

20           payments from the owners of the Saó Café that are based on profits derived from

21           the two gambling machines inside the café that are owned by the VN gang.

22       d.   Que Hong Nguyen a/k/a Sarah (a named interceptee) - She installs online sports

23           betting machines in Vietnamese cafés throughout San Jose on behalf of the VN

24           gang.  On December 21, 2011, CS 3 and CS 4 were shown a California Driver's

25           License photograph without identifying information of Que Hong Nguyen.  CS 3

26           and CS 4 positively identified the photograph as "Sarah. i)  Tu Xuan Nguyen - He

27           collects extortion payments from Vietnamese cafés on behalf of the VN throughout

28           San Jose.  In addition, he makes weekly visits to the Sao Café with Dinh to collect

19

1    cash payments for the two VN gang gambling machines that are being operated

2    inside the café.

3    e.    Ho Yong Jung Lee - He controls a group of young Asian males who are used by

4    the VN to intimidate and inflict violence on behalf of the Luu CE.  His targets

5    include noncompliant Vietnamese café owners or rival gangs who refuse to make

6    extortion payments to the Luu CE.

7    f.    Tam Thanh Nguyen - He installs and maintains control of illegal gambling

8    machines throughout San Jose on behalf of the VN.

9    g.    Young Ngoc Nguyen - He installs and maintains control of illegal gambling

10    machines throughout San Jose on behalf of the VN.

11    38.    The primary target of this OCDETF investigation, Bao Tu Luu (hereinafter referred to as

12    "Luu"), is an original member of the Vietnam (hereinafter referred to as "VN") gang since its

13    inception in the early 1990's.  Luu initially committed robberies, burglaries, extortion, and lower-

14    level narcotics trafficking, and eventually became the leader of the VN gang and its ongoing

15    criminal enterprises.  Luu has established a sophisticated, international drug trafficking and money

16    laundering network.  He utilizes high-ranking VN gang members to direct individual branches of

17    the CE and enforce the gang's rules through violent acts.

18    39.    The subject of this Application and user of the **Target Telephone**, Lennie Luan Le

19    (hereinafter referred to as "Le"), controls and directs extortion and illegal gambling activities for

20    the Luu organization.  Le and his associates have utilized the threat of violence to extort money

21    from numerous Vietnamese-owned and managed coffee shops in San Jose, CA (all addresses and

22    intersections throughout this affidavit are in San Jose, CA unless otherwise noted).  Le enforces

23    the rules set by Luu's organization and makes daily and weekly collections of extortion payments

24    from said coffee shops.

25    40.    Within the last several years, Luu has expanded his operations into 454 Life

26    Entertainment, Inc., a music production company of Asian rap music and a front for VN gang

27    activity.  The Luu CE operates a 454 Life Entertainment studio located at 529 North Sixth Street.

28    Intelligence obtained from confidential human sources (hereinafter referred to as "CSs") and

TITLE.III.WIRETAPS.TT1.TT2-
000432

1    OCDETF investigative efforts have identified relationships between Luu and the Hollywood

2    entertainment industry.  Luu has produced recent films in which comedians Rob Schneider and

3    Sacha Baron Cohen have appeared.  Luu's CE also controls various owners of Vietnamese coffee

4    shops in the San Jose area, where he extorts payments based on profits obtained from illegal

5    gambling machines that the VN has required be installed in the premises.

6    41.    Luu's CE has been able to successfully engage in extortion through the use of physical

7    violence and/or the threat of physical violence.  Its modus operandi with coffee shop owners is to

8    demand that they place illegal gambling machines, which Luu controls, into their establishment,

9    and demand cash payments of $2,000 to 3,000 per month per machine by the owners of the coffee

10   shops.  CS intelligence and local law enforcement reports have confirmed that Luu's CE has

11   disrupted and physically destroyed the businesses when coffee shop owners refused to cooperate

12   with his demands.

13   42.    Based on physical surveillance, investigative efforts to date, and CS intelligence, there is

14   probable cause to believe that of the approximately 31 Vietnamese-owned and managed coffee

15   shops located in San Jose, a majority are being extorted and controlled by members of Luu's CE.

16   In making the extortion payments, the owners of the coffee shops are able to keep a percentage of

17   their profits from illegal gambling activities.  If the coffee shop owners refuse to make the

18   extortion payments to the VN gang or install its gambling machines, the Luu CE attempts to shut

19   the business down by intimidating the business owners, creating disturbances in or near the coffee

20   shop, or utilizing violence by members of the VN gang in order to gain compliance.

21   43.    Information that CSs have obtained from Vietnamese coffee shop owners, customers, and

22   the Vietnamese community in San Jose has established that the Luu CE, Le, and his associates are

23   currently collecting extortion payments in excess of $10,000 per month from some of the

24   Vietnamese coffee shop owners.  During a meeting on November 15, 2011 with CSs who own

25   and manage a Vietnamese coffee shop in San Jose (identified below as "CS 3" and "CS 4"), Le

26   referred to himself as a "Lieutenant" within the VN.  One of the coffee shops that has been

27   making weekly payments to the VN gang is the Sao Café, 1054 Story Road.  Le, Dung Dinh, and

28   Tu Xuan Nguyen visit the Sao Café weekly to collect payment from the profits earned from four

TITLE.III.WIRETAPS.TT1.TT2-
000433

1  gambling machines that were installed in the café during November 2011.[2]

2  44.    During the course of the investigation, several CSs were developed who provided

3  information regarding the activities of the VN gang.  On September 22, 2010, a meeting was held

4  with the owner of a Vietnamese coffee shop in San Jose (hereinafter referred to as "CS 1").  CS 1

5  identified Luu as the leader of two Vietnamese gangs in San Jose:  the VN and 454.  CS 1 also

6  stated that Luu was resorting to the extortion of money from Vietnamese coffee shops in San Jose

7  because Luu's music label (454 Life Entertainment) had not been as profitable as Luu had

8  expected.

9  45.    During the September 22, 2010 meeting, CS 1 stated that Lennie Le was Luu's second-in-

10  command for the VN gang.  A few weeks prior to the meeting with CS 1, a group of Vietnamese

11  males entered his/her coffee shop and stated that it was time to "pay up."  An unidentified

12  spokesman for the group stated that they were sent on behalf of Luu.

13  46.    CS 1 stated that approximately 30 minutes after receiving a text from Luu, he/she received

14  a phone call from Le.  A meeting was arranged and Le told CS 1 that the VN gang expected 25

15  percent of the profits from the CS's coffee shop.  In addition, Le informed CS 1 that the VN gang

16  would be placing illegal gambling machines into his/her coffee shop and CS 1 would be forced

17  into an agreement regarding how much of the profits from the machines would go to the VN gang

18  and how much CS 1 could keep.

19  47.    During October 2010, CS 1 received a series of text messages from Le inquiring about

20  his/her location.  Le stated that he was near CS 1's shop and wanted $1,000.  After CS 1 stated

21  that he/she was not at his/her coffee shop, Le stated that he would be sending low-level VN gang

22  members to CS 1's shop that night to collect the money that CS 1 owed to the VN.  According to

23  CS 1, that evening, four Vietnamese males entered the coffee shop and collected the extortion

24  payment from CS 1.  An unidentified spokesman for the group advised CS 1 that they did not

25

26    [2]   The Sao Café is open seven days a week and the gambling machines inside it have

27  been in continuous operation since their installation during November 2011.  As a result, the
    illegal gambling business that is the subject of this investigation "has been or remains in

28  substantially continuous operation for a period in excess of thirty days," within the meaning of 18
    U.S.C. § 1955(b)(1)(iii).

TITLE.III.WIRETAPS.TT1.TT2-
000434

know anything about why they were collecting the money, and were merely assigned to the task by the "big guys." CS 1 stated that he/she understood the "big guys" to be Bao Luu and Lennie Le.

48.     During a meeting with CS 1 on October 26, 2010, he/she advised law enforcement that prior to paying Le during October 2010, Le mentioned that he was collecting $2,500 from various Vietnamese coffee shops throughout San Jose. However, because Le considered CS 1 to be a friend, Le stated that he would only be collecting $1,500 from him/her. Ultimately, CS 1 paid Le $1,000. Another Vietnamese coffee shop owner ("CS 2") accompanied Le to this meeting. CS 2 stated that he/she also made a $1,000 payment to Le. According to CS 1, following this payment, CS 1 and CS 2 received word that Luu asked Le to leave CS 1 and CS 2 alone.

49.     During a meeting with CS 3 and CS 4 on May 3, 2011, CS 3 stated that during November 2010, Le had approached him/her with a business proposition to be representatives for the VN gang and to go to other Vietnamese coffee shop owners in the San Jose area to talk to them about gambling machines. CS 3 and CS 4 declined Le's offer because they were unwilling to engage in criminal activity, and because of their first-hand knowledge of the violent propensities of the VN gang and their fear of what might happen to them in the event they did not cooperate with the VN. Le advised CS 3 and CS 4 that they would be expected to pay the VN gang $2,000 for each illegal gambling machine operating in their business. Because the business had four machines, they were advised that they needed to pay Le or another VN gang representative $8,000 per month. CS 3 and CS 4 knew that this amount was not subject to negotiation with Le. Based on prior experience with members of the VN gang, they understood that any disagreement would likely be followed by retaliation against them or their family.

50.     During a meeting with CS 3 and CS 4 on June 22, 2011, they stated that Le was a heavy gambler at casinos throughout the San Jose area. They stated that Le did not gamble in their coffee shop, but merely went there to collect extortion payments on behalf of the VN gang.

51.     On September 6, 2011, CS 3 notified FBI agents that he/she traveled to Los Angeles, CA on September 3 and 4, 2011 and purchased two video gambling machines for the Sao Café. CS 3 stated that he/she decided to do this because the price dropped from $5,000 to $3,000 per

23

machine.  CS 3 stated that he/she borrowed money from friends in order to purchase the machines and subsequently transported them to the Sao Café.  The machines remained in the Sao Café business office until final approval was obtained from the FBI to utilize them in support of this investigation, at which time they were made available for public customers to use inside the café.

52.     During a meeting with CS 3 and CS 4 on October 19, 2011, they stated that Le recently entered their shop and wanted to know why they had installed gambling machines into their business without informing him or anyone from the VN gang.  CS 4 stated that he/she did not know how to contact Le, at which point Le provided his cellular telephone number as 408-209-7795 (hereinafter, the **"Predecessor Phone"[8/]**), to CS 4.  CS 3 and CS 4 stated that because they did not inform Le of their shop's new gambling machines, Le told them that people within the VN gang might object and would likely demand a higher percentage of the shop's gambling profits. CS 3 and CS 4 stated that Le told them that he intended to install four VN gang illegal gambling machines and a sports betting computer terminal in their café.  Le stated that the profit-sharing would be as follows:

a.     50% to the VN gang and 50% to CS 3 and CS 4 for the four VN gang gambling machines;

b.     $5,000 per month to the VN gang for the two gambling machines installed by CS 3 and CS 4 in their café; and

c.     80% to the VN gang and 20% to CS 3 and CS 4 on the sports betting computer terminal.

CS 3 and CS 4 stated that Le's business proposal was not subject to debate.  Based on their

---

[8/] As is discussed later in this Affidavit, Lennie Le continued to use the **Predecessor Phone**, 408-209-7795, to contact CS 3, CS 4, and other individuals until approximately late March 2012.  On April 1, 2012, Le informed CS 3 and CS 4 that he was now using the **Target Telephone**, 408-613-0115, and requested that CS 3 and CS 4 contact him on the **Target Telephone** from that time forward.  According to records received from TracFone, the current account for the **Target Telephone** was activated on March 17, 2012.  As is discussed later in this Affidavit, I believe, based on common calling patterns, that Lennie Le is using the **Target Telephone** as a successor replacement phone for the **Predecessor Phone**.

TITLE.III.WIRETAPS.TT1.TT2-
000436

1    experiences with the VN gang, they stated that they knew that if they rejected Le's offer, they

2    would be subject to vandalism, violence, or possibly murder from the VN gang.  Their fear

3    stemmed from their personal first-hand knowledge of previous violence and intimidation inflicted

4    by the VN gang against their shop and other Vietnamese coffee shops in San Jose.

5    53.     On November 1, 2011, CS 3 and CS 4 conducted a consensually recorded meeting with

6    Le.[2]  It should be noted that all meetings between Le, CS 3, and CS 4 were conducted primarily in

7    Vietnamese.  The following details were translated from Vietnamese to English by the FBI

8    translation unit:

9          a.     Le placed a phone call to an individual identified as "Homie" and discussed

10                installing machines at the Sao Café.  Homie advised that he/she was not available

11                until the night of November 2, 2011.

12         b.     Le advised the CSs to "loud up" their shop in order to attract more customers, but

13                to be mindful of "devils" on the street.  He stated that if they encountered any

14                issues to immediately notify him so that he could [unintelligible] and beat the

15                heck [unintelligible].  Le advised that Thoa Café and Chot Nho café have

16                encountered issues with their rivals.  The CSs asked how he had such detailed

17                information.  Le stated that he had many connections in the community.

18         c.     Le stated that his partner (identity not provided) was not installing gambling

19                machines at the Thoa Café and he was only installing machines at the shops where

20                no issues existed.  CS 3 informed Le that Thoa Café had several machines.  Le

21                told him/her that the Thoa Café  paid directly to Mr. Cat/Cac (phonetic).  Le

22                further added that "the policemen" received a large percentage of the profits from

23                the games being played in the back of the shop.

24         d.     Le stated that CS 3 and CS 4 would be expected to pay the VN gang twice a

25                month on profits generated from illegal gambling machines owned by their shop

26                and installed by the VN gang in their shop.  For machines owned by their shop,

27

28         [2] Unless otherwise noted, all consensually recorded meetings described in this Affidavit
     that involved confidential human sources were conducted at the direction of the FBI.

TITLE.III.WIRETAPS.TT1.TT2-
000437

1    the CSs were advised to pay the VN gang $2,500 per machine on the designated

2    collection dates.

3    54.    On November 2, 2011, CS 3 conducted a consensually recorded meeting with a

4    Vietnamese female named "Sarah" (later identified as Que Hong Nguyen) at his/her café. CS 4

5    was also present. Que Hong Nguyen entered the café with two unknown Asian males.

6    Approximately ten minutes earlier, two other unknown Asian males entered the café. CS 3 stated

7    that these four Asian males were lookouts for the VN gang. While at the café, Que Hong Nguyen

8    installed the VN's laptop computer and provided instructions to CS 3 and 4 on how to log on to

9    the VN's server and the Internet gambling website. After installing and setting up

10   the computer, Que Hong Nguyen discussed the future breakdown of profits for the café and the

11   VN gang. Nguyen stated that 10% of the profits from the gambling website would go to the café

12   and 90% would go to the VN gang. Nguyen stated that for online card games such as poker, 20%

13   of the profits would go to the café, and 80% would go to the VN gang.

14   55.    On November 4, 2011, at approximately 10:00 p.m., CS 3 and CS 4 conducted a

15   consensually recorded meeting at the Sao Café with a member of the VN gang named Dung Dinh.

16   At that time, Dinh installed two gambling machines owned by the VN gang inside the café. CS 3

17   told Dinh that he was supposed to install four VN gambling machines, not two. Dinh responded

18   that he would install the remaining two gambling machines in the Sao Café on November 12,

19   2011.

20   56.    On November 14, 2011, at approximately 9:15 p.m., Lennie Le and Dung Dinh entered the

21   Sao Café together and met with CS 3 and CS 4. At that time, Le and Dinh collected the profits

22   from the two gambling machines owned by the VN that Dinh had installed in the café on

23   November 4, 2011. Neither Le nor Dinh explained to the CSs why the third and fourth gambling

24   machines owned by the VN gang were not installed in the café. As of the date of this Affidavit,

25   only two gambling machines owned by the VN gang have been installed in the Sao Café. As of

26   the date of this Affidavit, these two VN gambling machines, the two gambling machines owned

27   by CS 3 and CS 4, and the laptop computer installed by Que Hong Nguyen a/k/a Sarah on

28   November 2, 2011 continue to be operated at the Sao Café.

TITLE.III.WIRETAPS.TT1.TT2-
000438

57.     CS 3 and CS 4 have never observed Le carry a firearm. Through their employment, they have heard from customers, business associates, and acquaintances that Le carries a firearm in the shoulder bag he regularly wears.  CS 3 and CS 4 have also been told by employees, customers, other coffee shop owners, and members of the Vietnamese community in San Jose that Lennie Le and other VN gang members, including an individual named Ho Yong Jung Lee, carry firearms in the vehicles they drive.

Drug trafficking activities of certain VN gang members

58.     On July 27, 2011, an FBI Task Force Undercover Employee received a telephone call from Anthony James Aguas (hereinafter referred to as "Aguas") who stated that he would be unable to divide a kilogram of cocaine for the undercover employee because he (Aguas) and John Thanh Vo (hereinafter referred to as "Vo") were leaving town to conduct a 10-kilogram cocaine deal.  Several hours later, FBI agents and San Jose Police Department officers observed Vo drive to Lodi, CA and meet there with a truck driver later identified as Baljinder Singh Gill (hereinafter referred to as "Gill").  During the meeting, surveillance agents observed Vo give Gill a black duffel bag.  Following the exchange, Gill departed the area and was stopped near Redding, CA at a California Highway Patrol weigh station.  Following a positive alert by a narcotics-trained canine, a search of Gill's truck resulted in the seizure of 10 kilograms of cocaine.

59.     During a physical surveillance by agents and officers on August 19, 2011, at approximately 8:30 p.m., Vo and Aguas drove to 3277 Vineyard Parkway, San Jose and parked in the residential garage.  Shortly thereafter, Lennie Le arrived in a separate vehicle and parked near the garage in a public parking space.  Le entered the garage and closed the door behind him.  At approximately 10:30 p.m., Aguas exited the garage in his primary vehicle and departed the area.  Approximately five minutes later, Vo exited the garage in his primary vehicle and departed the area.  At approximately 11:40 p.m., Le exited the garage with a shoulder bag and departed the area in his primary vehicle.  Based on my training and experience and knowledge of this investigation, I believe that the residence at 3277 Vineyard Parkway may be being used by members of the Luu CE as a stash house for drugs or currency.

//

TITLE.III.WIRETAPS.TT1.TT2-
000439

60.    During a physical surveillance by agents and officers on August 22, 2011, at approximately 7:00 p.m., John Vo and Lennie Le were observed driving together in Vo's primary vehicle, a two-door Infiniti G35.  At approximately 7:23 p.m., the vehicle entered the parking lot of Motors Group International (hereinafter referred to as "MGI"), located at 647 Tully Road.  A few minutes later, an unidentified Asian male arrived in a Mercedes Benz SL55.  Le immediately transferred three large white kitchen bags from the trunk of the Infiniti G35 to the trunk of the Mercedes Benz SL55.  Le then entered the driver's seat of the Mercedes Benz SL55 and drove directly to his former residence located at 862 Cape York Place.  Based on my training, experience, knowledge of this investigation, and discussions with trained narcotics officers, I believe that the three kitchen bags contained narcotics, or cash proceeds from the distribution of narcotics, at that time.

**G.    ANALYSIS OF GAMBLING MACHINES BY FBI FORENSIC EXAMINER JAMES DUNLAP**

61.    On February 3, 2012, FBI agents met with CS 3 and CS 4 at the Sao Café and created video recordings of the operation of two of the gambling machines located inside the premises that had been installed by the VN gang and that are discussed throughout this Affidavit.  The machines are operated by insertion of currency into a feeder which generates four credits per dollar.  Once a patron begins playing, he or she accumulates credits depending on how well he or she is playing.  According to CS 3 and CS 4, once a patron stops playing, notification is made to the manager, and the café pays the patron in cash based on the amount of credits earned as displayed on the screen   The video recordings made on February 3, 2012 were sent to FBI Forensic Examiner James Dunlap in the Racketeering Records Analysis Unit in Washington, D.C., who received them on February 7, 2012.  Mr. Dunlap examined the recordings of the machines and prepared a report that he forwarded to me that contains the following findings:

62.    The video recordings depicted two multiple-theme video gambling devices.  Imprinted on the devices' screen was "Playtrix Brandon's 15 Amusement games." (An open-source information check on Playtrix indicated that it is based in Laval, Quebec.)  Gambling theme games offered on this initial attraction mode screen were named "Male Female 2," "777 On FIRE," "Black Jack,"

TITLE.III.WIRETAPS.TT1.TT2-
000440

1   "Bonus Blackjack," "Mini Roulette," and "Fever Poker."  A green button labeled "MORE" on the
2   right-hand side was depressed, which offered additional gambling theme games such as "Male
3   Female," "Progressive," "Magic Card," and "Poker."  A game selection was
4   made by touching the icon on the screen for that respective game.  Several of the games were
5   played.  The following is a review of the play of the Male Female 2 game.
6   63.    To commence play, a $5 bill in United States currency was inserted into the device's bill
7   acceptor.  This resulted in 20 units of play being registered on the device's screen below the word
8   "SCORE," which equated to 25 cents per credit.  This game simulated the game of "Draw Poker."
9   In a normal video gambling device of Draw Poker, video images of playing cards are displayed on
10  the screen.  In this game, format playing cards were replaced with crude video images of a male
11  and a female, which represented the traditional black and red colors of poker playing cards.  This
12  is a common ploy in the video gambling industry to change the primary appearance of the game
13  while retaining all of the original characteristics of the game of draw
14  poker.  This is done to disguise the nature of the game.  The male and female images were in four
15  colors:  black (male), white (male), blue (female), and gold (female).  These colors represent the
16  four suites of playing cards: clubs, spades, diamond, and hearts.  A video voice cloud appeared
17  from each image with the numbers "1" through "13."  These numbers represented the valve of the
18  images (ace through king).  When wagers were made, five male/females images appeared on the
19  screen with their corresponding number.
20  64.    The reward table on the screen was listed in the following order, with the corresponding
21  awarded credits (next to each of the winning hands is the traditional winning Poker hand-ranking
22  identifier.  Opposite the awarded credit amount is the monetary equivalent):

| | | |
|---|---|---|
| Consensus Five (*Royal Flush*) | 70 | $17.50 |
| Team (*Straight Flush*) | 50 | $10.00 |
| Consensus (*Four of a Kind*) | 20 | $5.00 |
| Conversation (*Full House*) | 8 | $2.00 |
| Stag Party (*Flush*) | 6 | $1.50 |
| Following (*Straight*) | 4 | $1.00 |

29

| | | |
|---|---|---|
| Three Friends (*Three of a Kind*) | 3 | $0.75 |
| Double Duo (*Two Pair*) | 2 | $0.50 |
| Big Duo (*One Pair*) | 1 | $0.25 |

65.     As the bet amount increased, the rewarded amount increased proportionally.  During the video demonstration, the bet amount was increased to 18, which equates to $4.50.  The reward for receiving a Royal Flush (Consensus Five) increased to 1260.  At 25 cents per credit, this equates to $315.  A yellow button on the lower left-hand side of the screen was used to remove or clear any accumulated credits.  According to Mr. Dunlap, this game possessed the elements of consideration, chance, and reward, and is therefore a gambling device.

     a.     Consideration:  The game's required consideration is the insertion of money to commence play and operate.

     b.     Chance:  The play is based on the result of an application of an element of chance.  A player has no control over the final outcome.

     c.     Reward:  A player receiving winning combinations anticipates a reward/return equal to or greater than the initial consideration that is required to commence play.

     d.     Other indicia of a gambling device were noted, including multiple coin feature, multiple bet feature, short duration of play, knock-off feature, and mislabeling.

66.     Based on Mr. Dunlap's examination and report concerning the two gambling machines, I believe that they are illegal under California Penal Code Section 330a(a) in that they are mechanical devices "upon the result of action of which, money is staked or hazarded and which are operated or played by placing or depositing therein any coins, balls, or other articles, or as a result of the operation of which, money or any other thing of value is won or lost or taken from or obtained from the machines, when the result of operation of the machines is dependent upon hazard or chance."

## II. STATEMENT OF FACTS REGARDING THE INVESTIGATION AND PROBABLE CAUSE TO BELIEVE THAT THE TARGET TELEPHONE IS BEING USED TO FACILITATE AND TO COMMIT THE TARGET OFFENSES.

TITLE.III.WIRETAPS.TT1.TT2-000442

1  67.     On October 26, 2011 at 5:05 p.m., CS 3 placed a consensually monitored telephone call[10]

2  to Lennie Le on the **Predecessor Phone.**.  The conversation was as follows[11]:

3          LE:             Give me, give me about an hour, I'll call you back, okay?

4          CS 3:           OK, OK.

5          LE:             Let me enter the games, and when I'm finished, I'll call you back, okay?

6                          Sorry.

7          CS 3:           Alright, alright, that's okay.  Yeah.

8  68.     On November 4, 2011 at 6:34 p.m., CS 3 sent a text message to Le at the **Predecessor**

9  **Phone**.  It should be noted that all text messages between Le, CS 3, and CS 4 were written in the

10  Vietnamese language.  The following text message statements were translated from Vietnamese to

11  English by the FBI translation unit:

12          CS 3:           Hi, (you) have the game machines today?

13          LE:             Yes.

14          CS 3:           OK.

15          LE:             Today (is OK), but tomorrow is busy.  Can (we) set up a time for

16                          tomorrow?

17          CS 3:           OK.

18          LE:             So what time tomorrow?

19

20      [10] Unless otherwise noted, all consensually recorded phone calls discussed in this
21  Affidavit that involved confidential human sources ("CHS's") were made at the direction of FBI
    agents, and were verified through the FBI's data intercept consensual monitoring system which is
22  used by CS 3 and CS 4 to place recorded phone calls to targets in this investigation.  After any
    consensually recorded phone calls are made by CS 3 and CS 4, the FBI's ELSUR unit downloads
23  the phone call and marks it as original evidence in the investigative file.

24

25      [11] The excerpts of the transcripts of recorded conversations that appear in this Affidavit
    are considered drafts at this time that may subsequently be amended and finalized.  I am not
26  fluent in the Vietnamese language and have relied on Vietnamese-language interpreters
    employed by the FBI who have informed me that Vietnamese words that appear in these
27  recordings were translated into English verbatim.  Parentheses that appear within quoted excerpts
    of phone conversations or text messages in this Affidavit contain words that reflect the implied
28  content of the conversation or message so as to give them meaning in English.

TITLE.III.WIRETAPS.TT1.TT2-
000443

1    CS 3:         Is the morning good?  So people can play.

2    LE:           It has to be in the evening.  Too much exposure in the morning.

3    CS 3:         OK.

4         I believe that in this text message, CS 3 and Lennie Le discussed the installation of

5    gambling machines at the Sao Café, and that Le suggested installing the machines after dark

6    because he was concerned that the gambling machines might otherwise be observed, possibly by

7    law enforcement.  Further, on November 4, 2011, from approximately 10:00 p.m. to 10:20 p.m.,

8    Dung Dinh entered the café and installed two VN gang gambling machines, per directions from

9    Le.

10   69.    On November 14, 2011 at 3:18 p.m., Le sent a text message to CS 4 from the **Predecessor**

11   **Phone**.  Excerpts from the conversation are as follows:

12   LE:           Tonight (we) will do the book for the machine and you should get the two-

13                 week profits ready for us.  Thank you.

14   CS 4:         Let's do it tomorrow night because my sister is away, and I don't have the

15                 money here.  Let's wait till my sister is back, please.

16   LE:           But (we) have to do the book for the machines tonight.  Meanwhile, I want

17                 to pick up the two-week money.

18   CS 4:         I do not have the money.  My sister is away, not back yet, and today is only

19                 the 14th.  Let's do the books on the 15th, my sister will be back at 11

20                 o'clock, so let's do the books and talk at the same time tomorrow.

21   LE:           So, everything tomorrow, huh?

22   CS 4:         OK.

23        On November 14, 2011 at approximately 9:15 p.m., Lennie Le and Dung Dinh arrived at

24   the Sao Café.  Upon entering the front entrance of the café, Le walked to the back entrance,

25   opened the rear door, and performed a visual search of the lot and surrounding area.  CS 3 and CS

26   4 told agents that they believed that Le did this to ensure that the café was not under surveillance

27   by law enforcement authorities.  After all the patrons departed the café, Dinh reviewed the profits

28   on the two VN gambling machines and concluded that VN machine 1 made 749 points and VN

32

machine 2 made 12,812 points.  The total amount of points earned between the two VN machines was 13,561 points (749 + 12,812 = 13,561 points).  Each point is equivalent to 25 cents.  To calculate the dollar value for 13,516 points, Dinh told CS 3 and CS 4 that they needed to divide 13,516 by 4, which equaled $3,390.25.  $3,390.25 was the total profit earned from the VN's two machines.  Per previous negotiations on the distributions of profit, Le took 50 % of the $3,390.25 for the VN gang, and CS 3 and CS 4 kept the other 50%.   Ultimately, both parties kept $1,695.13.

70.     On November 15, 2011 at 3:59 p.m., CS 4 placed a consensually monitored telephone call to Lennie Le on the **Predecessor Phone**.  The conversation was as follows:

LE:          I am coming over, okay?

CS 4:        Uh…is later… tonight alright, dear?  Because I haven't been able to get the money, not enough.  We also want to see you tonight to talk to you, and ask you to cut down as we don't… make much at all…

LE:          This is not going to work, my friend!  Motherfuck, I haven't seen anything yet, but I see that I am getting ready for…for some headaches already.

CS 4:        As you already know, we don't have the money.  No, it's not… You have to say God, just think about it, it's not that we…The machines, the machines, look at them, not much money at all.

LE:          I don't know about that, but you just do whatever you said, you promised. What time do you want me to come over?

CS 4:        I know, but you have to… You, yeah, come over this evening then…

LE:          What time, I want to know, to come over?

CS 4:        You, as you already understand… This evening we will sell and gather up (the money) for you.

LE:          Around what time?

CS 4:        Around 7:00 or later, that's fine.

LE:          OK, bye.

71.     On November 15, 2011 at approximately 9:15 p.m., Lennie Le entered the Sao Café and met with CS 3 and CS 4.  The meeting was consensually recorded by CS 3 and CS 4.  At the

TITLE.III.WIRETAPS.TT1.TT2-
000445

beginning of the meeting, the CSs asked that Le modify the manner in which their profits from the gambling machines at their shop would be shared with the VN.  CS 3 and CS 4 stated that business was slow, and they barely had enough money to cover their basic operating expenses.  Le expressed displeasure with their unwillingness to follow his breakdown of how the gambling profits would be divided between the VN and the CSs.  Le stated that he is accountable to many people, and would be unable to change their current business arrangement.  CS 4 asked Le if he would allow them to pay the VN gang $2,000 per month per machine.  Le stated that he would be unable to convince his bosses of this proposition.  Le offered a solution of providing the CSs a "two-month cut" valued at $2,000.  At the end of the two months, they would be expected to resume paying $2,500 per month per machine.  Le advised that he did not receive a lot of profit from the gambling machines at their shop.  He told the CSs to allow him to take the actions necessary to bring more customers into their shop.  He stated that he could go to other Vietnamese coffee shops throughout San Jose and create "trouble" for the businesses and patrons.  This "trouble" would involve staging fights and disrupting the business of their competitors.  Le stated that once done, CS 3 and CS 4's shop would have more customers because it would be viewed as safe.  Le advised the CSs to stop complaining or he would send another representative from the VN gang to conduct business with them.  Le noted that this would be an unpleasant situation because it would be difficult to deal with the new representative.

72.    On November 21, 2011, at 3:01 p.m., CS 3 placed a consensually recorded telephone call to the **Predecessor Phone,** spoke to Le, and told him that he/she did not have enough money on hand to cover that week's extortion payment.  He/she asked if Le would give him/her a break because the gambling machines in the shop were not generating much profit.  Le informed CS 3 that this was unacceptable and was causing him to have a headache.  Le stated that CS 3 should not violate their business arrangement.  Le stated that he would be at Sao Café at approximately 7:00 p.m. that night.

73.    On November 21, 2011, at 3:43 p.m., Le sent a text message to CS 3 from the **Predecessor Phone**.  Details from the conversations are as follows:

LE:        Let's do the books today.

34

1  CS 3:          God, why so soon?

2  LE:            Every week.  Two weeks for you and me.

3  CS 3:          OK.

4          I believe that Lennie Le sent this text message to CS 3 to ensure that CS 3 would be

5  prepared to make the weekly and/or bi-weekly extortion payment to him or one of his associates

6  from the VN gang.

7  74.     On November 21, 2011 at 7:36 p.m., CS 3 placed a consensually monitored telephone call

8  to Le on the **Predecessor Phone**.  The conversation was as follows:

9  CS 3:          Hi Luan.  Oh, isn't it that "we" do the book every two weeks?

10 LE:            Well... As for the machines, it has to be every week for Dung.  As

11                for the other ones, for you and me, it's once every two weeks.

12 CS 3:          Oh, at the other places [Translator Note:  "other places" is a

13                reference to other Vietnamese cafés], it's once every two weeks.

14 LE:            Oh, where did you get the info from?

15 CS 3:          Huh?

16 LE:            [Chuckles] Where did you get your information from?

17 CS 3:          We heard they said it's once every two weeks, every two weeks.

18                We just didn't know.

19 LE:            It's not true.  Every week [Unintelligible]

20 CS 3:          Is that right?  So once every week, huh?

21 LE:            Once every week.

22 CS 3:          Oh.

23 LE:            OK?

24 CS 3:          It's because I didn't know.  I thought every two weeks, every two

25                weeks, so...I didn't know.

26 LE:            Every week "we" do the book for the machines.  As for the other

27                ones, it's on the 15th and 30th, not every two weeks.  Okay?

28 CS 3:          Oh, okay.  Okay, so now I know.  Yeah.

35

1    On November 21, 2011, from approximately 9:20 p.m. to  to 10:15 p.m., Dung Dinh

2  entered the Sao Café for the purpose of collecting gambling machine profits from VN machines 1

3  and 2 in place of Le.  Dinh's accounting of the two machines determined that they generated a

4  profit of $1,840.50.  As a result, Dinh took $920 for the VN gang and CS 3 kept $920.

5  75.    On November 30, 2011 at 8:07 a.m., Le sent a text message to CS 3 from the **Predecessor**

6  **Phone**.  Excerpts for the conversation are as follows:

7        LE:            Good morning.  Today is the 30th.  Be ready for me to come and

8                         pick up.

9        CS 3:         Let's do it all tonight.  Because this guy Dung is also picking up.

10       LE:            OK.

11       I believe that Lennie Le sent this text message to CS 3 to instruct him/her to have the

12  gambling machine profits ready for him or one his associates from the VN gang to pick up.

13  76.    On November 30, 2011 at approximately 4:55 p.m., Le entered the Sao Café and collected

14  $2,000.00 from CS 3.  Later that evening at approximately 9:17 p.m., Dinh arrived at the Sao Café

15  and collected $3,900.00 from CS 3.

16  On December 13, 2011 at 12:45 a.m., CS 3 placed a consensually monitored telephone call to Le

17  on the **Predecessor Phone**.  Excerpts from the conversation are as follows:

18       CS 3:         Hi.

19       LE:            Uh, are you closed yet?

20       CS 3:         Oh, we're closed now, Luan.

21       LE:            You're closed, huh?

22       CS 3:         Uh.

23       LE:            Are you home yet?

24       CS 3:         Home, we're home now.  What's going on, dear?

25       LE:            You're home?  Because, around… Tomorrow I will be busy, going

26                       away for about a week.  I thought I would come over to get that

27                       early.

28       CS 3:         Oh, because… no, no …not yet, (we) do not have the money here.

36

| | | |
|---|---|---|
| 1 | LE: | Uh huh. |
| 2 | CS 3: | Yes. |
| 3 | LE: | Uh, can you meet me tonight? |
| 4 | CS 3: | No, I -- because we are home already. |
| 5 | LE: | If not, then… You're home already, huh? |
| 6 | CS 3: | Yes. |
| 7 | LE: | Okay, I'll call you tomorrow then. |
| 8 | CS 3: | Yeah, call… Yeah, let's see.  Yeah, call me if anything, and let's |
| 9 | | see. |
| 10 | LE: | It's only one day early, just one day, two days early.  Because I'll |
| 11 | | be busy, going away – going away out of town. |
| 12 | CS 3: | Uh, I see, but let me…me…Tomorrow (if) I can make some sales |
| 13 | | and gather up the money, I can give it to you then. |
| 14 | LE: | Okay, okay dear. |

15    I believe that during this conversation, Le sought to confirm that he would be receiving his
16 bi-weekly $2,000 payment from the Sao Café.  Le, CS 3, and CS 4 had previously agreed that CS
17 3 and CS 4 would pay Le $2,000 every two weeks from profits obtained from the Sao Café's two
18 gambling machines, regardless of the actual profit generated from the machines.

19 77.    On December 13, 2011 at 4:28 p.m., CS 3 placed a consensually monitored telephone call
20 to Le on the **Predecessor Phone**.  The conversation was as follows:

| | | |
|---|---|---|
| 21 | LE: | Sorry for bothering you with my calls.  Get that ready for me, dear! |
| 22 | CS 3: | Oh, uh… because we had to pay the people too much last night, |
| 23 | | and besides, we just paid the rent, so we are very tight, we don't |
| 24 | | have it. |
| 25 | LE: | So it has to wait until the 15th, huh? |
| 26 | CS 3: | Yes.  Because last night we had to pay several thousand to the |
| 27 | | people (playing) those machines. |
| 28 | LE: | Okay, I am sorry to bother – |

TITLE.III.WIRETAPS.TT1.TT2-
000449

| | | |
|---|---|---|
| 1 | CS 3: | Paid two thousand, more than two thousand to (sic) each machine. |
| 2 | | Paid two or three machines altogether.  We had to gather up all the |
| 3 | | money to pay them.  Besides we just paid the rent yesterday. |
| 4 | LE: | Okay, no problem, no problem.  If anything, (I'll) wait until the 15th |
| 5 | | and send someone over to pick up. |
| 6 | CS 3: | Yes, yes. |
| 7 | LE: | Okay. |

8    I believe that during this conversation, Le requested that CS 3 make a $2,000 extortion

9  payment to Le two days early.  I do not know why Le made this request, however, on December

10  16, 2011, CS and CS 4 told agents that they believed that Le needed money to cover debts that he

11  had accrued from his compulsive gambling addiction.

12  78.   On December 14, 2011, at 5:36 p.m., Le sent a text message to CS 3 from the **Predecessor**

13  **Phone**.  Details of the conversation are as follows:

| | | |
|---|---|---|
| 14 | LE: | Tonight I will come to do the books. |
| 15 | CS 3: | I don't have enough money for tonight.  Please pick up tomorrow |
| 16 | | night because (I) just paid the rent, and paid too many big |
| 17 | | winnings.  Thank you very much.  Let's wait till tomorrow so (I) |
| 18 | | can have one more day to sell.  Then I will give it all to you. |
| 19 | LE: | We will do the books tomorrow night then? |
| 20 | CS 3: | Can we do it all tomorrow, dear? |
| 21 | LE: | Then you should ask Dung.  He drives up and down. |
| 22 | CS 3: | OK, dear. |

23    I believe that during this text message, Le told CS 3 that he wanted his $2,000 extortion

24  payment one day early, but CS 3 told him that he/she would not have the money ready until the

25  following night.  On December 15, 2011, at approximately 5:57 p.m., Le entered the Sao Café and

26  collected $2,000 from CS 3 and CS 4.  Later that evening, at approximately 9:13 p.m., Dung Dinh

27  entered the Sao Café to collect gambling profits from VN machines 3 and 4.  Dinh determined

28  that both machines generated $7,476 in profit and as a result, he took $3,738 for the VN gang and

1   CS 3 kept $3,738.

2   79.     On December 28, 2011 at 7:12 p.m., Le sent a text message to CS 3 from the **Predecessor**

3   **Phone**. Details of the conversation are as follows:

4       LE:         Get ready for me.  Let's do the books tonight so (I) don't have to

5                   come on the 30th.

6       CS 3:       We don't have the money now, dear.  Please wait until the 31st.

7       LE:         (You) do the machines tonight?

8       CS 3:       That guy Dung said tomorrow night.

9       LE:         OK.

10      I believe that in this text message, Le again requested that CS 3 make a $2,000 extortion

11  payment due to the VN gang early.  CS 3 requested that Le wait until December 31, 2011 to

12  collect the money.  On December 29, 2011, at approximately 9:08 p.m., Dung Dinh entered the

13  Sao Café to collect profits from the two VN gambling machines in the café.  Dinh determined that

14  the two VN machines generated $4,899 in profits, and as a result, Dinh took $2,440 on behalf of

15  the VN and CS 3 kept $2,440.

16  80.     On December 31, 2011 at 6:35 p.m., Le sent a text message to CS 3 from the **Predecessor**

17  **Phone**.  Details of the conversation are as follows:

18      LE:         Get ready for me.  I am coming over in a little while, my friend.

19      CS 3:       We're closed.  We closed down at 4 o'clock today.  Please come

20                  tomorrow, dear...  We are going out for the New Year.

21      LE:         Tomorrow is the first of the year, dear.  Are you at the apartment?

22                  Have you left already, or you're still at the apartment...It's not good

23                  for the café to do tomorrow...

24      CS 3        (We have) already left, dear.  Come tomorrow at noon.  We do not

25                  bring  the money home.

26      LE:         OK.

27      I believe that in this text message, Lennie Le requested to collect a $2,000 extortion

28  payment from CS 3 on New Year's Eve.  However, because the Sao Café had already closed, CS

39

1   3 told Le to collect his money the next day.

2   81.     On January 1, 2012 at approximately 5:25 p.m., Le arrived at the Sao Café and made

3   contact with CS 4.  Per his previous agreement with the CSs, Le collected $2,000 from CS 4.  He

4   departed the café at approximately 5:29 p.m.

5   82.     On January 30, 2012, at approximately 3:08 p.m., CS 3 placed a recorded call to Lennie Le

6   on the **Predecessor Phone** and informed him of two confrontational and suspicious customers at

7   the Sao Café.  Le informed CS 3 that he would be sending Ho Yong Jung Lee (Lee) to the café to

8   handle this issue.  The two confrontational customers had arrived at the Sao Café at approximately

9   3:00 p.m. and did not order food or drinks.  When approached by CS 3, they stated that they were

10  there to "drink the air."  The two men then proceeded to use profane language with CS 3.  CS 3

11  stated that he/she believed that the two men intended to steal their gambling machines.

12  83.     On January 30, 2012, at approximately 4:00 p.m., Le arrived at the Sao Café.  He told CS

13  3 that he was going to beat up both men, but noticed two other customers that Le stated he

14  believed might be police officers.  CS 3 told Le that these men were regular customers and not

15  affiliated with law enforcement.  Le then told CS 3 to turn off the surveillance cameras inside the

16  Sao Café.  Le proceeded to speak to one of the rowdy customers.  The other customer appeared to

17  recognize Le, and both men immediately departed the Sao Café, entered their vehicle, and drove

18  away.  Le told CS 3 that he was going to leave and slap the men around.  At approximately 5:09

19  p.m., Le returned to the Sao Café and told CS 3 that he had followed both men and knew where

20  they lived.

21  84.     On January 30, 2012, at approximately 5:00 p.m., Ho Yong Jung Lee and a group of eight

22  Asian males approximately 18-20 years of age arrived at the Sao Café.  S-3 stated that Lee noticed

23  that the café had cameras and decided to walk around the building and wait for a meeting there

24  with Le.  When Le returned to the café, he met with Lee at the back of the building for about five

25  minutes.  The CSs did not hear the details of Le and Lee's meeting.  Before departing, Le told CS

26  3 and CS 4 that they need not worry about the two customers returning to their café to cause any

27  more problems.  Lee and the eight Asian males departed at approximately 5:30 p.m.

28  //

40

TITLE.III.WIRETAPS.TT1.TT2-
000452

On February 6, 2012, CS 3 told the me that the gross profit receipts for the single day of February 5, 2012 from one of the two VN gambling machines inside the Sao Café was approximately $5,000. I verified this amount based on the cash that CS 3 and CS 4 brought to their meeting with me. Thus, the illegal gambling business that is the subject of this investigation had "a gross revenue of (at least) $2,000 in any single day," within the meaning of Title 18, United States Code, Section 1955(b)(1)(iii).

85.     On February 11, 2012, at approximately 12:52 p.m,, Lennie Le used the **Predecessor Phone** to send a text message to CS 3. Le stated, "Hi dear. Can I come over and pick up early today?" CS 3 responded by sending the following text message to Le on the **Predecessor Phone**: "Hi dear. My two machines didn't make any money this week. They (the customers) couldn't click on, so (they) went over to your two machines to play. Last week, your two machines collected a total of $15,000. Please wait a couple of days more." Le texted back to CS and stated, "OK, dear."

86.     On February 13, 2012, CS 3 and CS 4 reported to me that the two machines owned by the VN gang inside the Sao Café generated $15,142 in gross receipts for the week of February 3, 2012 through February 9, 2012.

87.     On February 15, 2012 at approximately 4:11 p.m., CS 3 placed a recorded call to Lennie Le on the **Predecessor Phone** and said, "Hi dear. I want you to have two more (game) machines installed for us. Is it okay? Our two (game) machines do not (work)." Le replied, "Will come and talk about this later."

I believe that during this phone call, CS 3 asked Lennie Le to install additional VN gambling machines in the Sao Café. This was done at the direction of FBI agents, who had advised CS 3 and CS 4 to attempt to further ingratiate themselves to Le and members of the VN gang. The installation of two more gambling machines would be one such method.

88.     On March 2, 2012 at 5:28 p.m., Lennie Le sent a text message to CS 3 from the **Predecessor Phone**. Details of the conversation are as follows:

LE:     What?

CS 3:   We do not have the money. To give you.

41

1   LE:     OK, a brief and precise reply... So, this means I am once again stupid.. Never let
2           this money shortage happen again...

3   I believe that during this conversation, CS 3 told Lennie Le that he/she did not have the
4   required bi-weekly $2,000 extortion payment ready for Le.  FBI agents had previously instructed
5   CS 3 and CS 4 to temporarily discontinue their bi-weekly extortion payments to Le in an effort to
6   irritate him and possibly develop additional evidence of extortion threats made by Le to CS 3 and
7   CS 4

8   On April 1, 2012, at 1:32 p.m., Lennie Le informed CS 3 that his (Le's) new cellular
9   phone number is the **Target Telephone**, 408-613-0115.  Lennie Le sent a text message to CS 3
10  from the **Target Telephone,** 408-613-0115.  A summary translation of the conversation follows:

11  LE:     New number.  Get it ready for me, will stop by in the evening.

12  CS 3:   OK, dear.

13  LE:     My associate will stop by in 20 minutes.

14  CS 3 informed FBI agents that he/she believed that in this text message, Lennie Le told
15  him/her that he had obtained a new cellular telephone number and wanted CS 3 and CS 4 to call
16  this new number in the future to communicate with him.  In addition, Le informed CS 3 that Le's
17  associate (Tu Xuan Nguyen) would arrive at the Sao Café in 20 minutes to collect the bi-weekly
18  $2,000 extortion payment due to the VN gang from CS 3.

19  On April 15, 2012 at 3:45 p.m., Le sent a text message to CS 3 from the **Target**
20  **Telephone,** 408-613-0115.  A summary translation of the conversation follows:

21  LE:     Get it ready for me... Stop by in about an hour to pick it up.  Thanks.

22  I believe that in this text message, Lennie Le told CS 3 to have the bi-weekly $2,000
23  extortion payment ready as Le was expecting to come to the Sao Café.

24  On April 15, 2012 at approximately 3:57 p.m., CS 3 placed a consensually recorded
25  telephone call to Le on the **Target Telephone,** 408-613-0115.  A summary translation of the
26  conversation follows:

27  LE:     Hello?

28  CS 3:   Hi, big brother Luan.  It's me.  Could you stop by at about 6:00 to get the

42

1     machine money?

2   LE:    OK.

3   CS 3:  Wait, wait, I have something to tell you. There are a couple of Mexican guys that

4          stopped by the store and advertised their game machines.

5   LE:    They advertised about the "Megatouch?"

6   CS 3:  Two Mexican guys advertised their game machines.

7   LE:    So, what are they doing now? OK, thank you.

8     I believe that during this phone call, CS 3 requested than Lennie Le come to the Sao Café

9 at approximately 6:00 p.m. to collect his bi-weekly $2,000 extortion payment. In addition, CS 3

10 informed Le that two unidentified Mexican males had previously entered the Sao Café to promote

11 a competitive touchscreen gambling machine.

12     On April 16, 2012, CS 3 advised FBI agents that on April 15, 2012, at approximately 5:40

13 p.m., Tu Xuan Nguyen came to the Sao Café to collect $2,000 from CS 3 on behalf of Lennie Le.

14 CS 3 asked Tu Xuan Nguyen where Le was, since he did not come to make the collection

15 personally. Nguyen indicated that Le was busy with other matters. Nguyen left the Sao Café

16 shortly thereafter.

17     **A. CONFIDENTIAL SOURCES**

18 89.   The identities of all the Confidential Sources (CSs) used in this investigation are concealed

19 in this Affidavit due to their request to remain confidential, the concern for their safety and the

20 safety of the CSs' family members, and in order to protect the ongoing investigation. I believe

21 that if the identity of any of the CSs were to be revealed to the targets of this investigation, such

22 CSs would be in danger of retaliation from the targets of this investigation because the Luu CE

23 and various members of the VN gang have the capacity and willingness to exact vengeance and

24 utilize violence in order to ensure the continuation of their criminal activities. The targets of this

25 investigation have engaged in assaultive conduct and those familiar

26 with them have personal knowledge that they are likely to use violence and intimidation to protect

27 themselves from going to jail.

28 //

TITLE.III.WIRETAPS.TT1.TT2-
000455

**Confidential Source 1**

90.    CS 1 ██████████████████████ in San Jose.  Agents have found no instances where CS 1 has been found to have been untruthful or has attempted to deceive agents.  CS 1's knowledge regarding this investigation is based on his/her daily interactions with customers, employees, and other Vietnamese coffee shops in San Jose.  CS 1 is also very successful at eliciting information from members of the Vietnamese community in San Jose.  A great deal of his/her information is developed through first-hand accounts.  He/she also has ongoing contact with members of the VN gang through his/her business dealings.  CS 1 continues to provide information to law enforcement at this time.

91.    CS 1 is not willing to testify due to fear of retaliation and/or bodily injury from the VN gang.  CS 1 is not willing to make recorded conversations with members of the VN gang on behalf of law enforcement.  CS 1 has been affiliated with law enforcement authorities since the fall of 2010 and is considered to be credible and reliable.  His/her information has been corroborated through additional CSs, physical surveillance, and law enforcement investigative efforts.  CS 1 has several misdemeanor convictions that are more than 10 years old.

92.    CS 1 seeks to assist law enforcement authorities in dismantling the Bao Luu Criminal Enterprise.  He/she is angered by the VN gang's criminal activity throughout the San Jose area, particularly the manner in which they compel Vietnamese business owners to pay "protection money" to the VN.  CS 1 has not received any financial compensation from law enforcement authorities.

**Confidential Source 2**

93.    CS 2 ██████████████████████ in San Jose.  Agents have found no instances where CS 2 has been found to have been untruthful or has attempted to deceive agents.  CS 2's knowledge regarding this investigation is based on daily interactions with customers, employees, and other Vietnamese coffee shops in San Jose.  CS 2 has the ability to elicit information from members of the Vietnamese community.  Some of his/her information is developed through first-hand accounts.

//

44

94.     CS 2 is not willing to testify in this case due to fear of retaliation and/or bodily injury from the VN gang.  CS 2 is not willing to make recorded conversations with members of the VN gang on behalf of law enforcement.   He/she had only a single meeting with law enforcement authorities during 2010, and is not currently providing information to law enforcement.

95.     CS 2's reliability cannot be accurately measured based solely on a single meeting with law enforcement agents, however, information provided by CS 2 has been accurately corroborated through reporting of additional CSs and investigative findings to date.  His/her motivation in assisting law enforcement authorities was based on fear of retaliation from the VN gang in the event that he/she did not comply with the VN regarding previous extortion payments. Furthermore, the person sent by the VN to collect money from CS 2 knew his/her family and where he/she lived.  After making a $1,000 extortion payment to the VN gang during October 2010, CS 2 had no further contact, and received no further requests, from members of the VN for extortion payments.

96.     CS 2 has no criminal history and is not on probation or parole.  He/she sought to assist law enforcement authorities in dismantling the Bao Tu Luu Criminal Enterprise.  CS 2 was angered by the VN gang's criminal activity throughout the San Jose area, particularly the manner in which they compel Vietnamese business owners to pay "protection money" to the VN.  CS 2 has not received any financial compensation from law enforcement authorities.

**Confidential Source 3**

97.     CS 3 operates a Vietnamese coffee shop in San Jose.  Agents have found no instances where CS 3 has been found to have been untruthful or has attempted to deceive agents. CS 3's knowledge regarding this investigation is based on daily interactions with customers, employees, and other Vietnamese coffee shops in San Jose.  CS 3 is also successful at eliciting information from patrons at his/her shop.  A great deal of his/her information is developed through first-hand accounts.  However, he/she also has ongoing contact with members of the VN gang through his/her business dealings.

98.     CS 3 has agreed to testify against members of the Luu CE despite informing me that he/she believes that his/her life and that of his/her family would be in great danger and risk of

45

1  bodily harm and/or death.  CS 3 believes that it is necessary that someone stand up to the Luu CE

2  and the VN gang and bring an end to their illegal activities.

3  99.      CS 3 has been voluntarily assisting law enforcement authorities since April 2011.  He/she

4  is deemed highly credible and reliable.  CS 3's information has been corroborated on multiple

5  occasions through other CSs, physical surveillance, recorded conversations, and law enforcement

6  investigative efforts.

7  100.     During April 2011, CS 3 received a municipal citation from the San Jose Police

8  Department ("SJPD") for misdemeanor gambling violations that were occurring at his/her

9  business.  CS 3's cooperation is based in part on his/her understanding that law enforcement

10  authorities will forbear from prosecuting him/her for this offense.

11  101.     CS 3 seeks to assist law enforcement authorities in dismantling the Luu CE.  He/she is

12  angered by the VN gang's criminal activity throughout the San Jose area, particularly the manner

13  in which they compel Vietnamese business owners to pay "protection money" to the VN.

14  102.     CS 3 has received financial assistance from law enforcement authorities to reimburse

15  him/her for his/her operating business expenses.  To date, the FBI has paid CS 3 $38,265.76.

16  $21,000 of this total was for services he/she rendered to law enforcement, which payment covered

17  outstanding employees' wages.  CS 3 has never asked or expected payment for his/her services.

18  All profits that have been generated from illegal gambling machines installed at his/her shop have

19  been voluntarily turned over to the FBI as evidence.

20  **Confidential Source 4**

21  103.     CS 4 runs and operates the same Vietnamese coffee shop in San Jose as CS 3. Agents have

22  found no instances where CS 4 has been found to have been untruthful or has attempted to

23  deceive agents.  CS 4's knowledge regarding this investigation is based on daily interactions with

24  customers, employees, and other Vietnamese coffee shops in San Jose.  CS 4 is also successful at

25  eliciting information from patrons at his/her shop.  A great deal of his/her information is

26  developed through first-hand accounts.  However, he/she also has ongoing contact with members

27  of the VN gang through his/her business dealings.

28  //

104.    CS 4 has agreed to testify against members of the Luu CE despite informing me that he/she believes that his/her life and that of his/her family would be in great danger and risk of bodily harm and/or death.  CS 4 believes that it is necessary that someone stand up to the Luu CE and the VN gang and bring an end to their illegal activities.

105.    CS 4 has been voluntarily assisting law enforcement authorities since April 2011.  He/she is deemed highly credible and reliable.  CS 4's information has been corroborated on multiple occasions through other CSs, physical surveillance, recorded conversations, and law enforcement investigative efforts.

106.    During April 2011, CS 4 received a municipal citation from the SJPD for misdemeanor gambling violations that were occurring at his/her business.  CS 4's cooperation is based in part on his/her understanding that law enforcement authorities will forbear from prosecuting his/her for this offense.

107.    CS 4 seeks to assist law enforcement authorities in dismantling the Luu CE.  He/she is angered by the VN gang's criminal activity throughout the San Jose area, particularly the manner in which they compel Vietnamese business owners to pay "protection money" to the VN.

108.    CS 4 has received financial assistance from law enforcement authorities to reimburse him/her for his/her operating business expenses.  To date, the FBI has paid CS 4 $21,186.32.  $4,000 of this total was for services he/she rendered to law enforcement, which covered outstanding employees' wages.  CS 4 has never asked or expected payment for his/her services.  All profits that have been generated from illegal gambling machines installed at his/her shop have been voluntarily turned over to the FBI as evidence.

**Confidential Source 5**

109.    CS 5 is a narcotics dealer in San Jose.  CS5 was unable to provide any information concerning the gambling and extortion scheme operated by the VN gang that is the subject of this investigation.  His/her information relates to drug trafficking activities of the VN gang.  CS5 does not know Lennie Le and has no information concerning the use of the **Target Telephone**.

**Confidential Source 6**

110.    CS 6 is a narcotics dealer in Los Angeles, CA.  His/her information was singular in nature

47

TITLE.III.WIRETAPS.TT1.TT2-
000459

1   and did not pertain to illegal gambling or extortion activities. CS6 was unable to provide any

2   information concerning the gambling and extortion scheme operated by the VN gang that is the

3   subject of this investigation. His/her information relates to drug trafficking activities of the VN

4   gang. CS5 does not know Lennie Le and has no information concerning the use of the **Target**

5   **Telephone**.

6   111.    As discussed in more detail below in Section III. A. of the Necessity section of this

7   Affidavit, while the use of CSs has been helpful and has furthered the investigation, the CSs being

8   used in this investigation are not in a position to learn about the full scope of Luu, Le, and the VN

9   gang's criminal activities without arousing significant suspicion. The CSs are able to report on

10  what they have heard or seen themselves or what has been told to them by others, but if they were

11  to suddenly attempt to insert themselves into the daily activities of the VN gang, it would draw

12  unwanted attention to them, and rather than being in a position to gather further information, the

13  CSs' access to the VN gang might be lost entirely.

14  ### B. UNDERCOVER AGENTS

15  112.    On June 21, 2011, the FBI obtained authority to insert an undercover officer from

16  ██████████████████████ into the narcotics wing of the Luu CE. The officer successfully

17  developed rapport with John Vo and Anthony Aguas after meeting them in San Jose on July 20,

18  2011. Between July 24, 2011 through September 7, 2011, several phone calls and text messages

19  were exchanged between the undercover officer and Aguas in order to negotiate the purchase of

20  one kilogram of cocaine. After several failed assurances, Aguas retracted his offer to the

21  undercover officer and discontinued any future contact with him.

22  113.    On September 8, 2011, the FBI submitted an undercover proposal with the intention of

23  inserting a DEA agent into the Sao Café to interact with Lennie Le and his criminal associates. It

24  was determined that the use of the agent in an undercover capacity over an extended period of

25  time posed a safety threat to the agent, given the VN gang's propensity for violence and the fact

26  that the agent lived in the area where he/she would be operating

27  114.    On November 3, 2011, the FBI contacted ████████████████████ in order to

28  assess his/her willingness and availability to infiltrate the Luu CE. It was determined that he/she

48

1   did not have the availability, experience, or qualifications necessary to successfully operate as an

2   undercover agent in support of this investigation.

3   115.    The FBI conducted a local and national canvass of the FBI, DEA, San Jose Police

4   Department, Internal Revenue Service ("IRS"), Alcohol, Tobacco, Firearms, and Explosives

5   ("ATF"), and Sunnyvale Police Department for a qualified undercover agent willing and able to

6   infiltrate the gambling and extortion wing of the Luu CE.  After submitting detailed proposals and

7   interviewing several candidates, no qualified individual was identified.

8        **C. PHYSICAL SURVEILLANCE**

9   Surveillance conducted of Lennie Luan Le

10  116.    January 7, 2011:  At approximately 1:00 p.m., Le entered the Chot Nho Café located at

11  1040 McLaughlin Avenue, San Jose.  At approximately 4:00 p.m., Le departed the café and drove

12  to the Vung Tua Restaurant located at 535 East Santa Clara Street.  There, Le was observed

13  meeting with an individual believed to be Hoang Xuan Le a/k/a "Cloud" (per CS reporting, Hoang

14  Xuan Le is Bao Luu's bodyguard, a VN gang hit man, and the number two person within the Luu

15  CE.)  Two Asian females and an infant child were also present.  At the conclusion of the meal, the

16  females thanked Le for dinner.  Surveillance units overheard Le state, "Don't thank me, thank

17  Bao."  I believe that "Bao" is likely a reference to Bao Tu Luu, leader of the Luu CE and the VN

18  gang.  The purpose of the meeting could not be determined based on physical surveillance.

19  117.    March 26, 2011:  At approximately 3:10 p.m., Le entered the Chot Nho Café located at

20  1040 McLaughlin Avenue.  At approximately 4:10 p.m., Le departed the café and drove directly

21  to the Silver Creek Sportsplex located at 800 Embedded Way.  At approximately 4:20 p.m., Luu's

22  primary vehicle, a black Cadillac Escalade, was observed parked in the Silver Creek Sportsplex

23  parking lot.  For the next 25 minutes, Bao Luu, Lennie Le, and an unknown Asian male were

24  seated in front of High Five Pizza inside the Silver Creek Sportsplex.  No further activity was

25  observed.  The purpose of the meeting could not be determined based on physical surveillance.

26  118.    November 1, 2011:  At 4:15 p.m., Le entered the Chot Nho Café located at 1040

27  McLaughlin Avenue.  At 5:15 p.m., Le left the café and drove to the Bambu Snack and Coffee

28  Shoppe located at 949 McLaughlin Avenue.  He then sat on a bench with three unidentified Asian

49

males. The purpose of the meeting could not be determined based on physical surveillance. At 5:57 p.m., Le departed the Bambu Snack and Coffee Shoppe and drove to the Sao Café located at 1054 Story Road. Le was inside the café for approximately 45 minutes, during which time he met with CS 3 and CS 4 and presented the VN gang's expectations regarding profit-sharing for illegal gambling at the Sao Café.

119.   December 15, 2011:  At approximately 8:15 p.m., surveillance was initiated at the Sao Café.  The purpose of the surveillance was to observe Dung Dinh collect an extortion payment on behalf of the VN gang from the owners of the business.  At 9:12 p.m., Dinh arrived at the café and made his collection.  At 10:02 p.m., Dinh arrived at the Ozone Café and entered the business.  At 12:04 a.m. on December 16, 2011, Lennie Le arrived at the café and entered the business.  At 12:42 a.m., Le exited the café with Dinh and walked to his black Cadillac Escalade.  Surveillance units noted that Le's vehicle appeared to be experiencing a mechanical failure.  Dinh unsuccessfully attempted to get Le's vehicle to operate.  An Asian male exited the café and used battery cables to successfully start Le's vehicle.  At approximately 1:12 a.m., Le exited the parking lot of the Ozone Café and drove directly to his residence.

120.   Between December 13, 2011 through December 16, 2011, FBI surveillance agents conducted surveillance of Lennie Le from 8:00 a.m. until 12:00 a.m.  The following observations were made:

      a.    December 13, 2011:  Surveillance that morning began at Le's residence located at 2600 Corde Terra Circle, Building G, Apartment 6307, San Jose.  Agents were unable to locate Le.  The underground parking space believed to be assigned to him was occupied by a vehicle that had not been driven by Le during the prior few weeks.  Throughout the shift, other vehicles that had been observed on prior surveillances being driven by Le departed the apartment complex with different drivers, none of whom was Le.  During the afternoon, surveillance was initiated at Motors Group International, located at 647 Tully Road, San Jose.  Numerous vehicles were observed with different drivers, none of whom was Le.  At

TITLE.III.WIRETAPS.TT1.TT2-
000462

approximately 5:55 p.m., Le was observed entering the Ozone Café
located at 2268 Senter Road.  At 6:25 p.m., Le exited the café, removed an
unknown item from the trunk of a black Cadillac Escalade, and
subsequently returned to the café.  At 6:45 p.m., an unidentified Asian
male arrived at the Ozone Café and parked behind Le's Cadillac Escalade.
Le exited the café and removed a second package from the vehicle's trunk
and gave it to the unidentified Asian male.  The purpose of the meeting
could not be determined based on physical surveillance.  At 8:03 p.m., Le
departed the Ozone Café and drove directly to the Tuong Vi Café located
at 2485 Alvin Avenue.  At 8:27 p.m., Le exited the Tuong Vi Café and
returned to the Ozone Café, where he stayed until after 11:30 p.m.

b.     December 14, 2011:  Le departed his residence at 3:13 p.m. and drove
directly to the Chot Nho Café, arriving there at approximately 3:24 p.m.
At 3:38 p.m., Le exited the Chot Nho Café and drove to Motors Group
International, arriving there at 4:05 p.m..  At 4:43 p.m., Le exited Motors
Group International with an unidentified Asian male and drove to the
Ozone Café.  At 6:53 p.m., Le exited the Ozone Café and drove directly to
his residence.  After several minutes, he exited his residence and returned
to Motors Group International, arriving there at 7:04 p.m..  At 7:30 p.m.,
Le exited Motors Group International and returned to the Ozone Café.  At
7:36 p.m., Le returned to Motors Group International.  At 8:04 p.m., Le
exited Motors Group International and returned to the Ozone Café.  At
9:53 p.m., Le exited the Ozone Café and drove to the Tuong Vi Café.
After spending 30 minutes in the café, Le exited at 10:30 p.m. and
returned to the Ozone Café, where he remained until sometime after 11:25
p.m.

c.     December 15, 2011:  Surveillance was initiated at Le's apartment complex.
At 2:09 p.m., Le was observed returning the complex in a black Cadillac

51

1    Escalade.  He parked his vehicle in space # 137.  At 3:53 p.m., Le departed

2    his residence and drove to the Chot Nho Café.  At 5:46 p.m., Le exited

3    Chot Nho Café and drove to the Sao Café.  At 6:19 p.m., Le exited the Sao

4    Café and drove to his residence.  At 7:35 p.m., Le departed his residence

5    and drove to the Ozone Café.  Before entering the café, Le was observed

6    speaking with an unidentified Asian male in the parking lot.  At 10:01

7    p.m., Le exited the Ozone Café and drove to Foot City (an Asian foot spa

8    located at 1622 East Capitol Expressway, San Jose), and entered the

9    establishment at 10:12 p.m.  At 11:49 p.m., Le exited Foot City with two

10   unidentified women.  Surveillance was terminated at 11:55 p.m.

11          d.          December 16, 2011:  Surveillance was initiated in the vicinity of Le's

12   residence.  At 6:28 p.m., an unidentified female departed the residence in

13   a black Cadillac Escalade that has been driven primarily by Le and has

14   been observed numerous times on surveillance.  The female drove to 862

15   Cape York Place, a previous residence of Le.  Le was not observed on this

16   day.

17   Surveillance conducted of Dung Dinh

18   121.    November 5, 2011:  At approximately 10:15 p.m., Dung Dinh arrived at the Sao Café,

19   1054 Story Road, San Jose in a black Acura TL registered to Dung Dinh of 2266 174th Avenue,

20   Castro Valley, CA.  Dinh parked his vehicle in front of the café.  At approximately 10:17 p.m.,

21   Dinh opened the trunk of his vehicle and entered the café with one of two VN gambling machines

22   that he had previously been sent by Le to install.  At approximately 10:30 p.m., Dinh exited the

23   café, entered his vehicle, and departed the Sao Café parking lot.

24   122.    November 11, 2011:  At approximately 8:30 a.m., physical surveillance was initiated on

25   Dinh at his residence located at 2266 174th Avenue, Castro Valley.  The aforementioned black

26   Acura TL was observed parked in the residence's driveway.  Additionally, a white Chevrolet

27   delivery van registered to Dung Dinh was parked in the community parking lot located north of

28   the residence.

TITLE.III.WIRETAPS.TT1.TT2-
000464

123.     November 30, 2011: At approximately 7:15 p.m., physical surveillance was initiated at Dinh's residence located at 2266 174th Avenue, Castro Valley and the Sao Café, 1054 Story Road. At approximately 8:42 p.m., Dinh departed his residence.  At approximately 9:22 p.m., Dinh arrived at the Sao Café.  At approximately 9:30 p.m., Dinh exited the Sao Café and drove directly to the Mai Phuong Café located at 2987 Senter Road, San Jose.  At approximately 10:15 p.m., Dinh exited the café with four unidentified males, entered his vehicle, and departed the area.  At 10:32 p.m., Dinh arrived at Garden City Casino, 360 South Saratoga Road.  Dinh parked in the casino's parking lot and an unidentified male approached his vehicle and met briefly with Dinh. The purpose of the meeting could not be determined based on physical surveillance.  After the meeting, Dinh departed the area and the unidentified male entered the casino.

124.     December 15, 2011: At approximately 9:12 p.m., physical surveillance was initiated on Dinh as he entered the Sao Café.  At approximately 9:26 p.m., Dinh exited the café, entered his black Acura TL, and departed the area.  Dinh drove directly to the May Phong Café located at 1711 McKee Road.  At approximately 9:35 p.m., he entered the café.  At approximately 9:51 p.m., Dinh exited the café and departed the area.  At approximately 10:02 p.m., Dinh arrived at the Ozone Café located at 2268 Senter Road, and walked inside.  At approximately 12:02 a.m. on December 16, 2011, Le arrived at the Ozone Café and walked inside.  At approximately 12:42 a.m., Dinh and Le exited the café in order to repair a mechanical failure with Le's vehicle.  At approximately 1:12 a.m., Dinh and Le entered their vehicles and departed the area.

125.     January 19, 2012: At approximately 9:08 p.m., physical surveillance was initiated on Dinh and Tu Nguyen as they entered the Sao Café.  At approximately 9:30 p.m., Dinh and Tu Nguyen exited the café, entered Nguyen's white Honda Civic, and departed the area.  At approximately 9:38 p.m., they arrived at the May Hong Café and walked inside.  At approximately 10:00 p.m., they exited the May Hong Café and departed the area.  At approximately 10:25 p.m., a San Jose P.D. officer conducted a traffic stop of Tu Nguyen's Honda Civic for a vehicle code violation at the intersection of Tully and Senter Road.  Dinh was identified as the front passenger of the vehicle.  The driver of the vehicle was identified as Tu Nguyen.  Nguyen told the officer that he //

53

1  lives at 570 Keyes Street, Apartment #3211, San Jose.  He also advised that his telephone number
2  was 408-209-7390.

3  Surveillance conducted of Que Hong Nguyen a/k/a "Sarah"

4  126.     January 26, 2012:  At approximately 10:45 a.m., Que Hong Nguyen arrived at the Xinh
5  Xinh Café located at 1075 Tully Road, San Jose.  Que Hong Nguyen was observed in a silver
6  Lexus LS460 sedan registered to Dung T. Tring of 478 Lewis Road, Unit #2, San Jose.  The
7  vehicle was driven by Hoa Nguyen.  Que Hong Nguyen spoke to an unidentified Asian male
8  ("UAM") who drove a silver Mercedes Benz sedan registered to Ye T. Banh of 247 North Capitol
9  Expressway, Unit #258, San Jose.  Que Hong Nguyen, Hoa Nguyen, and the UAM entered the
10 Xinh Xinh Café.  The purpose of this meeting could not be determined based on physical
11 surveillance.  At approximately 11:45 a.m., Andy Luu arrived at the Xinh Xinh Café parking lot in
12 a silver Mercedes Benz with no license plate and entered the café.  At approximately 1:08 p.m.,
13 Que Hong Nguyen exited the café with a green folder, walked to Xtreme HID, located at 1075
14 Tully Road, Suite B3, and walked inside.  A short time later, Que Hong Nguyen exited Xtreme
15 HID and returned to the Xinh Xinh Café.  At approximately 1:43 p.m., she exited the  Xinh Xinh
16 Café and spoke on her cell phone.  The UAM also exited the café and made contact with her.
17 Both individuals subsequently returned inside.  At approximately 2:50 p.m., Que Hong Nguyen
18 exited the café to use her cellular telephone.  At approximately 2:55 p.m., Que Hong Nguyen
19 exited the café with Hoa Nguyen and the UAM and walked to the silver Mercedes Benz sedan.
20 Que Hong Nguyen removed a backpack from this vehicle and placed it in the backseat of the
21 Lexus.  At approximately 3:00 p.m., Que Hong Nguyen entered the driver's seat of the Lexus, Hoa
22 Nguyen entered the front passenger of the vehicle, and the UAM entered the rear passenger seat.
23 The surveillance team followed the Lexus driven by Que Honh Nguyen to the San Jose
24 International Airport domestic terminal.  She parked the vehicle in front of the US Airways
25 terminal and both the UAM and Hoa Nguyen exited the vehicle.  Hoa Nguyen retrieved a
26 backpack from the vehicle and entered the terminal.  The UAM sat in the front passenger seat of
27 the Lexus.  Surveillance observed Hoa Tran depart San Jose on US Airways Flight # 209 for San
28 Antonio, Texas.  At approximately 3:50 pm, Que Hong Nguyen returned to the Xinh Xinh Café

TITLE.III.WIRETAPS.TT1.TT2-
000466

1   parking lot with the UAM.  The UAM exited the Lexus and entered his Mercedes Benz.  Both

2   vehicles exited the parking lot of Xinh Xinh Café and drove to the intersection of Fontaine and

3   Alvin Avenue.  At approximately 4:10 p.m., Que Hong Nguyen's vehicle was observed exiting

4   Puritani Court and followed to Hair Xpertise, located at 2964 Aborn Square, San Jose.  The UAM

5   exited the vehicle and entered the business, where he remained until approximately 5:00 p.m.  The

6   UAM exited Hair Xpertise with two unidentified males and drove to the Target store located at

7   3155 Silver Creek Road, San Jose.  They remained in Target until approximately 5:20 p.m.  After

8   leaving Target, the UAM drove directly to Puritani Court.  Surveillance units observed the Lexus,

9   the aforementioned Mercedes Benz, and a different Lexus in the parking lot of an apartment

10  complex located at 2586 Fontaine Avenue.  Agents observed Que Hong Nguyen, the

11  aforementioned UAM, and several unidentified Asian males congregating together.  The purpose

12  of the meeting could not be determined based on physical surveillance.

13       **D.  TRASH SEARCHES**

14  127.   In performing physical surveillance at Lennie Le's apartment complex located at 2600

15  Corde Terra Circle, Apartment 6307, Building G, it was determined that to conduct a discreet

16  trash search would not be feasible, prudent, or fruitful.  CS reporting indicated that several

17  members of the VN gang live in different apartments within the Corde Terra Apartment complex.

18  In addition, VN gang members are either dating or married to the Corde Terra apartment staff and

19  the Corde Terra apartment manager reportedly is the mother-in-law of a member of the VN gang.

20  The Corde Terra apartments have several shared trash receptacles.  It is not possible to isolate

21  trash associated with Le when he dumps his garbage into a common dumpster.  The Corde Terra

22  apartment complex has approximately 15-20 shared trash receptacles/dumpsters that are located

23  throughout the publicly-accessible underground garage of the complex.  Through physical

24  surveillance, CS reporting, and open source queries, it was determined that  approximately 1,000

25  people live at the Corde Terra apartment complex.  Each of these residents has shared access to

26  the trash receptacles/dumpsters.  Attempting to isolate specific trash and associate it with Le

27  would be impracticable, if not impossible.

28  //

TITLE.III.WIRETAPS.TT1.TT2-
000467

128.     Agents considered conducting trash searches at the residences of Tu Xuan Nguyen and Que Hong Nguyen, but decided not to do so upon learning that both individuals reside in apartment complexes with shared trash receptacles and several community dumpsters.  It is highly impractical to isolate trash associated with Tu Xuan Nguyen or Que Hong Nguyen when they likely place their garbage in a common dumpster.

129.     On March 15, 2012, a trash search was conducted of the two trash containers at Dung Dinh's residence, 2266 174th Avenue, Castro Valley, CA.  As a result, an AT&T U-verse letter addressed to Dung Dinh at 2266 174th Avenue, Castro Valley, CA 94546-3902 was recovered.  No additional items of value were located.

### E.  MAIL COVERS

130.     On November, 28, 2011, a request was submitted to the United States Postal Inspection Service ("USPIS") for a mail cover at the residence of Lennie Le at 2600 Corde Terra Circle, Apartment 6307, Building G, San Jose, CA.  On December 30, 2011, the FBI was notified that the USPIS approved the mail cover request.  The mail cover at Le's residence was initiated on December 22, 2011 and concluded on January 20, 2012.

131.     The FBI received the following results from the mail cover at Le's residence:

     a.     SENDER:  County of Santa Clara at 331 West Julian Street.   RECIPIENT Suong Phan

     b.     SENDER:  CA Department of Health Care Services.  RECIPIENT:  Bill Huynh

     c.     SENDER:  Comcast.  RECIPIENT:  Suong Phan

     d.     SENDER:  T-Mobile.  RECIPIENT:  Nhan D. Huynh

     e.     SENDER:  Delta Dental.  RECIPIENT:  Suong Phan

     f.     SENDER:  Pacific Gas and Electric Company.  RECIPIENT:  Nhan Huynh

     g.     SENDER:  No return address.  RECIPIENT:  Kari Huynh

132.     The mail cover did not yield any relevant information regarding Lennie Le and was discontinued for that reason.  Investigative efforts to date have not clearly identified the involvement in criminal activity, if any, of the people listed above.

TITLE.III.WIRETAPS.TT1.TT2-
000468

1    ## F. SEARCH WARRANTS

2    133.    On July 27, 2011, Anthony Aguas contacted an undercover officer and informed him that

3    he would be unable to deliver cocaine to him because he and John Vo were leaving town to

4    conduct a 10-kilogram cocaine deal.  At that time, agents set up surveillance on Vo's residence at

5    1361 Tofts Drive.  At 9:00 a.m., Vo and Aguas departed Vo's residence in separate vehicles.  Vo

6    drove a silver Infiniti G35 and Aguas drove a silver Honda Accord.  At 9:26 a.m., Vo and Aguas

7    departed Hoang Xuan Le a/k/a "Cloud's" residence.  At 11:10 a.m., Vo's silver Infiniti G35 was

8    observed at the business headquarters of 454 Life Entertainment, Inc. at 529 North 6th Street.  At

9    12:30 p.m., Vo exited 454 Life Entertainment, Inc. and entered his vehicle.  Agents followed Vo

10   to different locations in San Jose until 3:12 p.m., when he arrived at Super Space Self storage

11   located at 875 East Arques Avenue, Sunnyvale, CA.  Four minutes later, Vo departed the parking

12   lot of Super Space Self Storage.  At 3:31 p.m., Vo arrived at the parking lot of a Ross department

13   store in Sunnyvale.  Five minutes later, Vo exited the parking lot carrying a black duffel bag with

14   a white Adidas logo.

15   134.    Agents eventually followed Vo as he drove the Infiniti to a truck stop and a gas station in

16   Lodi, CA, where he met and spoke with a truck driver later identified as Baljinder Gill.  At 7:46

17   p.m., Gill removed a black duffel bag with a white Adidas logo from the front passenger area of

18   Vo's Infiniti G35.  Surveillance was initiated on Gill as he drove alone on Interstate Highway 5

19   heading northbound.  Agents contacted the California Highway Patrol Cottonwood office for their

20   assistance.  At 9:54 p.m., Gill entered the Cottonwood Weigh Station.  Following a narcotics

21   canine alert to the tractor of the vehicle, Gill granted verbal and written consent to officers to

22   search the tractor.  During the ensuing search, CHP officers located ten individually-wrapped,

23   clear plastic packages of a tightly compacted white substance (weighing a total of 11,929.48 gross

24   grams) inside a black duffel bag with a white Adidas logo.  The white substance field-tested

25   presumptive positive for the presence of cocaine.  Based on these facts, I believe that

26   John Vo provided this cocaine to Baljinder Gill when the two men met in Lodi.

27   135.    On October 5, 2011, DEA agents obtained and served a federal search warrant for the

28   contents of Storage Unit # 1301 at the Super Space Self Storage facility in Sunnyvale where John

TITLE.III.WIRETAPS.TT1.TT2-
000469

1  Vo had been observed on July 27, 2011.  Agents had determined that Vo and his associates were

2  utilizing the storage locker to store narcotics until they were ready to be delivered to customers of

3  their drug trafficking organization.  Inside the storage locker, agents located equipment used to

4  manufacture MDMA (or Ecstasy or 3,4-methylenedioxymethamphetamine) and several assault

5  rifles and other handguns.

6  ## G.  FINANCIAL INVESTIGATION

7  136.    On September 1, 2011, a query through FBI databases identified extensive Casino

8  Currency Transaction Reports ("CCTRs") for Lennie Le as follows:

9       a.       January 9, 2008, CCTR# 20080210114140 for redeeming $15,000 in casino chips

10             for cash.

11      b.       July 27, 2010, CCTR# 20102770337740 for redeeming $16,561 in casino chips

12             for cash.

13      c.       March 1, 2011, CCTR# 20110660130340 for redeeming $17,407 in casino chips

14             for cash.

15      d.       March 21, 2011, CCTR# 20110870166140 for purchasing $20,000 in casino chips

16             with cash.

17      e.       March 5, 2011, CCTR# 20110660458640 for purchasing $18,000 in casino chips

18             with cash.

19      f.       April 21, 2011, CCTR# 20111220092840 for purchasing $13,600 in casino chips

20             with cash.

21      g.       May 13, 2011, CCTR# 20111430143640 for purchasing $19,5000 in casino chips

22             with cash.

23      h.       May 14, 2011, CCTR# 20111430143740 for purchasing $39,215 in casino chips

24             with cash.

25      i.       May 20, 2011, CCTR# 2011151014541 for purchasing $21,000 in casino chips

26             with cash.

27      j.       June 3, 2011, CCTR# 20111710082241 for purchasing $18,900 in casino chips

28             with cash.

1      k.      June 24, 2011, CCTR# 20110660458640 for purchasing $12,000 in casino chips

2      with cash.

3      CCTR total:  $197,583.00

4  137.    On December 27, 2011, I conducted a query through the California Employment

5  Development Department ("EDD") for employment records pertaining to Lennie Le.  On January

6  4, 2012, I was notified that for the second and third quarter of 2011, Le's employment records

7  were listed under Thomas N. George (as an individual, rather than as a "dba", or "doing business

8  as") of 647 Tully Road, Suite 3, San Jose.  This is the business address of the VN gang's

9  automotive garage, Motors Group International.

10  138.    On December 1, 2011, FBI agents received Federal Grand Jury subpoena results from

11  ChexSystems for Le.  ChexSystems is an electronic funds check verification and consumer

12  reporting agency similar to Experian, Equifax, and TransUnion.  While most credit reporting

13  agencies broker data about how a consumer handles credit relationships, ChexSystems provides

14  data related to how a consumer handles deposit accounts at banking institutions.  ChexSystems

15  provided the following results for Lennie Le:

16  139.    Two inquires initiated by consumer action from Citibank CA on September 12, 2009 and

17  May 29, 2009.

18  140.    One inquiry initiated by consumer action from Patelco Credit Union on April 14, 2011.

19  141.    Le's social security number of 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 became valid in CA in 1990.

20  142.    On January 3, 2012, FBI agents received Federal Grand Jury subpoena results from

21  Patelco Credit Union for Lennie Le.  Analysis and review of the financial records revealed the

22  following:

23  •     Le obtained an auto loan for $15,000 on April 14, 2011.  The loan was repaid on   August

24      25, 2011.  Patelco issued the original loan by cashier's check to Dag Auto

25      Broker, ref: 2009 Mercedes C300 for Lennie Le.  Dag Auto Broker issued a

26      personal check to Patelco on August 25, 2011 in the amount of $14,287.86 for

27      CA Mercedes #072694 to repay the loan.

28  143.    On January 3, 2012, FBI agents received Federal Grand Jury subpoena results from

TITLE.III.WIRETAPS.TT1.TT2-000471

Citibank NA.  Analysis and review of the financial records revealed the following:

- Le obtained two personal loans from Citibank in 2008.  Account #9223297814 (Loan #7814) was obtained on January 3, 2008 for $4,500.  On March 6, 2008, Loan #7814 was closed and account #9223416430 (Loan #6430) was opened for $7,900.  It is unknown why the loans were obtained because Citibank has been unable to provide supporting documentation to date.  Loan #6430 was repaid by October 21, 2008 (225 days after it was opened).  On January 26, 2012, an FBI Financial Analyst spoke with the subpoena compliance department of Citibank NA regarding obtaining the financial statement provided by Le in support of this loan application.  Citibank NA advised that the subpoena would take approximately six to eight weeks to comply with.  The results have not yet been received at this time.

- On March 8, 2007, Citibank credit card for Le, account number 5424180571182051 (Citi CC#2051) had a beginning balance of zero dollars.  Between March 8, 2007 through December 8, 2011 (referred to below as "the time period"), 439 debits totalling $26,259.35 and 56 credits totalling $22,445.01 were made.  The ending balance on December 8, 2011 was $3,814.34.  Credit card transactions greater than $500 consisted of the following:

  - $6,756.06 - Miscellaneous personal items (retail and entertainment)
  - $6,275.28 - Gasoline
  - $4,486.06 - Fees and Finance Charges
  - $3,214.59 - Cash Advances
  - $2,561.92 - Groceries and Restaurants
  - $699.75 - Credit Report
  - $598.27 - Hotels

- Le made 48 payments during the time period totaling $21,820.38, ranging from $14.95 to $4,393.49.  The majority of payments were made in cash at Citibank branch offices in denominations divisible by $100.

- On December 14, 2007, Le's Citibank checking account #40043294954 (Citi #4954) was opened with a $400 deposit.  During the time period, 307 debits totaling $89,276.18 and

60

89 credits totaling $89,410.23 were made.  The ending balance on November 13, 2011 was $134.05.

- Sources of funds:  82 deposits totaling $88,891.42 were made into Le's account during the time period.  The deposits ranged from $100 to $9,000; 74 of the deposits, totaling $77,900, were made in even amounts divisible by 100.  Agents have requested that Citibank search the 82 deposits for review of supporting documentation to determine the source of the funds, but have not yet received the results.

- According to the bank statements, no automated clearing house (hereinafter referred to as "ACH") deposits were made into LE's account from Thomas N. George.  An ACH deposit is a direct deposit of a check or payment into a bank account.  This method is used when one party chooses not to provide a paper check or currency to an account holder.  Instead, the account holder is provided funds electronically through a linked account.

- During the time period, 307 debits totaling $89,276.18 were made.  Debits in excess of $1,000 consisted of the following:

| | |
|---|---|
| Cash | $73,450.23 |
| Loan | $3,777.66 |
| Other Debits | $3,627.50 |
| Transfers | $2,371.66 |
| Gasoline | $2,080.54 |
| Casino | $2,072.95 |

82% of debits were cash withdrawals for unknown uses.  Miscellaneous personal items consisted of retail and entertainment purchases.

144.    On March 28, 2012, the Honorable Paul S. Grewal, United States Magistrate Judge for the Northern District of California, signed an order granting the government's application pursuant to 26 U.S.C. § 6103(i)(1)(A)(ii) and (iii); and 4(A)(i), for tax returns, return information, and taxpayer return information for numerous individuals and business entities that are the subject of this investigation, including, inter alia:

Bao Tu Luu

61

1    Lennie Luan Le

2    Que Hong Nguyen a/k/a "Sarah"

3    Dung Minh Dinh

4    John Thanh Vo

5    Anthony James Aguas

6    Tu Xuan Nguyen

7    454 Life Entertainment, Inc., and

8    Motors Group International, Inc.

9    145.   The government is awaiting the production of these tax-related materials and will analyse

10   them upon their receipt insofar as they may assist in the development of investigative leads and

11   the identification of unexplained income, currently unknown bank accounts, and assets for

12   potential criminal forfeiture.

13   **H.  POLE CAMERAS**

14   146.   On April 15, 2011, United States Magistrate Judge Paul S. Grewal signed an order

15   authorizing the installation of a pole camera on a Pacific Gas & Electric power pole located in the

16   vicinity of Jackson Street and North 5th Street, San Jose to conduct and record surveillance of the

17   exterior of the premises at 169 Jackson Street for a period of 90 days.  On February 25, 2011 at

18   approximately 12:46 p.m., this location was identified during the course of a physical surveillance

19   after Luu was observed parked in the residential carport of the apartment complex.  On that same

20   date, at approximately 1:09 p.m., an individual identified as Chin Woo Paek was observed

21   entering the residence carrying a green shoe box with unknown contents.  This location was

22   believed to be used as a narcotics stash house by members of the Luu CE.  The pole camera

23   was installed on June 1, 2011, but is no longer in operation.

24   147.   On May 4, 2011, a pole camera was installed in the vicinity of East Empire Street and

25   North 6th Street, San Jose to conduct and record surveillance of the exterior of the premises at

26   529 North 6th Street.  This is the location of 454 Entertainment, Inc. (the Asian rap music

27   production company owned by Bao Luu) and where VN gang members frequently meet.  The pole

28   camera is still in operation as of the date of this affidavit.  The pole camera at the 454

62

1   Entertainment, Inc. studio captured numerous targets believed to be associated with the VN gang.

2   On several occasions, Hoang Xuan Le a/k/a "Cloud", Bao Tu Luu, John Thanh Vo, Anthony

3   James Aguas, and other unknown individuals were observed parked in a lot adjacent to the studio.

4   The pole camera does not provide a direct view of the studio or the associated residence which

5   thereby limits its ability to confirm the identities of individuals who are present on the premises.

6   148.    On August 12, 2011, a pole camera was installed in the vicinity of Story Road and

7   Lucretia Avenue, San Jose to conduct and record surveillance of the interior of the premises at the

8   Sao Café located at 1054 Story Road.  The Sao Café is operated by CS 3 and CS 4, and is the

9   location of numerous meetings between the CSs, Lennie Le, and Dung Dinh.  The pole camera is

10  still in operation as of the date of this affidavit.  It has been effective in recording meetings

11  between CS 3 and CS 4 with various members of the VN gang, including Lennie Le and Dung

12  Dinh.  On February 9, 2012, the FBI reviewed and analyzed the pole camera video for the Sao

13  Café.  The following significant observations were made:

14          a.    On October 17, 2011 at approximately 7:13 p.m., Hoang Xuan Le and

15                approximately three unidentified Asian males entered the Sao Café.  They exited

16                at approximately 7:18 p.m.

17          b.    On October 19, 2011 at approximately 8:31 p.m., Lennie Le ("Le") entered the

18                Sao Café and met with CS 3 and CS 4.  He exited at approximately 9:25 p.m.

19          c.    On October 24, 2011 at approximately 3:05 p.m., Le and a VN gang member

20                identified as Johnny Ngo entered the Sao Café and met with CS 3 and CS 4.  They

21                exited at approximately 3:45 p.m.

22          d.     November 1, 2011 at approximately 6:00 p.m., Le entered the Sao Café and met

23                with CS 3 and CS 4.  He exited at approximately 6:50 p.m.

24          e.    On November 2, 2011 at approximately 3:00 p.m., Que Hong Nguyen entered the

25                Sao Café and met with CS 3 and CS 4.  She exited at approximately 4:00 p.m.

26          f.    On November 14, 2011 at approximately 9:15 p.m., Le entered the Sao Café and

27                met with CS 3 and CS 4.  He exited at approximately 9:59 p.m.

28          g.    On November 15, 2011 at approximately 5:36 p.m., Le entered the Sao Café and

63

1       met with CS 3 and CS 4.  He exited at approximately 7:41 p.m.

2  h.   On November 15, 2011 at approximately 9:14 p.m., Dinh entered the Sao Café and

3       met with CS 3 and CS 4.  He exited at approximately 10:06 p.m.

4  i.   On December 15, 2011 at approximately 5:51 p.m. Le entered the Sao Café and

5       met with CS 3 and CS 4.  At approximately 6:19 p.m., he exited the café.

6  j.   On December 15, 2011 at approximately 9:12 p.m., Dinh entered the Sao Café and

7       met with CS 3 and CS 4.  At approximately 9:26 p.m., he exited the café.

8  k.   On December 22, 2011 at approximately 8:41 p.m., Dinh entered the Sao Café and

9       met with CS 3 and CS 4.  At approximately 9:40 p.m., he exited the café.

10 l.   On December 29, 2011 at approximately 9:06 p.m., Dinh and Tu Xuan Nguyen

11      entered the Sao Café and met with CS 3 and CS 4.  At approximately 9:14 p.m.,

12      they exited the café.

13 m.   On January 1, 2012 at approximately 5:22 p.m., Le entered the Sao Café and met

14      with CS 3 and CS 4.  At approximately 5:24 p.m., he exited the café.

15 n.   On January 5, 2012 at approximately 8:09 p.m., Dinh and Tu Xuan Nguyen entered

16      the Sao Café and met with CS 3 and CS 4.  At approximately 8:53 p.m., they

17      exited  the café.

18 o.   On January 12, 2012 at approximately 9:38 p.m., Dinh and Tu Xuan Nguyen

19      entered the Sao Café and met with CS 3 and CS 4.  At approximately 9:49 p.m.,

20      they exited the café.

21 p.   On January 16, 2012 at approximately 5:35 p.m., Le and Tu Xuan Nguyen entered

22      the Sao Café and met with CS 3 and CS 4.  At approximately 6:04 p.m., they

23      exited the café.

24 q.   On January 19, 2012 at approximately 9:09 p.m., Dinh and Tu Xuan Nguyen

25      entered the Sao Café and met with CS 3 and CS 4.  At approximately 9:25 p.m.,

26      they exited the café.

27 r.   On January 31, 2012 at approximately 8:11 p.m., Le entered the Sao Café and met

28      with CS 3 and CS 4.   At approximately 8:11 p.m., he exited the café.

TITLE.III.WIRETAPS.TT1.TT2-
000476

149.    On October 7, 2011, a pole camera was installed in the vicinity of Tully Road and Senter Road, San Jose to conduct and record surveillance of the exterior of the premises at Motors Group International ("MGI") located at 647 Tully Road, #3, San Jose.  This business includes a garage that is operated by Bao Luu, and VN gang members frequently meet there.  The pole camera is still in operation as of the date of this affidavit.  On February 9, 2012, the FBI reviewed and analyzed the pole camera video for the MGI garage.  The following significant observations were made:

150.    On December 14, 2011 at approximately 4:05 p.m., Le arrived at the MGI parking lot driving a black Cadillac Escalade.  He exited the vehicle and walked inside the business.  At approximately 4:40 p.m., Le exited the business, spoke to a group of unidentified individuals in front of the black Cadillac Escalade, entered the vehicle, spoke to other individuals after backing the vehicle up, and subsequently departed at approximately 4:43 p.m.

151.    On December 14, 2011 at approximately 7:07 p.m., Le arrived at the MGI parking lot driving a black Cadillac Escalade.  He exited the vehicle and spoke to an unidentified male who drove a light-colored minivan that followed the Escalade into the MGI parking lot.  Le and the unidentified male entered the business.  At approximately 7:29 p.m., Le entered the Escalade, drove the vehicle around the parking lot, and departed at approximately 7:30 p.m.

152.    On December 14, 2011 at approximately 7:39 p.m., the black Cadillac Escalade with an unknown driver arrived at the MGI parking lot.  The driver exited the vehicle and walked into MGI.  At approximately 8:03 p.m., Le exited MGI, entered the Cadillac Escalade, and moved the vehicle in the parking lot.   Approximately one minute later, Le exited the MGI parking lot in the Cadillac Escalade.

153.    On January 9, 2012 at approximately 12:06 p.m., Le arrived at the MGI parking lot in a black Cadillac Escalade.  He exited the vehicle and spoke to a group of unidentified individuals in front of MGI.  After briefly speaking to one another, the group of individuals walked inside MGI.  At approximately 1:41 p.m., Le and an unidentified male in a red baseball hat exited MGI and spoke in the parking lot.  Le and the unidentified male were joined by additional unidentified males, and spoke to one another until approximately 2:26 p.m., at which time all individuals

65

1   returned inside MGI.  At approximately 2:30 p.m., Le and unidentified males exited MGI and
2   spoke in the parking lot.  At approximately 2:47 p.m., Le entered the Cadillac Escalade and
3   departed the MGI parking lot.  A black Honda and a black Acura followed the Escalade from the
4   MGI parking lot.
5   154.    On January 11, 2012 at approximately 1:37 p.m., Le entered the MGI parking lot in a
6   black Cadillac Escalade.  He exited the vehicle and spoke to a group of unidentified males in
7   front of his vehicle.  At approximately 1:43 p.m., the group of unidentified males walked into
8   MGI.  At approximate 1:52 p.m., Le and the unidentified males exited MGI and spoke to one
9   another in the parking lot.  At approximately 3:01 p.m., Le and an unidentified male entered the
10  Cadillac Escalade and departed the MGI parking lot.
11  155.    On September 24, 2011, a pole camera was installed in the vicinity of Nieman Boulevard
12  and Saffarian Court, San Jose, to conduct and record surveillance of the exterior of the premises at
13  2133 Saffarian Court. This location was identified through physical surveillance after Anthony
14  Aguas was driven to the San Jose International Airport by an unidentified Asian male on July 27,
15  2011 following a consensually monitored telephone call with an FBI undercover officer in which
16  Aguas stated that he would be unable to divide a kilogram of cocaine and sell it to him/her
17  because he (Aguas) and John Vo were leaving town to conduct a 10-kilogram cocaine deal.  After
18  taking Aguas to the airport, the unidentified Asian male drove to this residence.  In addition, on
19  September 14, 2011, after driving with two unidentified Asian males to 1123 Shoreview Court,
20  Baypoint, CA, Vo returned to San Jose and drove directly to 2133 Saffarian Court.  Based on my
21  training and experience, I believe that this residence was used in furtherance of narcotics
22  distribution activity on behalf of the VN gang.  The pole camera provided no evidence that is
23  relevant to this gambling and extortion investigation and is no longer in operation.
24  156.    In performing physical surveillance at Le's apartment complex located at 2600 Corde Terra
25  Circle, Apartment 6307, Building G, San Jose, it was determined that the installation of a pole
26  camera was neither feasible nor practical.  On November 28, 2011, an FBI technically-trained
27  agent performed a site survey at Le's residence and ascertained that no discreet location existed in
28  the apartment complex or its immediate vicinity to install a pole camera.  CS 3 and CS 4 reported

TITLE.III.WIRETAPS.TT1.TT2-
000478

1  that several members of the VN gang live in different apartments within the Corde Terra

2  Apartments.  In addition, VN gang members are either dating or married to the Corde Terra

3  apartment staff and the Corde Terra apartment manager reportedly is the mother-in-law to a

4  member of the VN gang.  As a result, agents made the strategic decision to not install a pole

5  camera in this location.

6  ### I.  GPS VEHICLE TRACKERS[12/]

7  157.   On March 2, 2011, the Honorable Howard R. Lloyd, United States Magistrate Judge for

8  the Northern District of California, signed an order authorizing installation of a GPS tracker for a

9  45-day period on a black 2007 Cadillac Escalade registered to Mai Khanh Pham, but being driven

10  by Bao Luu.  Agents executed the order on that date and monitored the location of the vehicle

11  until April 15, 2011.  While executing the order, agents observed Luu frequent the following

12  locations:

13    a.    454 Entertainment rap studio located at 529 North 6th Street, San Jose.

14    b.    A meeting with Lennie Le on March 26, 2011 at the Silver Creek Sportsplex

15          located at 800 Embedded Way, San Jose.

16    c.    1156 Spring Way, Gilroy, CA.

17    d.    Motors Group International warehouse located at 647 Tully Road, San Jose.

18  158.   Overall, the tracker assisted agents in obtaining points of initiation for surveillance.  While

19  the tracker was beneficial in helping observe a meeting between suspected co-conspirators, agents

20  were unable to determine the content of the meeting and whether the conversations were criminal

21  in nature.

22  159.   Through physical surveillance and CS reporting, it has been confirmed that Lennie Le

23  drives several different vehicles each week.  To date, he has been observed driving the following

24

25

26  [12/] In conformity with then-existing Supreme Court and Ninth Circuit precedent,
including United States v. Pineda-Moreno, 591 F.3d 1212 (9th Cir. 2010), agents deployed

27  trackers during 2011 without court orders on vehicles that were the subject of this investigation.
The results generated by these vehicle trackers are not discussed in this Affidavit and are not

28  being relied upon to demonstrate either probable cause or necessity for the Title III interception
order that is the subject of this Affidavit.

TITLE.III.WIRETAPS.TT1.TT2-
000479

1  vehicles:  Mercedes Benz SL55, Cadillac Escalade, Maseratti Quattroporte, Lexus IS, Acura TL,

2  and Porsche Cayenne.  Further, each of these vehicles displayed non-attributable paper dealership

3  license plates.  Based on my training and experience, I know that gang members and criminals

4  utilize this tactic to avoid detection by law enforcement and circumvent procedures established by

5  the Department of Motor Vehicles to legally register a vehicle in their true identity.

6  160.    If agents were to place a GPS tracker on any of these vehicles, they would have no

7  assurance that Le would consistently be the driver. In addition, placing a tracker on a vehicle at

8  Le's residence or any of his frequently visited locations has the inherent risk to compromise this

9  investigation due to the following:

10  161.    CS reporting revealed that several members of the VN gang live in different apartments

11  within the Corde Terra Apartment complex where Lennie Le resides.

12  162.    VN gang members are either dating or married to the Corde Terra apartment staff and the

13  Corde Terra apartment manager reportedly is the mother-in-law of a member of the VN gang.

14  163.    The VN gang controls and has access to an automotive garage identified as Motors Group

15  International.  Based on CS reporting and investigative efforts to date, I believe that Motors Group

16  International is being used as an illegitimate business for the Luu CE to further the distribution of

17  narcotics and the commission of other criminal activities.

18  164.    On November 7, 2011, CS 3 and CS 4 stated that they had been told by an associate of Tri

19  Pham that a tracking device had been discovered on the Infiniti G35 coupe that was being driven

20  by John Vo and Hoang Xuan Le.  CS 3 and CS 4 were also told that Bao Luu heard of this

21  incident and was fearful of returning to the United States from Vietnam.  The Infiniti G35 coupe

22  was no longer driven following its discovery by the VN gang.

23  J. **MEETINGS BETWEEN CONFIDENTIAL SOURCES, LENNIE LE, AND CO-**
   **CONSPIRATORS**

24

25  165.    On January 31, 2012, CS 1 stated that he/she had a chance encounter with Lennie Le at the

26  Grand Century Plaza ("GCP"), an Asian shopping mall, at the intersection of Story Road and

27  McLaughlin Avenue on January 21, 2012 during the Chinese New Year festival.  Le and his

28  associates arrived at the GCP in a white Mercedes Benz sedan.  Upon seeing CS 1, Le approached

TITLE.III.WIRETAPS.TT1.TT2-
000480

1  him/her and exchanged pleasantries.  Shortly thereafter, each party went their separate way.  CS 1
2  continued to walk around the GCP and stopped at a vendor's booth that had been set up as part of
3  an outdoor celebration.  An unidentified female in charge of the booth asked CS 1 if he/she was
4  there "to collect."  Unclear about the nature of the question, CS 1 asked for clarification.  The
5  woman stated that because she observed CS 1 and Le shake hands, she believed CS 1 was at her
6  booth to collect the "tax" imposed on her by Le.  CS 1 departed and continued walking through
7  the GCP.  He/she asked a few vendors at each booth how much money it cost to set up a spot for
8  the festival.  Each of the vendors advised him/her that they were required to pay 50% of their
9  profits to Le and his group.  This payment to Le was further described as "taxes."
10  166.    On November 30, 2011, CS 3 and CS 4 met with Lennie Le at the Sao Café.  CS 4 asked
11  Le if he had anything else for the CSs to do since business at their café had been slow.  Le
12  responded that he did and that it would be "really big."  Le asked the CSs if they were interested,
13  and CS 4 stated, "yes."  Le told the CSs that the deal would be worth approximately two million
14  dollars and that after the split with him, the CSs would receive approximately one million dollars.
15  CS 3 told Le that CS 3 and CS 4 would accept the job.  In fact, CS 3 and CS 4 had no intention of
16  accepting Le's proposal and only indicated that they did because they were attempting to develop
17  additional information and evidence against Le that they could provide to law enforcement.  Le
18  responded "okay," and said that he would talk it over with other people.  Le stated that several
19  Vietnamese cafes in San Jose made hundreds of thousands of dollars in profits from illegal
20  gambling.  Le added that Dung Dinh would arrive at the Sao Café that night to collect the profits
21  on the two VN gang gambling machines at the café.
22  167.    On December 1, 2011, a VN gang member named Tri Pham entered the Sao Café and met
23  briefly with CS 3 and CS 4.  Pham asked them if they were still interested in Le's proposition.  CS
24  3 stated that he/she was interested in a one-time deal so he/she could retire afterward.  Pham then
25  departed the coffee shop.  Since that time, Lennie Le has entered the Sao Café on numerous
26  occasions and spoken with CS 3 and Cs 4.  However, neither Le nor any other VN gang member
27  has ever raised the two million dollar business proposal again with CS 3 or CS 4, and the CSs
28  //

69

1 believe that Le was either never serious about it or that other members of the VN gang decided to

2 not pursue the proposition with the CSs.

3 168.   On December 15, 2011, CS 3 and CS 4 met with Le at the Sao Café.  Le advised the CSs

4 that he was tired and overworked and that his role as a middle man in the VN gang kept him

5 extremely busy.

6 169.   On December 22, 2011, CS 3 and CS 4 met with Dung Dinh at the Sao Café.  Dinh asked

7 if the CSs would accommodate him by making their designated collection to the VN gang on

8 Wednesdays.  Dinh noted that he had to collect money from other Vietnamese coffee shops on

9 Thursdays.  The CSs advised Dinh that he could make his collections each Thursday at 9:00 p.m.

10 The CSs asked if he would split more of the VN gang's profits with them from the two gambling

11 machines that he installed in the Sao Café on November 4, 2011.  Dinh stated that he was

12 unwilling to do this, and that the CSs would need to talk to the "other guy" regarding any

13 negotiations of gambling machine profits.  When asked to clarify the identity of the "other guy,"

14 Dinh said that he was referring to Lennie Le.

15 170.   On February 16, 2012, at approximately 5:15 p.m., Lennie Le arrived at the Sao Café to

16 collect profits from the two gambling machines owned by the café for the prior two-week period.

17 During the meeting with CS 3 and CS 4, Le demanded that they produce the remaining money

18 that they owed him, stating that he had been repeatedly shortchanged $1,000 each time he had

19 come to collect the pre-determined profit from the two Sao Café gambling machines (it is correct

20 that CS 3 and CS 4 had shortchanged Le on several previous extortion payments.)  Le added that

21 every time CS 3 and CS 4 shortchange him, he is responsible for covering the remainder of their

22 debt to the VN gang.  Le reminded CS 3 and CS 4 that others within the VN gang take a portion

23 of the money he collects from Vietnamese cafés in San Jose   Le advised CS 3 and CS 4 to ensure

24 that they made the entire portion of their negotiated payment to the VN in the future.

25 On April 12, 2012, CS 3 placed seven phone calls to Lennie Le on the **Target Telephone**,

26 408-613-0115, but did not receive a response.  On that same date at approximately 7:47 p.m., CS

27 3 placed a consensually recorded telephone call to Tu Xuan Nguyen and stated that he/she could

28 not reach Le.  Nguyen stated that he would convey the message to Le.

171.     On April 12, 2012, at approximately 7:55 p.m., CS 3 received a missed phone call from phone number 925-206-0135.  Immediately thereafter, CS 3 placed a consensually recorded telephone call to phone number 925-206-0135 and Lennie Le answered.  CS 3 told Le that the two gambling machines at the Sao Café were not operational and were in need of repair from Dung Dinh.  Le told CS 3 that he would contact Dinh and have him come by the café to make the repair.

172.     On April 12, 2012, at approximately 9:42 p.m., Dung Dinh and Tu Xuan Nguyen arrived at the Sao Café.  Tu Xuan Nguyen departed the café ten minutes later.  Dung Dinh spent approximately 20 minutes repairing the two gambling machines that belong to the Sao Café before he departed at approximately 10:21 p.m.  Between April 8, 2012 and April 12, 2012, these two gambling machines were not functioning and did not generate any money.

173.     On April 13, 2012, at approximately 10:50 a.m., CS 3 provided FBI agents the cash profits from the week of April 6-April 12, 2012 from the two gambling machines at the Sao Café that are owned by the VN gang.  During that week, the two VN gambling machines generated $20,000 in profit.  Tu Xuan Nguyen kept $10,000 for the VN.  CS 3 kept $10,000 and provided it to the FBI.  At that time, CS 3 also provided agents with $9,250 cash, which represented the Sao Cafe's share of gambling profits for the week of March 30-April 5, 2012.  CS 3 and CS 4 told agents that since Tu Xuan Nguyen began accompanying Dung Dinh to the Sao Café to collect the VN gang's gambling profits, Nguyen maintains control of the money while Dinh handles the gambling machine maintenance and accounting.

174.     To date, the following cash extortion payments have been made to Lennie Le, Dung Dinh, and Tu Xuan Nguyen by CS 3 and CS 4 based on the gambling scheme that is described in this Affidavit:

$2,500.00 to Le on November 15, 2011.

$920.00 to Dinh on November 21, 2011.

$2,000.00 to Le on November 30, 2011.

$3,900.00 to Dinh on November 30, 2011.

$2,780.00 to Dinh on December 7, 2011.

$2,000.00 to Le on December 15, 2011.

TITLE.III.WIRETAPS.TT1.TT2-
000483

1    $3,700.00 to Dinh on December 15, 2011.

2    $2,050.00 to Dinh on December 22, 2011.

3    2,440.00 to Dinh on December 29, 2011.

4    $2,000.00 to Le on January 1, 2012.

5    $800.00 to Dinh on January 13, 2012.

6    $1,000.00 to Le on January 31, 2012.

7    $1,000.00 to Le on February 15, 2012.

8    $5,650.00 to Dinh and Tu Nguyen on February 16, 2012.

9    $7,059.00 to Dinh and Tu Nguyen on February 23, 2012.

10   $9,500.00 to Dinh and Tu Nguyen on March 1, 2012.

11   $2,000.00 to Tu Nguyen on March 1, 2012 to be provided to Le.

12   $9,5000.00 to Tu Nguyen on March 1, 2012.

13   $2,000.00 to Le on March 16, 2012.

14   $4,869.00 to Dinh on March 24, 2012.

15   $4,750.00 to Dinh on March 29, 2012

16   $2,000.00 to Tu Nguyen on April 1, 2012.

17   $9,250.00 to Dinh on April 5, 2012.

18   $10,000.00 to Tu Nguyen on April 12, 2012.

19   TOTAL:  $93,668.00

20   175.    No cash was provided to Dinh and Tu Nguyen on March 8, 2012.  The two gambling

21   machines owned by the VN did not generate any profit during the week from March 2, 2012 to

22   March 8, 2012.  The two VN machines lost a total of $1,800.00.

23   All cash profits generated by the illegal gambling machines at CS 3 and CS 4's coffee shop have

24   been turned over to the FBI and retained as evidence.  To date, the following cash profits have

25   been turned over by CS 3 and CS 4 to the FBI:

26   $5,726.00 on November 16, 2011.

27   $920.00 on November 22, 2011.

28   $6,971.00 on December 1, 2011.

72

1    $2,780.00 on December 8, 2011.

2    $5,325.00 on December 16, 2011.

3    $2,050.00 on December 23, 2011.

4    $4,748.00 on January 3, 2012.

5    $1,670.00 on January 6, 2012.

6    $800.00 on January 13, 2012.

7    $3,723.00 on January 20, 2012.

8    $1,400.00 on January 27, 2012.

9    $4,974.00 on February 6, 2012.

10   $7,500.00 on February 13, 2012.

11   $1,385.00 on February 21, 2012

12   $5,650.00 on February 21, 2012

13   $7,059.00 on February 24, 2012

14   $11,500.00 on March 2, 2012.

15   $1,900.00 on March 16, 2012.

16   $7,232.00 on March 26, 2012

17   $6,592.00 on April 6, 2012.

18   $19,250.00 on April 13, 2012.

19   TOTAL:  $102,563.00

20   **K.  THE TARGET TELEPHONE**

21   176.    A pen register, or dialed number recorder (DNR), is a device that records the telephone

22   numbers dialed during the course of outgoing telephone calls placed from a particular telephone.

23   A trap and trace is a compilation, with reference to date and time, that documents "inbound

24   numbers" and is frequently used in conjunction with a pen register.  Toll records are data related

25   to incoming and outgoing toll calls placed to and from a particular telephone.

26   177.    On December 7, 2010, United States Magistrate Judge Howard R. Lloyd signed an order

27   authorizing a pen register/trap and trace device for 60 days on telephone number 408-859-9999, a

28   phone that was believed was being used by Bao Luu.   The phone is still subscribed to Luu at this

TITLE.III.WIRETAPS.TT1.TT2-
000485

1   time.  The fact that Luu has maintained 408-859-9999 as his phone number for such a long period
2   of time leads me to believe that it is being used exclusively for legitimate, non-criminal
3   communication.  Luu may in fact use this phone number to communicate with previously
4   identified and suspected criminal co-conspirators.  Although it is my belief that even if Luu
5   communicates with another suspected criminal co-conspirator with this phone, the exchanges
6   would be non-criminal in nature. It is also my belief that should Luu decide to conduct
7   communications regarding criminal activities on one of his disposable pre-paid cellular
8   telephones, he would only contact criminal co-conspirators via their own disposable pre-paid
9   cellular telephones.  To clarify, co-conspirator 'A' placing a call for the purposes of non-criminal
10  communications will use the cellular telephone that he (co-conspirator 'A') has previously
11  designated for non-criminal communication and will place said call to co-conspirator 'B' on a
12  telephone that he (co-conspirator 'B') has also previously designated for non-criminal
13  communications. When co-conspirator 'A' elects to communicate with co-conspirator 'B,' co-
14  conspirator 'A' will use a disposable pre-paid cellular telephone that he (co-conspirator 'A') has
15  previously designated for criminal communications. Further, co-conspirator 'A' will contact co-
16  conspirator 'B' on the disposable prepaid cellular telephone that co-conspirator 'B' has designated
17  for criminal communications.  I believe that Luu and his co-conspirators have the self-discipline
18  to ensure that phones used for legitimate purposes will never be in contact with phones used for
19  criminal purposes.
20  178.    On November 1, 2011, United States Magistrate Judge Howard R. Lloyd signed an order
21  authorizing a pen register/trap and trace device for 60 days on the **Predecessor Phone**, 408-209-
22  7795.  On December 29, 2011, United States Magistrate Judge Paul S. Grewal signed an order
23  extending the pen register/trap and trace device on the **Predecessor Phone** for an additional 60
24  days.  On February 23, 2012, United States Magistrate Judge Howard R. Lloyd signed an order
25  extending the pen register/trace and trace device on the **Predecessor Phone** for an additional 60
26  days.
27  179.    On April 4, 2012, United States Magistrate Judge Howard R. Lloyd signed an order
28  authorizing a pen register/trap and trace device for 60 days on the **Target Telephone**, 408-613-

TITLE.III.WIRETAPS.TT1.TT2-
000486

1    0115.  The pen register/trap and trace device is currently active on the **Target Telephone**.

2    Additionally, agents have used court orders, grand jury subpoenas, and administrative subpoenas

3    to obtain toll records for the **Predecessor Phone** and the **Target Telephone**.  Agents have issued

4    administrative subpoenas requesting subscriber information and toll records for telephone

5    numbers called on a frequent basis by the **Predecessor Phone** and the **Target Telephone**.  The

6    list of Interceptees herein is based, in part, on the combined analysis of the records obtained from

7    the **Target Telephone**.  Analysis of telephone calls from toll records for the **Predecessor Phone**

8    and the **Target Telephone** from November 4, 2011 through the present date disclose a pattern of

9    use that is corroborative of an extortion and illegal gambling operation.

10   180.    The interpretations and conclusions drawn by me in this analysis are based on my and

11   other experienced agents' years of investigative experience with extortion and illegal gambling

12   and on my particular knowledge of this investigation.  Also, as noted above, it is the experience of

13   this agent and that of other experienced law enforcement officers that, in an attempt to thwart law

14   enforcement, extortionists, illegal gambling vendors, and drug traffickers will often arrange for

15   people not directly involved with their activities to be subscribers for their telephones, or will use

16   prepaid cellular phones without providing subscriber information.  Accordingly, the following

17   analysis may be an incomplete assessment of the contacts between the **Predecessor Phone** and

18   the **Target Telephone** and the targets of this investigation, and their actual contact may, in fact,

19   be even higher than what is set forth below.

20   181.    During the course of this investigation, the FBI Intelligence Analyst working on the

21   investigation has carefully reviewed and analyzed the information obtained from pen register, trap

22   and trace data, and toll records of the **Predecessor Phone** and the **Target Telephone**.  The analyst

23   has informed me of the results of that analysis.  The results of the analysis were compared to the

24   FBI records database, which includes those telephone numbers documented by the FBI as a result

25   of past and present FBI investigations.  A criminal history search was also completed for those

26   individuals identified through this analysis.

27   182.    On April 12, 2012, FBI agents spoke with the Verizon Wireless Law Enforcement Center

28   regarding the **Predecessor Phone**, 408-209-7795.  The representative stated that the **Predecessor**

TITLE.III.WIRETAPS.TT1.TT2-
000487

**Phone** was activated on June 28, 2011.  Pen register records reflect that the last phone call made or received on the **Predecessor Phone** occurred on March 29, 2012, and the last text message sent or received on the **Predecessor Phone** occurred on April 16, 2012.  However, the latter text message was sent to the **Predecessor Phone** and was not **answered by Le.**  The representative was unable to determine the balance of pre-paid minutes or time (day, weeks, or months) that remain for the **Predecessor Phone**.  The representative stated that the customer who utilizes the **Predecessor Phone** can visit any local Verizon Wireless store and pay cash or charge on a credit card to obtain additional pre-paid minutes for the phone.  The representative informed agents that Verizon Wireless is unable to monitor additional purchases of pre-paid minutes for the **Predecessor Phone**.

183.   On April 13, 2012, FBI agents contacted the TracFone Subpoena Compliance Center.  The TracFone representative stated that the **Target Telephone**, 408-613-0115, is a pre-paid TracFone and was activated on March 17, 2012.  The representative stated that the balance of remaining pre-paid minutes for the phone could not yet be determined due to the telephone's recent activation.

184.   Pen register analysis of the **Predecessor Phone** indicates that incoming and outgoing telephone calls and text messages were unanswered as of March 29, 2012.  As of April 13, 2012, the volume of incoming and outgoing telephone calls and text messages for the **Predecessor Phone** has been drastically reduced from the time that pen register orders for the phone have been implemented beginning in early November 2011.

185.   Pen register analysis for the **Target Telephone** conducted on April 13, 2012 reflected that incoming and outgoing telephone call and text message activity was considerably higher than the activity of the **Predecessor Phone** and that the **Target Telephone** and the **Predecessor Phone** shared common phone contacts, including the telephone numbers utilized by Interceptees Dung Dinh and Que Hong Nguyen, as discussed below.

186.   On January 27, 2012, the FBI conducted telephone analysis of the publicly-listed telephone numbers for 29 Vietnamese coffee shops throughout San Jose.  All available numbers were run through multiple FBI databases.  Of the 29 Vietnamese coffee shops, Coffee Lovers,

76

1  located at 1855 Aborn Road, with a telephone number of 408-223-1199, received six telephone

2  calls from phone number 408-768-0856 during the period of November 16, 2010 through January

3  19, 2011.  Phone number 408-768-0856 is subscribed to an individual named Minh Lam, who is

4  referenced in an FBI investigative case file on the VN gang from October 7, 2008 through January

5  31, 2011.

6  187.    Agents have identified John Tran as the owner of the Ozone Café in San Jose and the user

7  of a phone that was in frequent contact with the **Predecessor Phone** and is currently in contact

8  with the **Target Telephone**, as discussed below in this Affidavit.  Apart from this, I am unaware

9  of any other contact that either the **Predecessor Phone** or the **Target Telephone** has had with

10  phones that are being used by the owners or operators of any other Vietnamese coffee shops in the

11  San Jose area.  However, the **Target Telephone** and the **Predecessor Phone** have made and

12  received numerous calls to and from phone numbers with unidentified subscribers who may

13  include operators or employees of these coffee shops.

14  **L.  PEN REGISTER, TRAP AND TRACE ANALYSIS**

15  188.    I know that Lennie Le has utilized, and continues to utilize, the **Predecessor Phone** and

16  the **Target Telephone** based on information received from CS 3 and CS 4 in terms of

17  consensually recorded telephone calls, text messages, and the fact that he answers to his name in

18  conversations with the CSs.  Based on the investigation of this case as detailed in this affidavit, Le

19  utilizes the **Target Telephone** to communicate with CS 3 and CS 4 in furtherance of his

20  illegal gambling and extortion activities.

21  189.    Analysis of the pen register results for the **Predecessor Phone** and the **Target Telephone**

22  during the period of November 4, 2011 to the present date reveals that Le had continuing and

23  frequent telephonic and text message contact with the following individuals:

24  190.    The **Predecessor Phone** made or received 253 telephone calls to or from phone number

25  510-648-4914, subscribed to Win Nguyen and utilized by Dung Minh Dinh (a named interceptee),

26  2266 174th Avenue, Castro Valley, CA, between September 2, 2011 through March 9, 2012, with

27  the last contact occurring on March 9, 2012.  The **Predecessor Phone** sent or received 128 text

28  messages to or from this same telephone between September 2, 2011 and March 17, 2012, with

TITLE.III.WIRETAPS.TT1.TT2-
000489

1  the last text message occurring on March 17, 2012.  During a meeting with Dung Dinh on

2  November 30, 2011, Dinh told CS 3 that 510-648-4914 is his phone number.  As stated in this

3  Affidavit, Dinh is a co-conspirator of Lennie Le who collects extortion payments from

4  Vietnamese coffee shop owners in the San Jose area on behalf of the VN gang.

5  191.    The **Target Telephone** made or received 30 telephone calls to or from phone number 510-

6  648-4914, subscribed to Win Nguyen and utilized by Dung Minh Dinh (a named interceptee),

7  2266 174th Avenue, Castro Valley, CA between March 1, 2012 and April 23, 2012, with the last

8  telephone contact occurring on April 23, 2012.  The **Target Telephone** sent or received 27 text

9  messages to or from this same telephone between March 1, 2012 and April 23, 2012, with the last

10  text message occurring on April 23, 2012.  As stated in the prior paragraph, phone number 510-

11  648-4914 is being utilized by Dung Dinh, a co-conspirator of Lennie Le.

12  192.    The **Predecessor Phone** made or received 308 telephone calls to or from a phone

13  subscribed to Que Hong Nguyen (a named interceptee) with a telephone number of 209-331-3743

14  and an address of 1910 Camperdown Way, San Jose, CA between September 2, 2011 through

15  November 9, 2011, with the last contact occurring on November 9, 2011.  The **Predecessor**

16  **Phone** sent or received 19 text messages to or from this same telephone between September 2,

17  2011 and November 16, 2011, with the last text message occurring on November 16, 2011.  As

18  stated in this Affidavit, Que Hong Nguyen a/k/a "Sarah" came to the Sao Café on November 2,

19  2011 to install an illegal gambling machine on behalf of the VN gang.  On that date, Que Hong

20  Nguyen a/k/a "Sarah" advised CS 3 and CS 4 to contact her on phone number 209-331-3743 if

21  they had any questions or concerns regarding the gambling machine she installed that day.

22  193.    The **Predecessor Phone** sent or received two text messages to or from a phone subscribed

23  to Que Hong Nguyen (a named interceptee) with a telephone number of 408-886-4568 and an

24  address of 1066 Woodminster Drive, San Jose, CA on March 6, 2012.  The FBI obtained this

25  number after issuing a subpoena to Cellco Partnership dba Verizon Wireless on December 7,

26  2010.  To date, this number has not been provided by Que Hong Nguyen to CS 3 or CS 4.

27  194.    The **Target Telephone** made or received 5 telephone calls to or from phone number 408-

28  886-4568 subscribed to Que Hong Nguyen (a named interceptee), 1066 Woodminster Drive, San

TITLE.III.WIRETAPS.TT1.TT2-
000490

1  Jose, CA 95121 between March 1, 2012 and April 21, 2012, with the last telephone call occurring

2  on April 21, 2012.

3         The **Target Telephone** sent or received 52 text messages to or from phone number 408-

4  886-4568, subscribed to Que Hong Nguyen (a named interceptee),1066 Woodminster Drive, San

5  Jose, CA 95121 between March 1, 2012 and April 23, 2012, with the last text message occurring

6  on April 23, 2012.

7  195.   The **Predecessor Phone** made or received 872 telephone calls to or from a phone

8  subscribed to Airvoice LLC with a telephone number of 408-898-6666 between September 1,

9  2011 through March 28, 2012, with the last contact occurring on March 28, 2012.  The

10 **Predecessor Phone** sent or received 826 text messages to or from this same telephone between

11 September 1, 2011 and March 31, 2012, with the last text message occurring on March 31, 2012.

12 The subscriber of phone number 408-898-6666 has been identified as John Tran.  Tran is the

13 owner of the Ozone Café.  According to CS 3 and CS 4, this café is frequented by several

14 members of the VN gang, including Lennie Le.  This reporting has been corroborated through

15 physical surveillance of Le and other VN gang members, and also from investigative reports

16 received from local law enforcement authorities.

17 196.   The **Target Telephone** made or received 4 telephone calls to or from a phone subscribed

18 to Airvoice LLC with a telephone number of 408-898-6666 between March 1, 2012 through April

19 23, 2012, with the last contact occurring on April 23, 2012.  The **Target Telephone** sent or

20 received 224 text messages to or from this same telephone between March 1, 2012 and April 24,

21 2012, with the last text message occurring on April 24, 2012.  The subscriber of phone number

22 408-898-6666 has been identified as John Tran.  As stated in the prior paragraph, Tran is the

23 owner of the Ozone Café.

24 197.   The **Predecessor Phone** made or received 142 telephone calls to or from a phone

25 subscribed to Van Nguyen with a telephone number of 408-660-7283 and an address of 2705

26 Nicasio Court, San Jose, CA between September 2, 2011 through January 31, 2012, with the last

27 contact occurring on January 31, 2012.  The **Predecessor Phone** sent or received 183 text

28 messages to or from this same telephone between September 2, 2011 and March 16, 2012, with

79

TITLE.III.WIRETAPS.TT1.TT2-
000491

1  the last text message occurring on March 16, 2012.  The subscriber of phone number 408-660-

2  7283 has been further identified as Thu Van T. Nguyen.  Per CS 3 and CS 4, Thu Van T. Nguyen

3  is a waitress at the Chot Nho # 1 Café located at 1040 McLaughlin Avenue, San Jose.  This café is

4  frequented by several members of the VN gang, including Lennie Le.  According to CS 3 and CS

5  4, this café is frequented by several members of the VN gang, including Lennie Le.  This reporting

6  has been corroborated through physical surveillance of Le and other VN gang members, and also

7  from investigative reports received from local law enforcement authorities.

8  198.  The **Target Telephone** made or received 3 telephone calls to or from a phone subscribed to

9  Van Nguyen with a telephone number of 408-660-7283 and an address of 2705 Nicasio Court,

10  San Jose, CA between March 1, 2012 through April 11, 2012, with the last contact occurring on

11  April 11, 2012.  The **Target Telephone** sent or received 3 text messages to or from this same

12  telephone between March 1, 2012 and April 19, 2012, with the last text message occurring on

13  April 19, 2012.  The subscriber of phone number 408-660-7283 has been further identified as Thu

14  Van T. Nguyen.  As stated in the prior paragraph, Thu Van T. Nguyen is a waitress at the Chot

15  Nho # 1 Café located at 1040 McLaughlin Avenue, San Jose.

16  199.The **Target Telephone** made or received 5 telephone calls to or from a phone subscribed to

17  Van Nguyen with a telephone number of 408-660-7283 and an address of 2705 Nicasio Court,

18  San Jose, CA between March 1, 2012 through April 11, 2012, with the last contact occurring on

19  April 11, 2012.  The **Target Telephone** sent or received 2 text messages to or from this same

20  telephone between March 1, 2012 and April 9, 2012, with the last text message occurring on April

21  9, 2012.  The subscriber of phone number 408-660-7283 has been further identified as Thu Van T.

22  Nguyen.  As stated in the prior paragraph, Thu Van T. Nguyen is a waitress at the Chot Nho # 1

23  Café located at 1040 McLaughlin Avenue, San Jose.

24  200.    The **Predecessor Phone** was in contact with various telephone numbers subscribed to

25  Airvoice LLC, OAS Phone in the Box, Red Pocket Mobile, Prepaid Customers, and other

26  unknown subscribers from October 11, 2011 to March 17, 2012.  The total number of contacts

27  with these telephones during this date range was 3,039.  Based upon my training and experience

28  and that of other law enforcement agents and officers who have assisted in this investigation, I

TITLE.III.WIRETAPS.TT1.TT2-
000492

1  know that subjects of this investigation have frequently utilized telephone numbers that are

2  untraceable and would not provide the true identity of the subject.  This is a common technique

3  used to attempt to thwart detection by law enforcement agents.

4  201.    The **Predecessor Phone** received numerous calls from a variety of international telephone

5  numbers with unknown subscribers located in different regions outside of the United States from

6  November 1, 2011 through February 18, 2012   Specifically, during this time period

7  the **Predecessor Phone** received 140 calls from international telephone numbers that began with

8  country code 247, which belongs to Ascension Island, which is located in the south Atlantic

9  Ocean between South America and West Africa.  Additionally, during the same period of time,

10  the **Predecessor Phone** received 103 calls from international telephone numbers that began with

11  country code 232, which belongs to Sierra Leone located in West Africa.[13] Additionally, during

12  the same period of time, the **Predecessor Phone** received three calls from international telephone

13  numbers that began with country code 248, which belongs to the Seychelles Islands, located in the

14  Indian Ocean.  The **Predecessor Phone** received one call from an international telephone number

15  that began with country code 234, which belongs to Nigeria.  The significance of these

16  international phone calls is unknown at this time.

17  202.    On April 7, 2012, the **Target Telephone** sent a text message to a phone number in

18  Argentina.  On April 9, 2012, April 12, 2012, and April 15, 2012, the **Target Telephone** received

19  text messages from a phone number in Tunisia.  The significance of these international contacts is

20  unknown at this time.

21  203.    Based on all the aforegoing and common calling patterns, I believe that the **Target**

22  **Telephone** is being used by Lennie Luan Le as a successor replacement phone for the

23  **Predecessor Phone.**

24  **M.    INVESTIGATIVE CONCLUSIONS**

25  204.    There is probable cause to believe that the Interceptees and others, unknown at this time,

26  are engaged in illegal gambling and extortion activities in the Northern District of California.

27  _____

28  [13] Sierra Leone has been designated by the United Nations as a source country for narcotics.

81

1       Based on the information set forth above in this Affidavit, there is probable cause to

2 believe that the Interceptees and others unknown at this time are using, or communicating with,

3 the **Target Telephone** to facilitate and to conduct their illegal gambling and extortion activities

### III.  NEED FOR INTERCEPTION AND UNAVAILABILITY OF OTHER INVESTIGATIVE TECHNIQUES

6   205.    Relevant facts explaining the necessity for wire and electronic interception have been

7 discussed throughout this Affidavit. Evidence developed thus far, using a wide variety of

8 investigative techniques, strongly suggests that the Interceptees and other individuals, both

9 identified and as yet unidentified, are committing, have committed, and are about to commit

10 criminal acts, including illegal gambling and extortion. No single investigative technique, nor

11 combination of investigative techniques, has resulted in exposing all of the means by which the

12 target organization commits such criminal acts, nor do I believe that any such technique or

13 combination of techniques is reasonably likely to do so in the future for the reasons set forth

14 below.

15   206.    As further discussed below, I know of no confidential source or undercover agent who has

16 been taken into the full confidence of the Interceptees or other co-conspirators in a manner which

17 would lead to achieving all of the goals of this investigation. No visual surveillance, pen register

18 and trap and trace analysis, telephone toll record analysis, undercover operation, trash search, mail

19 cover, financial investigation, pole camera, subject interviews, grand jury investigation, grants of

20 immunity, search warrants, or combination of these techniques can be expected to reveal the

21 complete inner workings of this organization and accomplish all of the goals of this investigation.

22 The implementation of these investigative techniques is not expected to reveal the manner, scope,

23 and extent that the Target Telephone is being used to facilitate and to commit the Target Offenses

24 enumerated above. Although the investigative techniques used so far have succeeded in

25 establishing probable cause for authorization to intercept wire and electronic communications as

26 requested herein, continued use of these techniques will likely fall short of achieving all of the

27 goals of this investigation.

28 //

TITLE.III.WIRETAPS.TT1.TT2-
000494

207.    Law enforcement agents and officers have used physical surveillance, pen registers and the analysis of toll records, confidential sources, trash searches, mail covers, pole cameras, GPS vehicle trackers, and have conducted a financial investigation.  However, these investigative techniques have not enabled investigators to achieve all the goals of this investigation, including dismantling the Luu CE and developing admissible evidence of the commission of the **Target Offenses** sufficient to establish proof beyond a reasonable doubt of the intent of each of the participants to knowingly and willingly join and participate in the conspiracy that is the subject of this investigation.

208.    Interception of wire and electronic communications over the **Target Telephone** is necessary because, as explained below, normal investigative techniques have failed to achieve all of the goals of the investigation, or appear reasonably unlikely to succeed if tried, or are too dangerous to be tried.  Interception of wire and electronic communications over the **Target Telephone** is necessary to enable the government to achieve the above-stated goals of this investigation.

209.    The following is a list of the investigative techniques that have been used, or which I have considered using to date, in this investigation and an explanation of why I believe such techniques are not reasonably likely to succeed in identifying all co-conspirators and allowing the government to prove beyond a reasonable doubt the full scope of the **Target Offenses**, and achieve the other goals of this investigation, including, but not limited to, the following:  (1) determining the full scope and nature of Le's illegal activities; (2) determining the identities and roles of all co-conspirators, associates, and participants involved in Le's illegal gambling and extortion activities; (3) identifying and locating all of the communication facilities being used to facilitate Le's illegal activities; and (4) determining the various methods used by Le to launder extortion and illegal gambling proceeds.

A. **CONFIDENTIAL SOURCES**

CS 1 and CS 2

210.    CS 1 and CS 2 have limited and infrequent contact with subjects of this investigation.  In addition, they are not willing to testify against Bao Luu, Lennie Le, or any other VN gang

83

member. CS 1 and CS 2 have not made or participated in any consensually recorded telephone calls or meetings with subjects of this investigation, and they have stated that they are not willing to do so.[14] CS 2 had a single meeting with law enforcement authorities prior to making a $1,000 extortion payment to a member of the VN gang during October 2010. CS 2 has not made any extortion payments to the VN gang during the past 12 months. CS 1 and CS 2 are very fearful of the VN gang because they know of its propensity for violence and several of the gang members know his/her/their family members. CS 1 and CS 2 are not currently being extorted by the VN gang, which limits their use in this investigation. I also believe that it would raise suspicion with the VN if CS 1 or CS 2 were to now reach out to VN gang members and attempt to engage them in conversations regarding topics that are relevant to this investigation. CS 1 and CS 2 are only willing to assist this investigation by speaking with members of the Vietnamese community in San Jose and providing any relevant information they receive by doing so to law enforcement. I do not believe that the use of CS 1 and CS 2 will achieve the numerous goals of this investigation, including, but not limited to, identifying all members of the VN gang who participate in gambling and extortion activities, the manner in which the VN gang conducts and finances its illegal gambling business, and the methods used by the organization to collect and launder the illegal proceeds derived from its gambling and extortion activities.

CS 3 and CS 4

211. In or around April 2011, the FBI began working with CS 3 and CS 4 to gather information related to Lennie Le and his associates. Their participation in this investigation has assisted in the identification of the organization and structure of the Luu CE. CS 3 and CS 4 have conducted various consensually recorded meetings with Le and his illegal gambling associates. In addition, CS 3 and CS 4 have made multiple cash extortion payments to Le and his associates at the direction of the FBI. At the present time, CS 3 and CS 4 are willing to testify against Lennie Le and other members of the VN. However, both CSs have told me that they are terrified of the VN

---

[14] On March 21, 2012, CS 1 informed his/her handling officer from San Jose Police Department that he/she is not willing to testify against any VN gang member in this case, nor to make any consensual recordings by phone or in person with any target of this investigation. On March 27, 2012, CS 2 informed the same officer of the same thing.

84

1  gang and may subsequently rescind any agreement to testify.  CS 3 and CS 4 have each expressed

2  to me a desire to sell their café in the near future and move away from the Bay Area based on their

3  fear of the VN gang.

4  212.     Although consensually-recorded conversations by the CSs have produced evidence as to

5  some of the illegal gambling and extortion activities of Le, this investigative effort is inherently

6  limited to individuals with whom the CSs have a relationship.  CS 3 and CS 4's ability to develop

7  additional information regarding Le and his co-conspirators is limited to the information that Le

8  volunteers.  Currently, CS 3 and CS 4 have a business relationship with Le.  Neither CS has been

9  able to develop substantial information regarding the details of Le's activities in the VN gang.

10  213.     While CS 3 and CS 4 have been able to engage in conversations with Le related to

11  gambling and extortion activities, they have been unable to develop evidence beyond their own

12  coffee shop.  No direct evidence of the extortion of other Vietnamese coffee shop owners in the

13  San Jose area by the VN gang has been developed aside from anecdotal reports supplied by the

14  CSs to law enforcement.  Given the limited nature of the CSs' relationship with Le and his

15  associates, they are unable to achieve all of the goals of the investigation including, but not

16  limited to, identifying all members of the VN gang who participate in gambling and extortion

17  activities, the manner in which the VN gang conducts and finances its illegal gambling business,

18  and the methods used by the organization to collect and launder the illegal proceeds derived from

19  its gambling and extortion activities.

20  214.     Although Le approached CS 3 and CS 4 during 2010 with a business proposition to join

21  the VN gang and visit Vietnamese coffee shops throughout San Jose to promote its illegal

22  gambling machines, CS 3 and CS 4 declined Le's offer because they were unwilling to engage in

23  criminal activity that might lead to violence.  CS 3 and CS 4 have first-hand knowledge of the

24  violent propensities of the VN gang and they fear what might happen to them in the event they

25  were to not cooperate with the VN.  I also believe that it would be too dangerous to utilize this

26  technique in this investigation given the violent history of the VN and the lack of criminal

27  sophistication of the two CSs.  CS 3 and CS 4 have no criminal history other than an arrest during

28  April 2011 for gambling violations that were occurring at their coffee shop.  I have no knowledge

85

1  that they have ever been involved in any other criminal activity.  There are inherent difficulties

2  and dangers in utilizing individuals with no criminal experience to pose as criminal actors in an

3  investigation, in particular, one involving an organization as dangerous and criminally

4  sophisticated as the VN.  There is also no evidence that Le would re-extend the business

5  proposition to CS 3 and CS 4 at this time   Even if Le were to do so and CS 3 and CS 4 were to

6  accept Le's proposition, it is unlikely that CS 3 and CS 4 would gain access to the higher levels of

7  the VN gang as their role would be passive in nature and limited to "selling" gambling machines

8  to other Vietnamese coffee shop owners.  Moreover, CS 3 and CS 4 have informed me that they

9  are seriously considering selling their coffee shop and moving out of the Bay Area due

10 to their fear of the VN gang and possible retaliation against them in the event the VN gang were to

11 learn of their cooperation with law enforcement in this investigation.  CS 3 and CS 4 therefore do

12 not currently have the commitment to long-term participation in this investigation that would be

13 necessary in the event they were to accept Le's business proposition.  Based on all these reasons, I

14 believe that accepting Le's business proposal reasonably appears to be unlikely to succeed if tried

15 and to be too dangerous.

16 215.    As stated above in this Affidavit, although CS 3 and CS 4 expressed an interest to Lennie

17 Le on November 30, 2011 in accepting his offer to help them earn one million dollars by engaging

18 in activities that would presumably be criminal in nature, CS 3 and CS 4 had no intention of

19 accepting Le's proposal, and only indicated that they did because they were attempting to develop

20 additional information and evidence against Le that they could provide to law enforcement.

21 Further, neither Le nor any other VN gang member has ever raised the proposal again with CS 3

22 or CS 4, and the CSs believe that Le was either never serious about it or that other members of the

23 VN gang decided to not pursue the proposition with the CSs.

24 216.    CS 3 and CS 4 have limited contacts with members of the VN gang other than Lennie Le

25 and his associates who service the gambling machines in their café.  Their role in this

26 investigation has been limited to making weekly extortion payments to Le or his associates.

27 217.    CS 3 and CS 4 have repeatedly stated that it is their belief that any focused or persistent

28 attempts by them to inquire further about Le's criminal associates would arouse suspicion and not

TITLE.III.WIRETAPS.TT1.TT2-
000498

1   be productive.  I share this assessment, as do the other law enforcement members of this

2   investigation.

3   218.    Based on my training and experience, and my participation in this investigation, I do not

4   believe that any persons not previously associated with this organization would be trusted with

5   pertinent information related to the organization's methods and day-to-day operations.  I therefore

6   believe that the prospect of locating and using additional confidential sources to penetrate this

7   organization appears remote at this time.

8   219.    This investigation has consistently attempted to identify individuals who may have

9   information concerning the Interceptees and the other co-conspirators in regards to their illegal

10  activities.  Whenever individuals who possess this information have been identified and debriefed,

11  the information they provided was utilized to attempt to advance the investigation.

12  To date, I have canvassed nationally within the FBI for confidential sources who are willing to

13  develop information and evidence on the VN gang.  In addition, I have contacted DEA; the

14  Internal Revenue Service; Alcohol, Tobacco, Firearms, and Explosives; San Jose Police

15  Department; Sunnyvale Police Department; and Santa Clara Police Department, all with negative

16  results.  However, investigators continue to devote attention towards identifying and developing

17  new confidential sources.

18  220.    Members of a criminal enterprise as sophisticated as the VN gang use many tactics to

19  minimize law enforcement detection and to protect themselves and their associates from criminal

20  competitors.  The modus operandi of the VN gang is to treat all outsiders with distrust and

21  scrutiny.  In my experience, and in the experience of other law enforcement personnel with whom

22  I have spoken, criminal enterprises like the VN gang are very aware that an effective and very

23  common investigative technique is the use of CSs to conduct various types of illegal activity with

24  them.  Thus, while the use of available CSs may be an invaluable investigative resource, it is often

25  difficult or impossible to find CSs who are able to infiltrate the upper levels of a criminal

26  enterprise of this nature and engage in sophisticated illegal activity.  Similarly, it is often difficult

27  and risky to find persons who are already involved in the organization who are willing and able to

28  cooperate with the government, particularly without jeopardizing the investigation.

TITLE.III.WIRETAPS.TT1.TT2-
000499

1    221.    Agents and officers in this investigation have attempted to interview and develop

2    additional confidential sources, specifically, individuals who own Vietnamese cafés, bars, or

3    establishments that are frequented by members of the Luu CE and the VN gang.  However, all

4    attempts have failed due to the extreme fear of retaliation and/or the perception that law

5    enforcement authorities are unable to provide protection and safety in the event that assistance is

6    offered.

7    222.    Based on my training and experience, as well as that of other law enforcement officers, the

8    use of confidential sources, either alone or in conjunction with other traditional investigative

9    techniques, will not achieve all of the numerous goals of this investigation.

10   **B. <u>UNDERCOVER AGENTS</u>**

11   223.    Based on my training and experience, I know that most criminal enterprises are extremely

12   selective in choosing the persons with whom they will conduct or even discuss their illegal

13   activities.  Further, because of the closed nature of the Vietnamese community, especially the

14   Vietnamese organized crime and street gang communities, it is both highly unlikely and very

15   dangerous for an undercover agent or officer to attempt to infiltrate the upper echelons of such

16   organizations.  Given these circumstances, I believe that the use of an undercover agent or officer

17   is at best of limited value in this investigation.  It is unlikely that undercover agents or officers

18   would be able to gain the trust of higher-ranking members of the VN gang or obtain detailed

19   information regarding the suppliers of illegal gambling machines, the placement and utilization of

20   extortion assets, or the structure of the target organization.  As such, the FBI has not attempted in

21   the last sixty days to infiltrate this group with undercover agents or officers.  As noted above in

22   this Affidavit, the only undercover agent utilized in this investigation was an officer from

23   Sunnyvale Police Department who developed a relationship with John Vo and Anthony Aguas in

24   an attempt to purchase narcotics from them.  This undercover officer was not able to develop any

25   evidence or information concerning the extortion and gambling activities that are the subject of

26   this Affidavit.

27   224.    Even if an undercover agent were utilized, his/her role would be minimal and insignificant

28   within the organization.  To obtain a position of trust within the Luu CE generally requires years

88

1  of effort and trust-building that are not feasible to provide at this juncture in the investigation.

2  Based on my training, experience, and knowledge of this investigation, I believe that the

3  introduction of an undercover agent or officer to Lennie Le would be unpractical, difficult, and

4  dangerous. Any attempts to introduce an undercover agent or officer to Le would cause him to be

5  suspicious and possibly cease all contacts with the CSs who are currently being utilized in this

6  investigation.

7  225.   Based upon my training and experience, it would be extremely difficult for an undercover

8  agent or officer to obtain intimate knowledge of the methods of operation of a sophisticated

9  organization such as the Luu CE. An undercover agent or officer might have the opportunity to

10  associate with some targets of the investigation on a social level, but the intelligence gained would

11  never rise to the level necessary to satisfy all of the goals of this investigation. In an organization

12  of this nature, information is compartmentalized in an effort to insulate its members and to avoid

13  detection. This means that the organization uses only trusted individuals for specific jobs, but

14  avoids allowing any one person access to information that would reveal the functioning and scope

15  of the entire organization. As a result, anyone from the organization who may cooperate with law

16  enforcement or with a rival organization can only temporarily hurt the organization, but cannot

17  disclose every aspect of its operation.

18  226.   The FBI conducted a local and national canvass of the FBI; DEA; Internal Revenue

19  Service; Alcohol, Tobacco, Firearms, and Explosives; San Jose Police Department, and

20  Sunnyvale Police Department for a qualified undercover agent willing and able to infiltrate the

21  Luu CE. After submitting detailed proposals and interviewing several candidates, no qualified

22  individual was identified. Consideration was given to introducing a DEA agent into the Sao Café

23  who would pose as a friend or relative of CS 3 and CS 4 who was interested in purchasing the

24  café from the CSs. However, it was determined that the use of the agent in this capacity over an

25  extended period of time posed a safety threat to the agent, given the VN gang's propensity for

26  violence and the fact that the agent lived in the area where he/she would be operating.

27  **C. PHYSICAL SURVEILLANCE**

28  227.   Physical surveillance of Le and his co-conspirators has provided only limited evidence of

89

1  their illegal activities.  Physical surveillance, in and of itself, is useful mainly in placing

2  individuals together, but provides little information regarding the purpose of their meetings or the

3  content of their conversations.  Surveillance has been conducted throughout this investigation in

4  an attempt to more fully understand the extortion and illegal gambling activities of the members

5  of the target organization, to identify possible associates and co-conspirators of the organization,

6  and to document the organization's narcotics trafficking activities.

7  228.    Law enforcement agents have repeatedly and recently conducted surveillance of Lennie

8  Le, starting in and around 2010, in connection with this investigation.  As part of that surveillance,

9  agents observed Le at his residence, Vietnamese coffee shops, in the presence of

10  VN gang members, and at businesses associated with the VN gang.  For example, on March 26,

11  2011, Le was observed meeting with Bao Luu, the leader of the VN gang, and an unidentified

12  Asian male.  While law enforcement agents were able to document the meeting and gather

13  additional data, they were not able to determine what specifically was discussed during the

14  meeting.  Wire and electronic interception will enable law enforcement to determine the location

15  of meetings and the time they start as well as possible details of these meetings as discussed by Le

16  and members of the VN gang.  The information that will be gained from wire and electronic

17  surveillance on the **Target Telephone** will assist in establishing the roles of individuals

18  associated together, the nature of their activities, and the location of physical evidence.

19  229.    Throughout the course of this investigation, agents and officers have conducted

20  surveillance on members of the VN gang.  During some of the surveillances, there have been

21  occasions when members of the gang conducted counter-surveillance techniques.  An example of

22  this occurred on December 15, 2011 when Lennie Le drove to the Corde Terra Apartment parking

23  garage located at 2600 Corde Terra Circle, San Jose.  Le drove around the complex's large

24  underground garage, circled the parking lot in his vehicle, and drove away.  As a result, the

25  surveillance team lost surveillance on Le.  Le and other VN gang members who reside in this

26  apartment complex have consistently parked their vehicles in its underground garage.  The

27  complex has two entrances/exits that connect to a main road that encompasses the entire complex.

28  Surveillance teams have determined that it has been difficult to conduct surveillance of Le and

TITLE.III.WIRETAPS.TT1.TT2-
000502

1   other VN gang members at this location without compromising surveillance team vehicles as well

2   as agents and officers.

3   230.   Le and other VN gang members have rented apartments at the Corde Terra apartment

4   complex.  Surveillance teams have attempted to identify the apartment units where the VN gang

5   members reside.  However, following the gang members on foot after they park their vehicles

6   might readily compromise one or more agents or officers due to the close proximity of the

7   apartment units to the access routes (including hallways, elevators, and stairs in the complex that

8   connect to the underground parking area), thus precluding the ability to engage in further

9   surveillance efforts inside the apartment complex.  Additionally, VN gang members who reside

10  at the Corde Terra apartment complex have been involved in relationships with employees who

11  work at the apartment management office.  This information has been corroborated by CS 3 and

12  CS 4.  If agents or officers were to inquire about any of the VN gang members who reside at the

13  Corde Terra apartment complex, the employees and/or apartment manager would likely provide

14  advance notice to the gang members which would allow them to depart their apartments before

15  law enforcement authorities arrived there.

16  231.   VN gang members have been observed switching vehicles that belong to the gang at

17  specific locations on a frequent basis to prevent surveillance teams from successfully following

18  them and thwart law enforcement from observing the activities of the gang.  Several of the

19  vehicles used by the VN gang have automobile dealership paper plates, even though investigation

20  has established that the vehicles have been assigned automobile registration and California license

21  plates.  Traffic stops by a local police department have been conducted on vehicles being driven

22  by VN gang members for committing vehicle code violations, however, this technique has only

23  been used on a limited basis to prevent the VN gang from suspecting that it is a target of any law

24  enforcement investigation.

25  232.   VN gang members have been observed driving to different Vietnamese coffee shops and

26  businesses in San Jose during this investigation.  Gang members were observed meeting in

27  parking lots before entering the coffee shops or businesses and remaining inside for hours without

28  any further activity being observed outside of the locations.  As a result, surveillance teams were

TITLE.III.WIRETAPS.TT1.TT2-
000503

1  unable to collect additional evidence and observations due to the members' inactivity at these

2  locations.

3  233.    Authorization of wire and electronic interception as requested would enhance the effective

4  and safe use of physical surveillance.  Constant surveillance increases the chances of agents being

5  detected and jeopardizes this investigation before the entire organization can be identified and

6  dismantled.  If the targets of this investigation are alerted to the presence of surveillance agents,

7  they are likely to modify or terminate their illegal activities to avoid detection by law enforcement.

8  Further, I believe that if individuals in the organization were to become aware of surveillance

9  agents, they might end their association with CS 3 and CS 4 in an

10 effort to avoid arrest and prosecution.  Moreover, due to the nature of this organization, its

11 members are likely to possess weapons that heighten the danger of surveillance and other

12 investigative techniques that cause agents to be in close proximity to the subjects of the

13 investigation.  Surveillance in conjunction with wire and electronic interception allows law

14 enforcement to utilize its resources in an efficient manner by observing and corroborating

15 significant criminal activities that will further the overall objectives of this investigation.

16 Based on my training and experience, as well as that of other law enforcement agents with whom I

17 have consulted, I believe that the continued use of physical surveillance, either alone or in

18 conjunction with other traditional investigative techniques, will not achieve all of the goals of this

19 investigation.

20         **D.  PEN REGISTERS, TRAP AND TRACE DATA, AND TOLL RECORD**
               **ANALYSIS**

21

22 234.    Pen registers, trap and trace devices, and toll records only provide the telephone numbers,

23 duration, dates, times, and subscribers of contacts between two telephone numbers.  Based on my

24 training, experience, and participation in this investigation, I know that subscriber information is

25 not always useful because subscriber records do not identify the person who is actually using a

26 particular telephone number, much less the contents of phone conversations.

27 Importantly, members of the VN gang frequently use pre-paid cell phones with fictitious

28 subscriber names and telephone company default addresses.  Further, telephone toll records are

TITLE.III.WIRETAPS.TT1.TT2-
000504

1  not immediately accessible because they must be subpoenaed, thus precluding the possibility of

2  utilizing them during surveillance.

3  235.    Pen registers and trap and trace devices also do not identify the individual placing the call

4  to the subject of the investigation (unless it is a conversation intercepted on a court-authorized

5  wiretap).  They do not provide information regarding other members of the organization, the

6  locations where gambling and extortion proceeds are distributed or laundered, the scope of the

7  organization, or the roles of the various participants in the organization   The fact that Lennie Le

8  and his associates are known to communicate on the telephone does not provide evidence of the

9  crimes that they are suspected of committing.  Agents can merely speculate as to the content and

10  purpose of such telephone calls.  Without authorization to intercept the wire and electronic

11  communications of the **Target Telephone**, evidence regarding the full scope and activities of Le's

12  activities cannot be obtained.

13  236.    Based on my training and experience, as well as that of other law enforcement agents with

14  whom I have consulted, I do not believe that the continued analysis of pen register, trap and trace,

15  and toll record data, either alone or in conjunction with other traditional investigative techniques,

16  will achieve all of the goals of this investigation.

17      **E.  TRASH SEARCHES**

18  237.    Trash searches have been conducted during this investigation.  In performing physical

19  surveillance at Le's apartment complex located at 2600 Corde Terra Circle, Apartment 6307,

20  Building G, San Jose, it was determined that it would not be feasible, prudent, or fruitful to

21  conduct a discreet trash search.  CSs have reported that several members of the VN gang live in

22  different apartments within the Corde Terra Apartments.  In addition, VN gang members are

23  either dating or married to the Corde Terra apartment staff.  Moreover, the Corde Terra apartment

24  manager reportedly is the mother-in-law of a member of the VN gang.  The Corde Terra

25  apartments have several shared trash receptacles.  It is highly impractical to isolate trash

26  associated with Le that he likely places in a common dumpster.

27  238.    Agents considered conducting trash searches at the residences of Tu Xuan Nguyen and

28  Que Hong Nguyen, but decided against doing so upon learning that both individuals reside in

TITLE.III.WIRETAPS.TT1.TT2-
000505

1   apartment complexes with shared trash receptacles and several community dumpsters. It is highly

2   impractical to isolate trash associated with Tu Xuan Nguyen and Que Hong Nguyen when they

3   likely place their garbage in a common dumpster.

4   239.    On March 14, 2012, investigators conducted a trash search at the residence of Dung Minh

5   Dinh at 2266 174th Avenue, Castro Valley, California, however, only a letter from AT&T

6   addressed to Dinh was located.

7   240.    The simple act of collecting trash can alert criminals to law enforcement investigation.

8   For example, law-abiding citizens often innocently notify their neighbors if someone other than

9   the regular trash collector has gathered their trash. Further, trash searches expose those agents

10  who acquire the trash to safety issues, given that the trash is obtained in a covert manner that

11  could lead to possible confrontation with the targets, their associates, or the public. Obtaining the

12  assistance of city or city-contracted employees who collect the trash could compromise the

13  investigation because I do not know whether or not trash collection personnel know the targets or

14  other residents in the area or if they could be trusted not to compromise the investigation since

15  they are not law enforcement officers. Criminals often go to great lengths to destroy possible

16  incriminating evidence and frequently will not use their residential trash containers to dispose of

17  valuable information, or will shred it instead. Based on my training and experience, and what

18  other agents have told me, I know that criminals will even carry trash away from their residences

19  and place it in commercial dumpsters to avoid having it examined by law enforcement. Criminals

20  are frequently familiar with the law enforcement strategy of searching trash for the purpose of

21  gaining intelligence and are therefore alert to changes in the collection routine. While it is possible

22  that records of criminal activity could be recovered from a trash search, it is unlikely. Even if

23  such documents were recovered, they are generally difficult, if not impossible, to decipher without

24  additional information from another source regarding the parties and transactions involved.

25  241.    I believe that the use of trash searches alone or in conjunction with other traditional

26  investigative techniques would yield only limited results at most and would not reveal the full

27  scope of the organization and its criminal activities nor significantly advance the investigation

28  toward its stated goals.

TITLE.III.WIRETAPS.TT1.TT2-
000506

### F. MAIL COVERS

242.   Although relevant evidence regarding banking relationships, telephone numbers, and the names of other individuals receiving mail at an address is likely to be obtained, this investigative tool in and of itself cannot achieve all of the goals of this investigation.  From my training, experience, and knowledge of this investigation, I know that the members of the target organization in this case will not use the mail to communicate any significant information to their co-conspirators.  I believe this because the Luu CE is extremely sophisticated in nature and has well-established rules from Bao Luu on communication and all matters pertaining to business. More specifically, per CS information, Luu has repeatedly advised members of the VN gang to conduct all business via in-person meetings, and to avoid any communication with him or others via the telephone.  By its very nature, use of the mail has a built-in period of delay in reaching its destination.  Communicating by traditional mail is simply too slow in an era where there are instantaneous and more secure means of communication available.

243.   Additionally, a mail cover only provides the return address of the sender, assuming said address is accurate or even placed on the envelope, and does not provide any information regarding the contents of the item that is being mailed.  Contemporary electronic technology such as e-mail and text messaging has made people significantly less reliant on the use of regular mail than they were in the past.  This investigation has determined that Lennie Le makes extensive use of text messages, and this Affidavit seeks to intercept both the wire communications and the text messages that are being sent to and from Lennie Le's cellular phone.  Based on my training and experience, as well as that of other law enforcement agents with whom I have consulted, I do not believe that the use of mail covers, either alone or in conjunction with other traditional investigative techniques, will achieve all of the goals of this investigation.

### G. INTERVIEWS

244.   Based upon my training and experience, I believe that interviews of the Interceptees and their known associates would produce insufficient information as to the identities and roles of all of the persons involved with them in committing the Target Offenses.  I also believe that any responses to the interviews would contain a significant number of untruths, thereby diverting the

95

1  investigation with false leads or otherwise frustrating the investigation.  Additionally, questioning

2  any of the Interceptees and their known associates at this time would almost certainly alert other

3  co-conspirators and accomplices, and cause either the flight of the Interceptees and their co-

4  conspirators (possibly resulting in retaliatory action of violence against CS 3 and CS 4), the

5  destruction of evidence, and/or a change in their methods of operation before all of the co-

6  conspirators and accomplices are identified, thereby compromising the investigation.

7  245.    For example, I considered interviewing Dung Dinh, but have decided not to because of his

8  frequent telephonic contact with Lennie Le and his ongoing association with several members

9  of the VN gang.

10  246.    Based on my training and experience, as well as that of other law enforcement agents with

11  whom I have consulted, I do not believe that interviews of the Interceptees and their known

12  associates, either alone or in conjunction with other traditional investigative techniques, will

13  achieve all of the goals of this investigation.

14  ### H.  GRAND JURY SUBPOENAS AND GRANTS OF IMMUNITY

15  247.    Federal grand jury and administrative subpoenas have been used during this investigation.

16  The results of these subpoenas have only provided limited information and do not show who is

17  involved with the targets of this investigation or how they conduct their business.  As stated

18  previously, the subscriber names listed with the telephone companies for telephones are not

19  always the persons who are actually using the telephones.

20  248.    Furthermore, based on my training and experience, I believe that issuing grand jury

21  subpoenas to persons believed to be involved in extortion and illegal gambling and compelling

22  them to testify before a federal grand jury would be unsuccessful in achieving the goals of this

23  investigation.  In the event that the targets of this investigation, their co-conspirators, and other

24  participants were called to testify before a grand jury, they would likely be uncooperative and

25  invoke their Fifth Amendment right not to testify.  Even if called to testify and immunized, it is

26  likely that they would choose to suffer contempt sanctions (including incarceration for up to 18

27  months, the maximum term of service for a grand jury) rather than testify, as this would enhance

28  their standing in the organization.  It has been my experience that Asian criminals are frequently

TITLE.III.WIRETAPS.TT1.TT2-
000508

1 reluctant to testify because they fear retaliation from the people against whom they may be

2 testifying.  Granting such persons immunity from prosecution would likely prevent the

3 prosecution of the most culpable members of this organization and could not ensure that such

4 immunized witnesses would provide truthful testimony before the grand jury.

### I.  ARRESTS AND/OR BUY-BUSTS

249.   The following VN gang members were arrested between 2006 and 2008:

    a.   Lennie Luan Le:  Arrested on September 27, 2006 by DEA for possession with intent to distribute marijuana.  An attempt was made to interview Le following his arrest, however, he declined to speak with law enforcement authorities and stated that he intended to invoke his right to remain silent.

    b.   Lan Ngoc Nhat Nguyen:  Arrested on April 25, 2007 by the FBI for conspiracy to distribute MDMA and distribution of MDMA.  Nguyen pleaded guilty and agreed to cooperate with the FBI in its investigation of the VN gang, however, he fled to Vietnam prior to sentencing and has not been located or apprehended since then.  A no-bail arrest warrant is currently outstanding for Nguyen.  Significantly, the United States does not have an extradition treaty with Vietnam.

    c.   Hoa Xuan Bui:  Arrested on December 11, 2008 by the FBI for conspiracy to distribute MDMA and distribution of MDMA.  Following Bui's arrest, he was offered the opportunity to cooperate with law enforcement authorities. Bui accepted the offer and was released on the condition that he coordinate a controlled drug purchase with Van The Hoang.  Bui failed to follow through with his promise to cooperate and terminated all telephonic contact with his handling agent.  On December 12, 2008, the FBI re-arrested Bui and returned him to court.

250.   Throughout 2010 to 2012, San Jose Police Department encountered the following issues with members of the VN gang.  It should be noted that although some of these individuals agreed to cooperate with San Jose P.D. regarding the limited subject of their immediate arrest, none of them agreed to cooperate or assist law enforcement authorities in their efforts to combat the activities of the VN gang:

97

a.  February 18, 2010 - Anthony James Aguas was cited for possession of marijuana.

b.  February 26, 2010 - Lennie Le was a suspect in a forgery incident at Garden City Casino located at 360 Saratoga Avenue in which he used a counterfeit $50 bill while gambling.

c.  April 6, 2010 - Khanh Nguyen was a suspect in a vehicle tampering incident at 3339 Michelangelo Drive.

d.  September 3, 2010 - Ho Lee approached the owner of Hot Spot Espresso located at 1682 Berryessa Road regarding paying extortion to the VN gang.

e.  September 26, 2010 - Khanh Nguyen and Ho Lee were involved in a shooting at a 7-Eleven store located at 998 Lundy Avenue. Neither subject cooperated with the police officers who responded.

f.  November 7, 2010 - Khanh Nguyen and Ho Lee were involved in a shooting at the Xa Lang Restaurant located at 1632 Story Road. Nguyen provided a statement to the police, but Lee declined to do so.

g.  November 26, 2010 - Bao Luu was involved in a domestic disturbance at 1201 Parkmoor Avenue, Apartment 1317. Luu fled the scene prior to arrival of the police, and the female denied the assault.

h.  February 28, 2011 - Khanh Nguyen was arrested on a narcotics warrant.

i.  July 9, 2011 - Khanh Nguyen and Christian Michael Sung were involved in a fight at the intersection of South 1st Street and Post Street.

j.  July 12, 2011 - Khai Lam was cited at the intersection of Senter Road and Sylvandale Road for possession of burglary tools.

k.  December 10, 2011 - Ho Lee was arrested for creating a disturbance, resisting arrest, and a probation violation at 1375 Lick Avenue. Lee was not cooperative with the police.

l.  January 3, 2012 - Various gang members were at the Nha Em Restaurant & Bar located at 4126 Monterey Road. The reporting party stated that he wanted the gang members to leave his establishment, but was afraid to ask them. The reporting

98

1     party stated that the gang members created a disturbance after previously leaving,

2     and made several threats.

3   m.   January 22, 2012 - The reporting party was gambling with a group of Vietnamese

4     males at the Grand Century Plaza located at 1101 Story Road.  A Vietnamese male

5     with the numbers "454" tattooed on his hand produced a gun and demanded 50

6     percent of his winnings.  San Jose P.D. determined that the assailant was likely Ho

7     Le based on the description.

8   n.   January 24, 2012 - The reporting party from the January 22, 2012 incident saw a

9     group of VN gang members at the Grand Century Plaza located at 1101 Story

10    Road.  Also observed was an individual whom he identified as the leader of the

11    group, the same man who had demanded 50 percent of his gambling winnings two

12    days earlier.

13  251.   Following the three above-described incidents that occurred during January 2012, the VN

14  gang members involved in those incidents either fled from the area of the disturbance or the police

15  were unable to locate them.

16  252.   Significantly, the nature of Bao Luu's CE is highly closed, and I believe that this has a

17  distinct impact on the willingness of individuals with direct knowledge of the VN gang to

18  cooperate with law enforcement authorities.

19  253.   In addition, arresting any of the known VN gang members and attempting to obtain their

20  cooperation in investigating the criminal activities of the Luu CE and Le is an investigative

21  technique that, in my judgment, is too risky at the present time.  Were an unsuccessful attempt

22  made to arrest Le and obtain his cooperation in this investigation, other subjects of the

23  investigation would almost certainly be alerted to the existence of the investigation and take

24  defensive measures that would seriously jeopardize the investigation.  Accordingly, the risk of

25  failure in arresting and attempting to obtain these targets' cooperation at this stage of the

26  investigation greatly outweighs any possible benefits and makes this investigative technique too

27  dangerous to utilize.

28  //

TITLE.III.WIRETAPS.TT1.TT2-
000511

## J. **SEARCHES**

254.   The execution of search warrants in this matter has been considered.  However, investigating agents have not been yet able to identify and/or locate all members of the Luu CE nor ascertain the locations used to store illegal gambling machines, records of their use, and the proceeds of their use.  In the event that agents identify specific locations and/or residences used by suspects, I believe that enforcement action, such as the execution of search warrants, at these locations would not enable investigators at this time to achieve the goals of this investigation, which include identifying all members of Luu's CE and the full scope of criminal activity engaged in by Luu, Le, and their co-conspirators.  Thus, I believe that the execution of search warrants at this time would be premature and would likely compromise the investigation and allow other unidentified members of the conspiracy to distance themselves further from successful detection, rather than yield evidence that will help satisfy the goals of this investigation.  In addition, the distinct nature of an extortion scheme makes it inherently difficult to identify its proceeds, which consist of non-contraband United States currency and which may be taken to premises where legitimate activity is occurring and co-mingled there with legitimate business receipts.

## K. **FINANCIAL INVESTIGATION**

255.   During this investigation, attempts have been made to ascertain the financial activities of the Bao Luu criminal enterprise.  Although obtaining tax returns, bank records, credit reports, and real estate records would be helpful in attempting to identify the location of extortion and illegal gambling proceeds, these records, standing alone, will not necessarily prove the source of the proceeds, nor provide the information necessary to fully understand and identify the scope of the organization.  The identification of assets does not allow investigators to understand how they were obtained, the size of a customer base, the types of collection methods used to accumulate the assets, the methods used to transport the proceeds from illegal gambling and extortion, nor the identities of the individuals involved in the collection and transportation of the illegal proceeds.

256.   Through my training and experience and through discussions with other agents, I know that criminals frequently utilize third parties to conceal the proceeds obtained from their activities.

TITLE.III.WIRETAPS.TT1.TT2-
000512

1   By doing so, they can effectively conceal the connection between the proceeds from their

2   activities and the criminals themselves.  These third parties frequently are not involved in the

3   actual criminal activity and in some cases may have no actual knowledge of the illegal means by

4   which the proceeds in question were obtained.  A financial investigation, standing alone, will not

5   reveal the manner in which illegal proceeds from the extortion and illegal gambling scheme

6   involved in this investigation are transferred to third parties for laundering and the methods used

7   to return those assets to the members of the target organization.

8   257.   Furthermore, from my training and experience and the experience of other investigators

9   familiar with this investigation, I know that criminals frequently send money to offshore banks

10  outside the jurisdiction of the United States and utilize bulk-cash smuggling as common

11  techniques to avoid detection by law enforcement.

12  258.   Based on my training and experience, as well as that of other law enforcement agents with

13  whom I have consulted, I do not believe that a continued financial investigation, either alone or in

14  conjunction with other traditional investigative techniques, will achieve all of the goals of this

15  investigation.

16      **L.  POLE CAMERAS/CLOSED-CIRCUIT TELEVISION  MONITORING**

17  259.   In performing physical surveillance at Le's Corde Terra Apartment complex in San Jose, it

18  was determined that the installation of a pole camera was neither feasible nor practical.  On

19  November 28, 2011, an FBI technically-trained agent performed a site survey at Le's residence

20  and ascertained that no discreet location existed near the apartment or within the immediate

21  vicinity to place a pole camera.  CS reporting revealed that several members of the VN gang live

22  in different apartments within the Corde Terra Apartments.  In addition, VN gang members are

23  either dating or married to the Corde Terra apartment staff.  Moreover, the Corde Terra apartment

24  manager reportedly is the mother-in-law of a member of the VN gang.  As such, this investigative

25  technique will not be employed at that location because it is likely to fail, reasonably appears to be

26  unlikely to succeed if tried, and is too dangerous.  Investigators have utilized pole cameras

27  extensively throughout the course of this investigation.  To date, the following locations,

28  frequented by members of the Luu CE, have been subjected to monitoring by pole camera:

TITLE.III.WIRETAPS.TT1.TT2-
000513

1     a.    2133 Saffarian Court, San Jose - This residence is suspected of being used in

2          furtherance of narcotics distribution activity on behalf of the VN gang.

3     b.    Motors Group International - 647 Tully Road #3, San Jose - This business is

4          operated by Bao Luu and is where several of the VN gang members frequently

5          meet.

6     c.    Sao Café - 1054 Story Road, San Jose - This business has been frequented by

7          several members of the VN gang, including Bao Tu Luu, Lennie Le, Dung Dinh,

8          and Tu Nguyen.

9     d.    529 North 6th Street, San Jose - This is the location of 454 Entertainment, Inc. the

10          Asian rap music production company owned by Bao Luu and where VN gang

11          members frequently meet.

12     e.    169 Jackson Street, San Jose - This location was believed to be used as a narcotics

13          stash house by members of the Luu CE.

14 260.    Agents have continued to use video surveillance through closed-circuit television

15 monitoring in this investigation.  The pole cameras only capture the images of individuals entering

16 and exiting the premises under scrutiny.  The pole cameras have been helpful in conducting

17 surveillance of people and vehicles leaving the premises.  For example, the positioning of the

18 Motors Group International business on Tully Road and the closed and confined nature of its

19 parking lot make it difficult to conduct surveillance of people or vehicles leaving this location

20 without the assistance of a pole camera.  The camera has the ability to zoom in and out and can

21 capture license plates and subjects' faces; however, someone must monitor the camera at the exact

22 time of an arrival or departure from the premises in order to capture this information.  Constant

23 round-the-clock monitoring of a pole camera is impractical, and watching the playback of the

24 camera's recordings can also be onerous unless the exact date and time of significant activity is

25 known or suspected.  The value of this type of monitoring is limited.  It does not gather evidence

26 of the contents of conversations between the individuals who are observed.  Further, I know that

27 persons engaged in criminal activity tend to be highly aware of, and sensitive to, surveillance

28 techniques such as pole cameras.  If a pole camera were detected, these persons could easily

TITLE.III.WIRETAPS.TT1.TT2-
000514

1  thwart its purpose by trying to disable it or simply meeting elsewhere. For these reasons, I believe

2  that the use of a pole camera, in conjunction with conventional investigative methods, unaided by

3  wire interception, cannot achieve all of the goals of this investigation.

4  **M.  GPS VEHICLE TRACKERS**

5  261.    Through physical surveillance and CS reporting, it has been confirmed that Lennie Le

6  drives several different vehicles each week. To date, he has been observed driving at least six

7  different vehicles. If investigating agents placed a GPS tracker on one of these vehicles, they

8  would have no assurance that Le would consistently be the driver. As such, this investigative

9  technique reasonably appears to be unlikely to succeed if tried.

10  262.    During the course of this investigation, GPS trackers have been employed targeting the

11  following individuals: Bao Tu Luu, John Than Vo, Anthony James Aguas, and Lennie Luan Le.

12  Overall, these GPS trackers assisted the investigation in obtaining points of initiation for

13  surveillance, meeting locations for members of the Luu CE, pattern analysis, and corroboration of

14  CS information. While the trackers were beneficial in these areas, agents were unable to learn the

15  content of the meetings and whether the conversations were criminal in nature. The use of GPS

16  trackers was discontinued in pursuit of other, potentially more fruitful, investigative techniques.

17  263.    In addition, the Luu CE has unfettered access to an automotive garage, the Motors Group

18  International warehouse in San Jose. In the event that members of the organization were to

19  become concerned about law enforcement surveillance efforts, they could easily utilize the tools

20  and equipment from the warehouse to identify the presence of a GPS tracker or other law

21  enforcement monitoring equipment. Indeed, as stated above in this Affidavit, on November 7,

22  2011, CS 3 and CS 4 stated that they had been told by an associate of Tri Pham that a tracking

23  device had been discovered on the Infiniti G35 coupe that was being driven by John Vo and

24  Hoang Xuan Le. CS 3 and CS 4 were also told that Bao Luu heard of this incident and was

25  fearful of returning to the United States from Vietnam. The Infiniti G35 coupe was no longer

26  driven following its discovery by the VN gang. In addition, John Vo ceased spending time at

27  locations that he had frequented in the past and stopped using his cellular telephone. Based on my

28  training and experience, I believe that the GPS tracker installed on Vo's vehicle was discovered,

TITLE.III.WIRETAPS.TT1.TT2-
000515

1  which ultimately caused him to temporarily discontinue his narcotics trafficking activity and to

2  cease driving the vehicle on which the tracker had been placed.

3  264.    Based on investigative efforts to date, including extensive hours of physical surveillance, it

4  was determined that utilizing GPS vehicle trackers is neither safe, prudent nor viable as an

5  investigative technique.

6  ### N.  INVESTIGATIVE CONCLUSIONS

7  265.    Based on all the circumstances and events described in this Affidavit, there is probable

8  cause to believe that the Interceptees and their co-conspirators have been, are now, and will

9  continue to be, using the **Target Telephone** to commit extortion and engage in illegal gambling

10  activities in the Northern District of California and elsewhere.

11  266.    As stated above, no confidential sources or agents, physical surveillance, pen registers,

12  trap and traces, toll record analysis, trash searches, mail covers, subject interviews, grand jury

13  investigations and grants of immunity, arrests and buy-busts, search warrants, financial

14  investigation, pole-cameras, GPS vehicle trackers, or combination of these techniques, can be

15  expected to disclose evidence of the entire operation of this organization and accomplish all of the

16  goals that have been set in this investigation.  The implementation of these investigative

17  techniques will not reveal the manner and extent that the **Target Telephone** is being used to

18  facilitate and to commit the **Target Offenses** enumerated above.

19  267.    Although the investigative techniques used so far in this investigation have succeeded in

20  establishing probable cause for authorization to intercept the wire and electronic communications

21  as requested herein, the use of these techniques without the interception of wire and electronic

22  communications over the **Target Telephone** will fall short of achieving all of the goals of this

23  investigation set forth above.

24  ### IV.  FINAL MATTERS

25  ### A.  LENGTH OF INTERCEPTION

26  268.    Because of the continuing nature of the offenses described in this Affidavit, and in order to

27  determine the full scope of the activities and the identities of all members of the organization

28  under investigation, I request that this Court direct that the interception of wire and electronic

TITLE.III.WIRETAPS.TT1.TT2-
000516

1  communications authorized by this Court's Order terminate upon attainment of all of the

2  authorized goals of this investigation or at the end of thirty (30) calendar days, whichever occurs

3  first, measured from the earlier of the day on which an investigative or law enforcement officer

4  first begins to conduct an interception or ten (10) days after the Order is signed by the Court.

5  **B.  MINIMIZATION EFFORTS AND PROCEDURES**

6  269.    All monitoring of wire and electronic communications shall be conducted in such a way as

7  to minimize the interception and disclosure of the communications intercepted to those

8  communications relevant to the pending investigation, in accordance with the minimization

9  requirements of Chapter 119 of Title 18, United States Code.

10  270.    This case is currently being investigated by Special Agents of the FBI, and agents and

11  officers from other law enforcement agencies.  Monitoring of wire and electronic interceptions

12  will be performed by FBI Special Agents, government personnel, and employees and/or

13  individuals operating under contract with the United States Government, all of whom will be

14  acting under the supervision of investigative or law enforcement officers authorized to conduct

15  the interceptions as defined by, and pursuant to, Title 18, United States Code, Section 2510(7).

16  Monitoring of conversations over the **Target Telephone** must immediately terminate when it is

17  determined that the conversation is unrelated to communications that are subject to interception

18  under Chapter 119 of Title 18, United States Code.  Monitoring must terminate if a monitor

19  determines that the conversation is not criminal in nature, is privileged, or is not subject to

20  interception pursuant to the Order.  If monitoring is discontinued, monitoring agents may later

21  spot-check the conversation in order to determine whether the conversation has become criminal

22  in nature or is otherwise now subject to interception pursuant to the Order.

23  271.    With regard to the electronic communications sought for the **Target Telephone**, because

24  the transmission of electronic messages occurs instantaneously, and as the messages sent are

25  typically short, it is impossible to attempt to minimize them in the manner typically used with

26  telephone conversations, i.e., monitoring the beginning of a given conversation for relevance, then

27  ceasing to monitor it if the conversation in question is not relevant.  As such, minimization of

28  electronic communications will be affected as follows:

TITLE.III.WIRETAPS.TT1.TT2-
000517

1    All monitoring of electronic communications will be conducted in accordance  with

2    Chapter 119 of Title 18, United States Code.  Each text message will be reviewed over a secure

3    system, and based on the identities of the sender and recipient and the content of the message,

4    monitoring personnel will determine as soon as practicable after interception whether the text

5    message appears to be relevant to the investigation or otherwise criminal in nature.  If the message

6    is not criminal in nature, the message will be marked "minimized" and not accessed by other

7    members of the investigative team.  If the message appears to be privileged, it will be marked

8    "privileged" and secured from access by other members of the investigative team.  If a text

9    message appears to be relevant to the investigation or otherwise criminal in nature, it will be

10   marked "non-minimized" and may be shared with the other agents and monitors involved in the

11   investigation.  If a text message is marked "minimized" or "privileged," it will not be

12   disseminated to members of the investigative team.  All intercepted text messages will be sealed

13   with the court upon the expiration of the court's order authorizing the interception.  It is

14   anticipated that the monitoring location will not be staffed at all times, but will be staffed at

15   regular hours, at which time intercepted communications will be monitored and read (including

16   those intercepted at hours when the location was not staffed).  However, even when unmanned,

17   the monitoring location will be kept secured with access limited to only authorized monitoring

18   personnel and their supervising agents.

19   272.    Interception must be suspended immediately when it is determined through voice

20   identification, physical surveillance, or otherwise, that none of the named Interceptees or any of

21   their confederates, when identified, are participants in the conversation, unless it is determined

22   during a portion of the conversation already overheard that the conversation is criminal in nature.

23   A memorandum outlining the guidelines for minimization and application of privileges, as well as

24   a copy of the Application and Order, will be provided to all monitors.

25   273.    Delayed minimization shall be utilized as authorized by the provisions of Title 18, United

26   States Code, Section 2518(5), in interceptions in a foreign language.  In the event the intercepted

27   communication is in a code or foreign language, and an expert in that code or foreign language is

28

106

1    not reasonably available during the period of interception, minimization may be accomplished as

2    soon as practicable after such interception.

3    274.    Pursuant to Title 18, United States Code, Section 2518(5), and its provision for specialized

4    minimization procedures when intercepting foreign language or coded conversations, the

5    following minimization procedures shall be established:

6        a.      Should foreign language translators not be reasonably available to minimize

7                conversations on the spot, all such conversations will be intercepted and recorded

8                in their entirety.

9        b.      In the event the translator is not a federal agent, the translator, whether he/she be a

10                foreign language-trained support employee or under contract to the government,

11                will be under the supervision of a federal agent.

12        c.      Conversations monitored by the translator under the supervision of a federal agent

13                will be minimized by the translator, and an English translation of the pertinent

14                criminal conversations will be furnished to the supervising federal agent.

15    **C. EXPENSES**

16    275.    Pursuant to Title 18, United States Code, Section 2518(4), any reasonable expenses related

17    to technical assistance rendered to the government incurred in the execution of the Court's Order

18    by a wire or electronic communications service provider or other persons, will be processed by the

19    Investigative Agency for payment by the United States Government, unless the Court should

20    direct otherwise.

21    **D. CONCLUSION**

22    276.    Based on the facts and circumstances contained in this Affidavit and my experience as a

23    Special Agent, I believe that probable cause exists to believe that the **Target Telephone** has been

24    used, is being used, and will continue to be used to commit offenses that are enumerated in Title

25    18, United States Code, Section 2516, and that particular wire and electronic communications

26    concerning those offenses will be obtained over the **Target Telephone** through the Order applied

27    for herein.  Therefore, I respectfully request that the Court authorize the interception of wire and

28    electronic communications as requested in the Application and this Affidavit.  I believe that such

TITLE.III.WIRETAPS.TT1.TT2-
000519

1 | interceptions and monitoring are necessary to produce evidence sufficient to accomplish all of the

2 | goals of this investigation.

3 | 277.   It is further requested that this Affidavit, the attached Application, the resulting Orders,

4 | and all periodic reports submitted pursuant to those Orders be sealed until further order of this

5 | Court because this investigation is ongoing and disclosure of said documents is likely to

6 | compromise its success.

7 |         I declare under penalty of perjury that the above is true and correct to the best of my

8 | knowledge and belief.

10

11 | TERRY J. ALBURY
     Special Agent
12 | Federal Bureau of Investigation

13

14 | SUBSCRIBED AND SWORN TO before me
     this ___1ST___ day of ___MAY___
15 | at _4:34_ a.m./p.m.

16

17

18 | EDWARD J. DAVILA
     UNITED STATES DISTRICT JUDGE
19 | NORTHERN DISTRICT OF CALIFORNIA

20

21

22

23

24

25

26

27

28